# In the United States Court of Federal Claims

No. 16-1647

(Filed: 20 December 2022)[*]

```
*************************************
MYNETTE TECHNOLOGIES, INC.          *
AND STEVEN M. COLBY,                *
                                    *
              Plaintiffs,           *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *    Motion for Terminating Sanctions;
              Defendant,            *    Prosecution Bar; Covenant Not To Sue;
                                    *    Protective Order Violation; Duty of Candor;
GEMALTO, INC.,                      *    Attorneys' Eyes Only; Competitive
                                    *    Decisionmaker; Risk of Inadvertent
              Intervenor Defendant, *    Disclosure; Discovery.
                                    *
and                                 *
                                    *
IDEMIA IDENTITY & SECURITY          *
USA, LLC,                           *
                                    *
              Intervenor Defendant. *
                                    *
*************************************
```

*Robert J. Yorio*, Carr & Ferrell LLP, Menlo Park, CA, with whom was *Eric J. Maurer*, Boies Schiller Flexner LLP, Washington, DC, for plaintiffs.

*Michel E. Souaya*, with whom were *Gary L. Hausken*, Director, Commercial Litigation Branch, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, all of Washington, DC, for defendant.

*Edward D. Johnson*, Mayer Brown LLP, Palo Alto, CA, for third-party defendant Gemalto, Inc.

---

[*] This Opinion was originally filed under seal on 5 December 2022 pursuant to the protective order in this case. The Court provided the parties an opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 12 December 2022. After requesting an extension of time until 19 December 2022 to file redactions, which the Court granted via non-pdf order, plaintiffs proposed redactions on 19 December 2022, which defendants did not oppose. The Court accepts plaintiffs' proposed redactions and reissues the Opinion, with redacted language replaced as follows: "[XXXXX]."

*Richard L. Brophy*, Armstrong Teasdale LLP, St. Louis, MO, for third-party defendant Idemia Identity & Security USA, LLC.

## OPINION AND ORDER

**HOLTE**, Judge.

Plaintiff Dr. Steven Colby is an experienced scientist and listed inventor on approximately thirty patents dating back to the early 1990s, including the four in this suit. Plaintiff Mynette Technologies, Inc. is a nonpracticing entity, formed in 2016 for the purpose of pursuing patent infringement claims against the government, and is the assignee of the patents at issue. Robert Yorio is the attorney of record for both plaintiffs. In addition to being attorney of record, Yorio is also [XXXXXX] shareholder of Mynette Technologies, Inc., a member of the board of directors, and formerly the chief financial officer and vice president. Defendants learned of Yorio's relationship with Mynette Technologies, Inc. during discovery, nearly five years after plaintiffs initiated this litigation. Defendants contend plaintiffs breached the Court's protective order and violated their duty of candor by failing to disclose this information sooner. According to defendants, plaintiffs' actions are part "of an ongoing conspiracy to get access to confidential government technology. It wasn't a mistake; it was a business model." Oral Arg. Tr. ("Tr.") at 12:9–12, ECF No. 151. As a result, defendants filed a motion for terminating sanctions, requesting the Court dismiss plaintiffs' claims with prejudice. For the reasons discussed below, the Court grants-in-part and denies-in-part defendants' motion for terminating sanctions.

## I.    Factual History

### A.    Dr. Steven Colby

Dr. Steven Colby received a Ph.D. in analytical chemistry with a minor in chemical physics from Indiana University in 1992. Colby Decl. ¶ 3, ECF No. 141-1. Colby is an avid inventor across a diverse array of technologies. 8 July 2021 Colby Depo. Tr. ("1st Colby Depo.") at 45:4–7, ECF No. 138-1 (Colby describing a wide range of technologies). Since the early 1990s, Colby was listed as the inventor on about thirty patents covering technology related to: "matrix-assisted desorption/ionization[;] . . . LED lighting; three-way lighting; location-based services; . . . [radio-frequency identification "]RFID["]; electronic paper; chemical instrumentation; [and] phone systems." *Id.* at 44:14–24. Colby "pretty much do[es] everything but [p]harma[ceuticals.]" *Id.* at 45:8–11.

Beginning in 2000, Colby was "a technical writer and a patent agent at the law firm of Carr & Ferrell, LLP." Colby Decl. ¶ 4. Robert Yorio, plaintiffs' counsel of record, was, and still is, a partner at Carr & Ferrell. *Id.* Colby attended law school from 2001 to 2004, joined the California bar, and continued working for Carr & Ferrell as a patent attorney until 2007. *Id.* ¶¶ 5–6. Colby then left Carr & Ferrell, and through present, he has been a partner at three other law firms where he practiced patent law. *Id.* ¶¶ 7–9. After leaving Carr & Ferrell, Colby was co-counsel with Yorio on one litigation matter in 2008, representing a third-party plaintiff in the

assertion of its patent rights.  *Id.* ¶ 2.  Additionally, Colby was involved in several technological ventures, none involving Yorio.  *Id.* ¶ 10.

Although his day job became the practice of law, Colby continued his scientific innovations.  Between 2005 and 2012, Colby filed dozens of provisional and utility patent applications.[1]  Through Colby's innovations and tireless patent prosecution efforts, the U.S. Patent and Trademark Office issued Colby the four patents now asserted in this suit.  *See* Third Am. Compl. ¶ 5, ECF No. 97-1; *see also supra* note 1.  Colby's attention extended beyond patent prosecution; during 2005, Colby produced marketing materials covering his RFID technology. 1st Colby Depo. at 96:2–16.  Colby sent those marketing materials to members of the press and to a member of the California state senate.  *Id.* at 97:21–99:22.  At the time, there was an ongoing public debate about RFIDs and pending California state RFID legislation; Colby attempted to influence both in favor of RFID technology.  *Id.* at 99:4–104:9.

### B.   Mynette Technologies, Inc.

On 7 July 2016, Colby incorporated Mynette Technologies, Inc. ("Mynette") in the state of Delaware.  Mynette Certificate of Inc. at 1, ECF No. 125-2 (Defs.' Ex. A).  [XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]

On 31 August 2016, plaintiff Mynette entered into a fee agreement with Yorio's law firm, Carr & Ferrell LLP, and plaintiff Colby in his capacity as a patent attorney.  [XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXX]

---

[1] *See* U.S. Patent Nos.:  7,924,156 (filed 19 July 2006); 7,719,425 (filed 7 February 2006); 9,524,458 (filed 17 March 2015); 9,569,777 (filed 17 March 2015).  Specifically, see the "Related U.S. Application Data" on the face of each of these four patents for the extensive—but not exhaustive—list of applications filed by Colby during this time period.

At Mynette's inception, Colby and Yorio shared executive responsibilities.  Per Mynette's organizational resolutions, Colby served as Mynette's chief executive officer, president, and secretary.  Org. Resolutions at 2, ECF No. 141-5 (Pls.' Ex. 3).  Yorio served as Mynette's vice president and chief financial officer.  *Id.*  Further, Mynette's board of directors comprised two individuals:  Colby and Yorio.  *Id.* at 1, 7.  While the board remains unchanged, Colby and Yorio testify they agreed Yorio would resign from his posts as CFO and vice president around "August or September of 2016."  Colby Decl. ¶ 22; Tr. at 45:4–9 (plaintiffs' counsel answering when Yorio resigned).  Colby and Yorio further testify Colby took over all corporate and financial duties of Mynette from this point on; "Colby is the sole officer of Mynette."  Yorio Decl. ¶ 6, ECF No. 141-2; Colby Decl. ¶ 22.  The testimonies of Colby and Yorio are the only documentation of Yorio's resignation as an officer of Mynette.  Tr. at 45:10–16.

Besides the present litigation, Mynette is an inactive nonpracticing entity.  "Mynette does not make any products" and has no plans to do so in the future.  Colby Decl. ¶ 18.  Mynette does not acquire third-party patents and has no plans to do so in the future.  *Id.* ¶ 19.  The present action is Mynette and Colby's "first and only patent infringement lawsuit as a party."  *Id.* ¶ 20.  Thus far, Mynette and Colby have only acquired one license for their patent portfolio, and it arose via settlement with a third-party intervenor in this lawsuit.  Tr. at 119:21–120:8 (plaintiffs' counsel explaining plaintiffs' patent monetization history).  Plaintiffs are "not sending out licensing letters" or "enforcement letters."  *Id.*  According to Colby and Yorio, they determined the government was infringing Colby's patents, so they formed Mynette to pursue this litigation and serve as a contingency fee vehicle "for tax reasons."  Tr. at 38:21–39:3; Pls.' Suppl. Br. at 4–5, ECF No. 141.

## C.   Yorio-Mynette Relationship Disclosure Opportunities

### 1.   Protective Order Negotiations

On 14 December 2016, plaintiffs Mynette and Dr. Steven Colby filed a complaint alleging the government infringed their patents without a license.  *See* Compl. at 2, ECF No. 1.  Yorio is the attorney of record for both plaintiffs, Mynette and Colby.  Defs.' Mot. for Sanctions at 4, ECF No. 125.  In October 2018, the parties began negotiating a protective order to govern the disclosure of confidential and highly confidential information in this case.  *Id.* at 6.  The parties agreed to use the Court's standard form protective order with minor, non-substantive changes.  *Id.*; *see* Tr. at 101:8–102:7 (counsel for the government stating the protective order "is not identical to the standard form" and agreeing "the changes are minor and not substantive").

The protective order comprises two levels of confidentiality:  "Restricted" and "Restricted—Attorneys' Eyes Only" ("AEO").  Protective Order ("PO") ¶¶ 4–5, ECF No. 74.  "Restricted" documents can be viewed by, among others, "inside counsel of the parties" and "a party's officers and employees directly involved in this litigation whose access to the information is reasonably required to supervise, manage, or participate in this litigation."  *Id.* ¶ 4.  By contrast, those individuals are excluded from viewing AEO documents.  *Id.* ¶ 5.  The parties jointly moved the Court to enter the protective order, ECF No. 73 ("J. Mot. PO"), and on 9

November 2018, the Court granted the motion, PO.  Plaintiffs did not inform defendants of Yorio's status as Mynette board member, [XXXX] shareholder, and former officer.  Defs.' Mot. for Sanctions at 6–7.

### 2.      Initial Disclosures

After claim construction, a discovery schedule was entered on 4 December 2018, ECF No. 78.  On 17 December 2018, plaintiffs served defendants their Rule 26(a)(1) of the Rules of the Court of Federal Claims ("RCFC") initial disclosures.[2]  Defs.' Mot. for Sanctions at 7. Plaintiffs disclosed two individuals "likely to have discoverable information that [p]laintiffs may use to support the claims or defenses"—Steven Colby and Robert Hayden.  Pls.' Initial Disclosures at 2–3, ECF No. 125-8 (Defs.' Ex. G).  Plaintiffs omitted Yorio from this list.  *See id.*

### 3.      Interrogatory Responses

On 9 December 2019, third-party defendant Gemalto served plaintiffs with its first set of interrogatories.  *See* Gemalto 1st Interrog., ECF No. 125-9 (Defs.' Ex. H).  Gemalto's first interrogatory requested plaintiffs:

> Describe the ownership history of each of the Asserted Patents, including dates of acquisition or transfer of ownership, the identities of the persons or entities with any interest (including ownership and security interests) in the Asserted Patents at any time, and any consideration exchanged relating to the ownership of the Asserted Patents, and identify (by production number) all documents, persons, and other evidence supporting, contradicting, or otherwise relating to your response.

*Id.* at 8.  Plaintiffs responded to this interrogatory stating:  "Steven Colby received shares of stock in MYNETTE in exchange for the [asserted patents'] assignments . . . ."  Mynette Interrog. Resp. at 5, ECF No. 125-14 (Defs.' Ex. M).

On 16 July 2020, Gemalto requested Mynette supplement its interrogatory one response for "fail[ing] to identify the number or value of [Colby's Mynette] shares, or Colby's ownership stake in Mynette."  Gemalto Deficiency Letter at 2, ECF No. 125-12 (Defs.' Ex. K).  Plaintiffs supplemented their response on 3 August 2020, stating:  "[XXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXX]"  Defs.' Mot. for Sanctions at 8 (quoting Mynette's second interrogatory supplemental response dated 9 October 2020 to support this claim, Mynette 2nd Interrog. Suppl. Resp. at 6, ECF No. 125-15 (Defs.' Ex. N)).

---

[2] RCFC 26(a)(1) obligates adverse parties to disclose without discovery request:  (1) "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses"; (2) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support it claims or defenses"; and (3) "a computation of each category of damages claimed by the disclosing party."  RCFC 26(a)(1)(A).

On 22 September 2020, Gemalto asked Mynette to again supplement its response with "Mynette's capital structure or Steven Colby's contribution," and "identify the value of those shares and specify Dr. Colby's 'interest' in this case." Gemalto 2nd Deficiency Letter at 1, ECF No. 125-13 (Defs.' Ex. L). On 9 October 2020, Mynette supplemented its response a second time stating:

> [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]

Mynette 2nd Suppl. Interrog. Resp. at 6. Plaintiffs omitted Yorio from all of the above interrogatory responses. *See id.*

### 4.    Document Production

On 9 December 2019, Gemalto also served Mynette its first set of requests for production ("RFP"). *See* Gemalto 1st RFP, ECF No. 125-17 (Defs.' Ex. P). Gemalto's RFP 24 solicited: "Documents sufficient to show the organizational structure of Mynette, including the name and position or title of Mynette's current officers, directors, and managing agents, by position and/or title." *Id.* at 14. On 29 June 2020, "[p]laintiffs produced Mynette's Bylaws and Certificate of Incorporation[.]" Defs.' Suppl. Resp. at 5 n.1, ECF No. 144; Defs.' Mot. for Sanctions at 10 n.5. Neither document identifies the current officers or directors, and neither bears Yorio's name. *See* Mynette Certificate of Inc.; Mynette Bylaws, ECF No. 125-4 (Defs.' Ex. C).

### 5.    Litigation Counsel Privilege Log Exception

On 29 April 2021, Yorio emailed Gemalto's counsel requesting clarification as to whether "communications between clients and litigation counsel are not to be included in the [privilege] logs." Yorio Priv. Log Email at 1, ECF No. 125-19 (Defs.' Ex. R). The parties agreed to this privilege log exception. Defs.' Mot. for Sanctions at 10. Plaintiffs did not disclose Yorio's [XXXX] ownership of Mynette or his position on the board in reaching this agreement. *Id.*

### 6.    Dr. Colby Depositions

Defendants deposed Colby on 8 July 2021. Pls.' Suppl. Br. at 8. Colby testified Yorio is the [XXXX] owner of Mynette, an officer, and board member. 1st Colby Depo. at 33:4–11, 43:2–24. After discovering Yorio's status as Mynette [XXXX] shareholder, on 12 July 2021, Gemalto demanded Yorio sit for a deposition. Gemalto Demand Email at 1, ECF No. 130-4 (Pls.' Ex. 3). Gemalto also demanded further discovery specifically in response to its first interrogatory and the organizational structure of Mynette, among other things. *Id.* at 1–2. Plaintiffs responded agreeing to a Yorio deposition and several of Gemalto's other requests. Pls.' Suppl. Br. at 8.

On 16 July 2021, Colby sat for another deposition.  *Id.* at 9.  This time Colby testified he fulfills every officer role, while Yorio is only [XXXXXX] shareholder and a director.  16 July 2021 Colby Depo. Tr. ("2nd Colby Depo.") at 396:4–397:2, ECF No. 141-33.  Defendants never deposed Yorio.  Pls.' Suppl. Br. at 8; *see* Tr. at 48:4–16 (counsel for Gemalto stating, "We frankly think that any testimony we got from [Yorio] . . . would be no more credible than the declarations.").

### 7.    Updated Discovery Responses

Following Colby's 8 July 2021 deposition, on 12 July 2021, Gemalto requested Mynette supplement its interrogatory response once more to "identify[ Yorio's] interest in Mynette and any other interests by any third parties[.]"  Gemalto Demand Email at 1.  Gemalto also requested:  "Documents showing the organizational structure of Mynette that include [Yorio], Dr. Colby and any other party with any interest (RFP No. 2[4]) . . . ."  *Id.* at 2.  On 17 September 2021, Mynette supplemented its response one final time, stating:

> [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
> XXXXXXXXXX]

Mynette 3rd Suppl. Interrog. Resp. at 6, ECF No. 125-16 (Defs.' Ex. O).  This is the first interrogatory response in which plaintiffs disclosed Yorio's relationship with Mynette.  *Id.* at 6.  Plaintiffs also produced Mynette's organizational resolutions on the same day.  Defs.' Mot. for Sanctions at 10.  [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXX].  *See* Org. Resolutions.

## II.    Procedural History

On 14 December 2016, plaintiffs Mynette and Dr. Steven Colby filed a complaint alleging the government infringed their patents without a license.  *See* Compl. at 2.  On 4 March 2020, this case was reassigned to the undersigned judge while discovery was ongoing.  *See* Notice, ECF No. 106.  Discovery continued, and on 11 October 2021, plaintiffs filed a motion to preclude defendants from interfering with or withholding discovery based on allegations of protective order violations, ECF No. 122.  On 25 October 2021, defendants filed a motion for terminating sanctions, ECF No. 125.  The parties fully briefed the respective motions, and the Court held a telephonic status conference on 8 March 2022.  *See* 2 February 2022 Order, ECF No. 132.  During the status conference, plaintiffs informed the Court its motion to preclude was moot because discovery had resumed.  8 March 2022 Order at 1, ECF No. 133.  Plaintiffs stated

they regretted not producing certain corporate documents sooner but contended such conduct was typical for the parties in this case.  *See* Status Conf. Tr. at 56:23–58:6, ECF No. 135.  The parties all agreed to meet and confer after the status conference to discuss modifying the Court's protective order to incorporate a covenant not to sue as a starting point to remedy the issues identified in defendants' motion for terminating sanctions.  8 March 2022 Order at 2.  After the status conference, the Court stayed all proceedings in this case to resolve an alleged protective order violation and related sanctions.  *Id.*

On 1 April 2022, the parties filed a joint status report stating they failed to reach agreement and proposed a supplemental briefing schedule.  13 April 2022 Order at 1–2, ECF No. 140.  On 13 April 2022, the Court denied plaintiffs' motion to preclude as moot and entered the parties' proposed supplemental briefing schedule on defendants' motion for terminating sanctions.  *See id.* at 2.  On 2 May 2022, plaintiffs filed a supplemental brief, ECF No. 141, and defendants filed a supplemental brief ("Defs.' Suppl. Br."), ECF No. 142.  On 16 May 2022, plaintiffs filed a supplemental response brief ("Pls.' Suppl. Resp."), ECF No. 143, and defendants filed a supplemental response brief, ECF No. 144.  On 14 June 2022, the Court heard oral argument on defendants' motion for terminating sanctions, ECF No. 149.  All other proceedings remain stayed, and defendants' motion is the only item pending before the Court.  *See* 8 March 2022 Order at 2.

## III.   Summary of the Parties' Arguments

Defendants collectively move for terminating sanctions against plaintiffs.  Defs.' Mot. for Sanctions at 1.  Defendants allege plaintiffs willfully violated the Court's protective order and breached their duty of candor by failing to disclose Yorio's relationship with Mynette sooner.  *Id.*  In the alternative, defendants request the Court prohibit plaintiffs from relying on any AEO documents and information to support their infringement allegations.  *Id.*

### A.   Protective Order Violation

Defendants contend plaintiffs have "violated both the letter and spirit of this Court's Protective Order, which permits attorneys-eyes-only information to be received only by a party's 'outside counsel.'"  *Id.* at 15.  Defendants argue Yorio should be considered a Mynette insider directly prohibited from viewing AEO information under the plain language of the protective order.  *Id.* at 15–16.  "Yorio cannot rely on his appearance as counsel of record to override the Protective Order's express prohibition of the disclosure of AEO information to a party's inside representatives."  *Id.* at 17.  Defendants further argue plaintiffs have not produced satisfactory evidence demonstrating Yorio ever resigned as an officer of Mynette.  Defs.' Mot. for Sanctions at 18–19.  Defendants assert they face serious competitive harm from an insider like Yorio viewing AEO information, regardless of Mynette's nonpracticing status.  *Id.* at 19–20.  Mynette's organizational documents do not create a contingency fee arrangement with Yorio, defendants argue, so his roles in this two-person entity create an unacceptable risk of disclosure with Colby.  Defs.' Reply at 12–16, ECF No. 131.  Defendants claim Yorio is a competitive decisionmaker within Mynette, despite plaintiffs' declarations to the contrary, and the prejudice to defendants and the severity of plaintiffs' conduct warrants sanctions.  *Id.* at 13–20.

Plaintiffs respond to defendants' protective order allegations arguing Yorio, as attorney of record for both plaintiffs, "is entitled to access AEO information under the Protective Order." Pls.' Resp. at 15, ECF No. 130.  Plaintiffs explain, "[t]he [protective order] does not preclude a [XXXX] shareholder or directors from viewing AEO information," so nothing precludes Yorio, a partner at Carr & Ferrell, attorney of record, and outside counsel, from AEO access.  *Id.* at 18.  Plaintiffs argue further Yorio orally resigned from his officer roles prior to commencement of this suit; caselaw and the Mynette bylaws permit oral resignations.  *Id.* at 18–19.  Plaintiffs contend Yorio is not involved in patent prosecution, is subject to the protective order prosecution bar, and Mynette does not practice its inventions, so Yorio cannot be a competitive decisionmaker.  *Id.* at 20–23.  Defendants accordingly do not suffer prejudice, and no sanctions are warranted.  *Id.* at 26–29.

### B.    Duty of Candor Breach

Defendants next argue plaintiffs breached their duty of candor "by actively concealing Yorio's true relationship to Mynette for over four years, and obstructing basic discovery that would have uncovered the truth."  Defs.' Mot. for Sanctions at 20.  Defendants contend plaintiffs should have disclosed the Yorio-Mynette relationship:  (1) during protective order negotiations; (2) in initial disclosures; (3) in response to Gemalto's first interrogatory; (4) in response to Gemalto's RFP 24; and (5) in requesting a litigation counsel privilege log exception.  *Id.* at 10, 20–21, 24; *see supra* Section I.C.  Plaintiffs deceived defendants in violation of their duty of candor, defendants argue, so the Court should issue sanctions.  Defs.' Mot. for Sanctions at 22.

Plaintiffs respond they did not violate a duty of candor, act dishonestly, or deceive defendants or the Court in any way.  Pls.' Resp. at 23–26.  Plaintiffs disagree they were obligated to disclose the Yorio-Mynette relationship during protective order negotiations, in initial disclosures, in response to Gemalto's first interrogatory, or when confirming the litigation counsel privilege log exception.  Pls.' Resp. at 12–14.  Regarding RFP 24, however, "[p]laintiffs regret not producing responsive documents sooner" showing Yorio as a current director of Mynette.  Pls.' Suppl. Br. at 35.

### C.    Appropriate Sanctions

Defendants argue "[p]laintiffs' longstanding and intentional violation of the Protective Order and breach of their duty of candor justifies dismissal of their claims."  Defs.' Mot. for Sanctions at 23.  Defendants contend plaintiffs acted in bad faith by concealing the Yorio-Mynette relationship, and "the prejudice to [d]efendants is severe."  *Id.* at 23–24.  Defendants believe plaintiffs are using AEO information to further Colby's patent prosecution practice and "pursu[e] their next round of patent lawsuits."  *Id.* at 24.  Although defendants argue lesser sanctions would be inadequate, plaintiffs should alternatively be prohibited from using any AEO information in this action, "as such documents are the fruits of Mynette's violations."  *Id.* at 26–27.  Defendants also request a perpetual covenant not to sue ("CNS") defendants for all patents owned by plaintiffs now or in the future.  Defs.' Suppl. Br. at 16.  Defendants finally argue the doctrine of unclean hands supports their motion for sanctions.  *Id.* at 20.

Plaintiffs respond defendants face no prejudice from Yorio viewing AEO information as his relationship is no more advantageous to plaintiffs than defendants' outside counsel is to their clients. Pls.' Resp. at 27. Plaintiffs argue defendants' asserted prejudice is manufactured as they have not identified any produced AEO documents that would benefit plaintiffs in future litigation. *Id.* Plaintiffs also note Yorio "is subject to the [protective order] prosecution bar" and Colby cannot access Yorio's files, so the AEO information cannot benefit plaintiffs' patent prosecution. Pls.' Suppl. Resp. at 17. Plaintiffs contend defendants have over designated documents as AEO and the doctrine of unclean hands precludes sanctions as defendants also delayed discovery. Pls.' Suppl. Br. at 39–40. Although plaintiffs do not believe sanctions are warranted, plaintiffs believe a CNS would be more appropriate than defendants' alternative sanctions. *Id.* at 38–39.

## IV.   Applicable Law

"Rule 16 outlines the court's authority to impose sanctions for the violation of pre-trial orders." *Zeidman Techs., Inc. v. United States*, 141 Fed. Cl. 726, 730 (2019). "Protective orders are included among the pre-trial orders addressed by RCFC 16." *Id.* (quoting *Pyramid Real Estate Servs., LLC v. United States*, 95 Fed. Cl. 613, 617 (2010)); *see also Pac. Gas & Elec. Co. v. United States*, 82 Fed. Cl. 474, 482 (2008). Available RCFC 16 sanctions "include[e] those authorized by RCFC 37(b)(2)(A)(ii)–(vii)." RCFC 16(f)(1). Rule 37(b)(2) "provide[s] for an array of sanctions designed to discourage discovery abuse and to encourage the full disclosure of information prior to trial." *Advanced Am. Servs., Inc. v. United States*, 32 Fed. Cl. 191, 193 (1994). Thus, "[i]f a party or a party's officer, director, or managing agent . . . fails to obey an order to provide . . . the court may issue further just orders." RCFC 37(b)(2)(A). These include "dismissing the action" or "rendering a default judgment against the disobedient party." *Id.* at (v)–(vi).

The Supreme Court has placed "two basic limitations upon a court's discretion" to impose RCFC 37(b)(2) sanctions: (1) "[t]he sanction must be just"; and (2) "[the sanction] must relate to the particular claims to which the discovery order was addressed." *Alaska Pulp Corp. v. United States*, 41 Fed. Cl. 611, 614 (1998) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)). A sanction of dismissal "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). Dismissal is appropriate "where failure to comply is due to willfulness or bad faith on the part of the litigant," as opposed to "an inability to comply, confusion, or a misunderstanding." *Advanced Am. Servs., Inc.*, 32 Fed. Cl. at 194 (citing *Societe Int'l Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212 (1958)). In making that determination, a court may consider many factors, including: "the extent to which plaintiff's dilatory tactics prejudiced the defendant; the extent of plaintiff's responsibility for the delays; and the extent to which alternative sanctions would be equally effective." *Id.*

Even without a violation of a discovery order, "[t]he Court of Federal Claims possesses the inherent authority to impose sanctions for abuses of the discovery process in some cases." *Precision Pine & Timber, Inc. v. United States*, No. 98-720, 2001 WL 1819224, at *3 (Fed. Cl.

Mar. 6, 2001); *see also United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 264 (2007) ("Although established under Article I of the Constitution, this court, no less than any Article III tribunal, possesses this form of inherent authority."). In cases where "the Rules are [not] up to the task, the court may safely rely on its inherent power." *Sellers v. United States*, 110 Fed. Cl. 62, 68 (2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)); *see also In re Bailey*, 182 F.3d 860, 864 n.4 (Fed. Cir. 1999) (holding Article I court's possess inherent powers based on "the need to control proceedings before such court and the need to protect the exercise of judicial authority in connection with those proceedings"); *see United Med. Supply Co.*, 77 Fed. Cl. at 264 (using inherent authority to sanction litigant).

### A.      Law Governing A Corporation's Bylaws

Bylaws are the governing rules of a corporation and considered "contracts, subject to the general rules of contract and statutory construction." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006); *E. Saginaw Salt Mfg. Co. v. City of E. Saginaw*, 80 U.S. 373, 378 (1871) ("Charters granted to private corporations are held to be contacts."). "A private corporation is an artificial entity that is created by statute, and it can exist only under some statutory authority for the prolongation of its life." *BLH, Inc. v. United States*, 2 Cl. Ct. 463 (1983). Accordingly, "state law . . . governs incorporation-related issues, such as . . . formation, dissolution, and internal governance . . . ." *Watters v. Washovia Bank, N.A.*, 550 U.S. 1, 21 (2007). The bylaws of a corporation, therefore, are governed and "subject to the general rules of the contract and statutory construction" of the state in which it is incorporated. *Benihana of Tokyo*, 906 A.3d at 120. "A bylaw that is inconsistent with any statute or rule of common law, however, is void." *Frantz Mfg. Co. v. EAC Industries*, 501 A.2d 401 (Del. 1985).

## V.      Analysis of Defendants' Motion for Terminating Sanctions

Defendants move for sanctions against plaintiffs for violation of the protective order and for breaching the duty of candor. Defs.' Mot. for Sanctions at 1. As a remedy, defendants request the Court either dismiss the case with prejudice or preclude plaintiffs' use of defendants AEO information and restrain plaintiffs from suing defendants for infringing any patents now owned or later acquired. *Id.* at 26–27; Defs.' Suppl. Br. at 16. The Court analyzes each of these issues below.

### A.      Whether Plaintiffs Violated the Protective Order

The parties present three disputes specific to the Court's protective order: (1) whether Yorio is a current officer of Mynette prohibited from accessing AEO information under the protective order; (2) if Yorio is not an officer, whether the protective order nevertheless excludes Yorio from accessing AEO information; and (3) whether there would have been any basis to exclude Yorio from accessing AEO information in the first place. *See* Defs.' Mot. for Sanctions at 15–20; Pls.' Resp. at 15–23.

#### 1.      Whether Yorio is a Current Officer of Mynette

Mynette is incorporated under the laws of the State of Delaware, and state law governs contracts, including the bylaws, of a corporation. *See supra* Section IV.A. Accordingly, the Court analyzes Mynette's bylaws under Delaware's contract and statutory constructions. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 21 (2007) ("State law . . . governs incorporation-related issues, such as . . . formation, dissolution, and internal governance . . . ."). Under § 142(a) of Delaware code:

> Every corporation organized under this chapter shall have such officers with such titles and duties as shall be stated in the bylaws or in a resolution of the board of directors which is not inconsistent with the bylaws . . . .

8 Del. C. § 142(a). Section 28 of Mynette's bylaws, titled "Tenure and Duties of Officers" describes the roles and responsibilities of Mynette's officers. Mynette's Bylaws § 28.

Defendants argue Yorio serves as Mynette's vice president and Chief Financial Officer ("CFO"). Defs.' Mot. for Sanctions at 15. As the protective order excludes "'a party's officers and employees' from accessing AEO materials," Yorio should have never had access to begin with. *Id.* (quoting PO ¶¶ 4–5). Defendants argue plaintiffs have not produced any record that Yorio resigned in accordance with Mynette's bylaws or Delaware law. *Id.* at 18–19. In his first deposition on 8 July 2021, Colby testified Yorio was an officer, and plaintiffs' "conclusory, self-serving declarations from both Yorio and Colby do not provide evidence of an effective resignation." Defs.' Suppl. Resp. at 19. Defendants assert oral resignations must be "clearly manifest[ed]" to be effective and followed by "subsequent actions consistent with an oral resignation to provide evidence of an effective resignation." *Id.* at 12 (first quoting *Villette v. MondoBrain, Inc.*, No. 2020-295, 2020 WL 7706961, at *3 (Del. Ch. Dec. 29, 2020); then citing *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 459 (Del. Ch. 2012); *Gorman v. Salamone*, No. 10183, 2015 WL 4719681, at *7 (Del. Ch. July 31, 2015); *Boris v. Schaheen*, No. 8160, 2013 WL 6331287, at *17 (Del. Ch. Dec. 2, 2013)).

Plaintiffs respond Yorio is plaintiffs' attorney of record and outside counsel, "not an employee, inside counsel, or an officer." Pls.' Resp. at 17–18. Plaintiffs contend both Mynette's bylaws and Delaware law allow oral resignations. *Id.* at 18–19 (first quoting Mynette Bylaws ("[a]ny officer *may* resign *at any time* by giving written notice"), then quoting 8 Del. C. § 142(b) ("[a]ny officer *may* resign *at any time* upon written notice to the corporation" (emphasis added))). Plaintiff explains such oral resignation can occur "at any time," not only during minute book recorded acts and proceedings. *Id.* at 19. On 16 July 2021, Colby clarified his earlier deposition testimony by explaining he is "all the officers" of Mynette, and Yorio has no titles "other than director." *Id.* (quoting 2nd Colby Depo at 396:15–397:2). Colby's clarified testimony, Colby and Yorio's declarations, and the parties' conduct all support that "Yorio has not acted as an officer or been involved in any 'operational decisions at Mynette.'" *Id.* (quoting Yorio Decl. ¶¶ 6, [11]); *see also* Pls.' Suppl. Resp. at 3 ("Although he initially was an officer, he has not been one since before the suit was filed around two years prior to the [protective order]."). Plaintiffs note defendants do not have standing to object to a change in the Mynette officers even if they believe the change followed improper procedures. Pls.' Suppl. Resp. at 3 n.4.

Section 30 of Mynette's bylaws, titled "Resignations[,]" states: "Any officer may resign at any time by giving written notice to the Board of Directors or to the President or to the Secretary." Mynette's Bylaws § 30. Section 28(f) of Mynette's bylaws, titled "Duties of the Secretary[,]" requires: "The Secretary shall attend all meetings of the stockholders and of the Board of Directors and shall record all acts and proceedings thereof in the minute book of the corporation." *Id.* § 28(f). Neither of these sections of the bylaws refers to the other, nor do they cover the same subjects. The bylaws do not require an officer resignation occur during a meeting of the directors or be recorded in a minute book. Rather, the bylaws merely state: "Any officer may resign at any time by giving written notice . . . ." *Id.* § 30.

Like Mynette's bylaws, Title 8, Section 142(b), of the Delaware Code states: "Any officer may resign at any time upon written notice to the corporation." In *Biolase, Inc. v. Oracle Partners, L.P.*, the Supreme Court of Delaware reviewed the Court of Chancery's decision interpreting § 141(b), similar to the language found in § 142(b),[3] to allow resignation "by means of an oral statement." 97 A.3d 1029, 1033 (Del. 2014). Supreme Court of Delaware affirmed "the word 'may' . . . is permissive and does not mean 'may only'" but "implies that a director may resign in other ways—such as verbally.*" Id.* at 1034, 1034 n.9 ("The Court of Chancery's interpretation of § 141(b) as taking a permissive approach that authorizes resignation by the means specified, but not ruling out a resignation by other means, is a sensible and reasonable one."). As such, Delaware law also permits oral resignation by officers. *Oracle Partners, L.P. v. Biolase, Inc.*, No. 9438, 2014 WL 2120348, at *15–16 (Del. Ch. May 21, 2014), *aff'd,* 97 A.3d 1029, 1033–35 (Del. 2014) (stating "Delaware law generally permits directors to resign verbally[,]" finding bylaws did not modify this permissive rule where the bylaws similarly use "may," and holding trial and deposition testimony that director "agree[d] to go along with" verbal resignation was sufficient to confirm a resignation, even without an explicit "I resign" statement).

"[W]hether a director has resigned is a question of fact to be determined from the circumstances of each case." *Oracle Partners, L.P.*, 2014 WL 2120348, at *16 (citation omitted). To orally resign from his post as an officer at Mynette, Yorio needed to "clearly manifest[]" his intention to resign. *Villette*, 2020 WL 7706961, at *3. "Although the magic words 'I resign' may not be necessary, there must nonetheless be some objective manifestation of words or actions to that effect." *Oracle Partners, L.P.*, 2014 WL 2120348, at *16. Examples of such clear manifestation include "an oral statement announcing his resignation . . . [, or] an unequivocal statement of resignation to any director." *Villette*, 2020 WL 7706961, at *3. Yorio's "subsequent statements and conduct" are "relevant in determining whether he . . . resigned[.]" *Oracle Partners, L.P.*, 2014 WL 2120348, at *16.

The entire Mynette organization consists of two individuals: Colby and Yorio. Tr. at 51:9–13 (counsel for Gemalto and plaintiffs agreeing Mynette is "a two-person company"). At Mynette's inception, Colby served as Mynette's chief executive officer, president, and secretary, and Yorio served as Mynette's vice president and chief financial officer. Org. Resolutions at 2. Further, Mynette's board of directors comprises just two individuals: Colby and Yorio. *Id.* at 1,

---

[3] Title 8, Section 141(b) of the Delaware Code states, "Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation." Section 142(b) states, "Any officer may resign at any time upon written notice to the corporation."

7. Colby and Yorio both testify Yorio orally resigned from his officer positions around "August or September of 2016." Colby Decl. ¶ 22; Yorio Decl. ¶ 6; Tr. at 45:4–9 (plaintiffs' counsel answering when Yorio resigned). Colby and Yorio further testify Colby took over all corporate and financial duties of Mynette from this point on; "Colby is the sole officer of Mynette." Yorio Decl. ¶ 6; Colby Decl. ¶ 22; 2nd Colby Depo. at 396:4–397:2. Although Colby originally testified Yorio is an officer of Mynette, 1st Colby Depo. at 43:2–24, he later clarified Yorio resigned from his officer roles. 2nd Colby Depo. at 396:4–397:2. According to plaintiffs' counsel, Colby "just misremembered" Mynette's officers. Tr. at 51:6–8. Colby's and Yorio's testimonies are the only documentation of Yorio's resignation as an officer of Mynette. Tr. at 45:10–16.

Although plaintiffs have no contemporaneous evidence of Yorio's resignation, Colby's and Yorio's testimonies are sufficient to establish Yorio resigned as a Mynette officer. *See Oracle Partners, L.P.*, 2014 WL 2120348, at *16. Colby, the only other board member, testifies twice, once in a deposition and once in a declaration, he is the sole Mynette officer and Yorio has not acted as an officer since before this lawsuit began. 2nd Colby Depo. at 396:4–397:2; Colby Decl. ¶ 22. Whatever communication occurred between Colby and Yorio in "August or September of 2016[,]" Tr. at 45:4–9, was evidently sufficient to "clearly manifest[]" Yorio's intention of resigning to the board of directors—himself and Colby. *Villette*, 2020 WL 7706961, at *3. Neither Mynette's bylaws nor Delaware Code obligated Yorio to resign in writing. Mynette's Bylaws §§ 28, 30; *Oracle Partners, L.P.*, 2014 WL 2120348, at *15–16. Further, both Yorio and Colby testify Colby fulfilled all officer duties and responsibilities from the point of resignation on. Yorio Decl. ¶ 6; Colby Decl. ¶ 22; 2nd Colby Depo. at 396:4–397:2. As defendants provide no other subsequent conduct to demonstrate Yorio did not resign, the Court is left to conclude Yorio must have resigned as Colby took responsibility for every officer position in Yorio's absence. *See* 2nd Colby Depo. at 396:4–397:2. Such subsequent conduct is indicative of an effective oral resignation, so the Court finds Yorio has not been an officer of Mynette since at least prior to the start of this case. *See Oracle Partners, L.P.*, 2014 WL 2120348, at *16.

## 2.    Whether the Protective Order Excludes Yorio from Access to AEO Information

Defendants next argue the protective order excludes Yorio's access to AEO information because "Yorio is the quintessential Mynette insider:  its controlling shareholder [and] one of two directors[.]" Defs.' Mot. for Sanctions at 15.[4] "[T]he letter and spirit of this Court's Protective Order . . . permits attorneys-eyes-only information to be received only by a party's 'outside counsel.'" *Id.* (quoting PO ¶¶ 4–5). According to defendants, the protective order provides a two-tiered system. Defs.' Reply at 9. In a first lower tier, insiders can access restricted documents, but not AEO information. *Id.* In a second higher tier, AEO information can be accessed but not by "inside counsel" or "a party's officers." *Id.* Defendants contend Yorio cannot qualify himself for the second tier and gain AEO access under the protective order just by designating himself as outside counsel and attorney of record. Defs.' Mot. for Sanctions at 16–17. Defendants assert this distinction is evident in paragraph nine of the protective order,

---

[4] As the Court concludes *supra* Section V.A.1, Yorio is not an officer of Mynette, the Court omits defendants' protective order violation arguments that depend upon Yorio's status as an officer.

which requires a written assurance and advanced notice from inside counsel and officers before receiving restricted, non-AEO documents from the first lower tier.  Defs.' Suppl. Resp. at 11.

Plaintiffs respond Yorio is attorney of record for both Colby and Mynette, so Yorio is entitled to view AEO information regardless of whether Yorio is inside counsel or an officer. Pls.' Resp. at 16–17.  According to plaintiffs, "the [protective order] is worded permissively to provide increasing levels of access to trade secrets depending on one's position and role in the case."  *Id.* at 17 (emphasis removed).  "The [protective order] does not define 'attorneys of record' to exclude outside attorneys with dual roles, or even those who are solely in-house counsel."  *Id.*  Plaintiffs disagree Yorio is inside counsel and note "[t]he [protective order] does not preclude a [XXXX] shareholder or directors from viewing AEO information[.]"  *Id.* at 18. Yorio is a partner at Carr & Ferrell and represents other clients, so "[u]nder no reasonable interpretation of 'inside counsel' is Mr. Yorio inside, not outside, counsel."  *Id.*

Generally, the protective order comprises two levels of confidentiality:  restricted and AEO.  PO ¶¶ 4–5.  Restricted documents can be viewed by, among others, "inside counsel of the parties" and "a party's officers and employees directly involved in this litigation whose access to the information is reasonably required to supervise, manage, or participate in this litigation[.]" *Id.* ¶ 4.  Any inside counsel, officer, or employee receiving restricted information must execute a written assurance and opposing counsel must be notified prior to disclosure to allow for objections. *Id.* ¶ 9.  AEO documents can be viewed by the "attorneys of record" and "members or employees of their respective law firms[.]"  *Id.* ¶¶ 4(b), 5.  AEO information "may not be disclosed to . . . any individual attorney involved in the prosecution of patent applications related to the subject matter of the claimed invention involved in this litigation."  *Id.* ¶ 7(a).  Any individual who receives AEO information is automatically subject to a patent prosecution bar. *Id.* ¶ 7(c).

Paragraph five of the protective order states:  "Without a further court order, . . . disclosure of [AEO] information will be *limited* to the persons designated [attorney of record] . . . ."  PO ¶ 5 (emphasis added) (irrelevant categories of permissible AEO disclosure omitted).  Paragraph five specifically excludes inside counsel and officers from AEO access. *Id.* As such, it would be a violation of paragraph five to disclose AEO information to any inside counsel or officer.  *Id.*  Although under the protective order a party may still designate their inside counsel as attorney of record, doing so would not extinguish that individual's status as inside counsel.  In such a case, the attorney of record would remain inside counsel, but sharing AEO information with him would violate paragraph five of the protective order.  *See id.* Accordingly, as the Court finds *supra* Section V.A.1 Yorio is not an officer of Mynette, for defendants to show plaintiffs violated the protective order, Yorio must constitute "inside counsel[.]"  *Id.* ¶ 4(e).

At oral argument defendants clarified although they believe Yorio is "inside of Mynette[,]" they "have not alleged [Yorio is] in-house counsel."  Tr. at 56:14–57:4 (defendants' counsel agreeing Yorio's role at Carr & Ferrell is outside counsel to Mynette).  Defendants concede Yorio is not "in-house counsel," and the facts here would not support an argument to the contrary:  Yorio is a partner at Carr & Ferrell; Yorio represents other clients; Yorio is attorney of record for Colby, not just Mynette; Yorio's only recovery from this suit is through any proceeds

paid to his law firm and otherwise receives no compensation from Mynette; and Carr & Ferrell's recovery, and subsequently Yorio's, is contingent on a successful outcome in this case. *See supra* Sections I.A–B. Accordingly, Yorio is not "inside counsel" for the purpose of determining access to AEO information under the protective order. *See* PO ¶ 4.

The Court is left with Yorio's status as Mynette's [XXXX] shareholder and director to analyze a potential protective order violation. The protective order places no restrictions on shareholders or directors; it is silent on the topics of stock ownership and board membership. *See* PO. Defendants agree "the [protective order] does not have any shareholder language in it." Tr. at 62:8–12. Rather, defendants contend "the spirit of the protective order that has . . . [a] general inside and outside distinction," not a specific provision, should exclude Yorio's AEO access. Tr. at 59:4–60:8. The parties jointly negotiated and moved for entry of the protective order, J. Mot. PO, and "[i]n contract interpretation, the plain meaning of the contract's text controls unless it is apparent that some other meaning was intended and mutually understood." *Ace Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007); *see* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); *cf. BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015) ("Statutory interpretation begins with the words of the statute."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case[,]" and the inquiry ends if the language is unambiguous.). While a protective order is not a contract or statute per se, the protective order's plain meaning is still controlling. Scalia & Garner, *supra*, 56. The parties could have bargained for a protective order excluding AEO access to shareholders or directors and included such provisions in their joint motion, J. Mot. PO. The parties did not do so; rather, they largely adopted a standard form protective order which does not exclude shareholders or directors from AEO access. *See* PO. It is not "apparent that some other meaning was intended and mutually understood[,]" *Ace Constructors, Inc.*, 499 F.3d at 1361, as is evidenced by the parties' conflicting interpretations of the protective order. *Compare* Defs.' Mot. for Sanctions at 15–18, *with* Pls.' Resp. at 15–18. Accordingly, as Yorio is neither a Mynette officer nor inside counsel, and the plain text of the protective order does not exclude shareholders or directors from accessing AEO information, the Court does not find plaintiffs violated the Court's protective order. *See Static Media LLC v. Leader Accessories LLC*, 38 F.4th 1042, 1046, 1048 (Fed. Cir. 2022) (requiring "clear and convincing evidentiary support for" protective order violations and reversing a finding of contempt based on "a fair ground of doubt as to whether the protective order barred . . . disclosure" to defense counsel in a separate action who agreed to be subject to the protective order for purposes of forming a "Joint Defense Group").

### 3. Whether Yorio Should Have Been Excluded from Access to AEO Information at the Onset

Defendants lastly contend it is "highly prejudicial" "to credit the nonviolation of [the protective order] . . . when the formation of the [protective order] was the result itself of a nondisclosure." Tr. at 61:13–62:2. Defendants allege the only reason the protective order does not "explicitly" exclude Yorio from AEO access is "because there was fraud by omission in the

formation of the protective order." Tr. at 60:2–61:10.  Defendants argue plaintiffs should have disclosed the Yorio-Mynette relationship during protective order negotiations, but now "[t]hey're asking for forgiveness instead of for permission[—t]hey took it out of [the Court's] hands to decide who [gets AEO access] and made the decision themselves." Tr. at 160:24–161:2.  To support their argument Yorio should never have had AEO access, defendants state Mynette is in competition with defendants and "Yorio is a competitive decisionmaker" as Mynette's principal owner.  Defs.' Reply at 13–14 (citing *Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*, No. 15-53, 2016 WL 2904592, at *4 (D. Del. May 18, 2016)).  Yorio is engaged in "monetizing Mynette's patents through litigation and licensing[,]" and according to defendants, he "is thus a competitive decisionmaker, notwithstanding that he does not personally prosecute Mynette's patents."  *Id.* at 14 (citing *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, No. 7-346, 2008 WL 5634214, at *6–7 (E.D. Tex. Mar. 14, 2008)).  Even if Yorio is not a competitive decisionmaker, his "close proximity to Colby" in the two-person Mynette entity creates an unacceptable risk of disclosure and harm.  *Id.* at 15.  Defendants argue other cases like *Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*, 2016 WL 2904592, are not adequately similar enough to this case, because "[n]early *every* such case, from either side, arose before the individual in question actually viewed AEO materials."  Defs.' Suppl. Br. at 15; *see also* Defs.' Suppl. Resp. at 17–18.

Plaintiffs respond "[d]efendants would have had no basis to exclude Mr. Yorio from the [protective order] when it was negotiated." Pls.' Resp. at 20.  Yorio, plaintiffs assert, is outside counsel, does not prosecute Mynette's patent applications, and is subject to the protective order's prosecution bar.  *Id.*  Plaintiffs state:

> Mynette and Dr. Colby do not compete in the marketplace with [d]efendants; Dr. Colby has no access to Mr. Yorio's documents or data from this case, and they are in different locations; Mynette and Dr. Colby are not in the business of acquiring third-party patents; Mynette and Dr. Colby have no plans to acquire third party patents; and this is Mynette's and Dr. Colby's first patent infringement lawsuit.

*Id.*  "Mr. Yorio should not have been treated any differently than any other contingency (or hourly billing) counsel."  *Id.*  Plaintiffs cite eight cases in support of this position and argue "none of [d]efendants' cases suggest a contrary result."  *Id.* at 21.

The Federal Circuit set out the analytical framework governing protective orders limiting a lawyer's access to confidential information in *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984).  In *U.S. Steel*, the Federal Circuit emphasized protective orders must be considered on a "counsel-by-counsel basis" to determine whether an "unacceptable opportunity for inadvertent disclosure" of confidential material learned during discovery exists.  *Id.* at 1468.  "The factual circumstances surrounding each individual counsel's activities, association, and relationship with a [client], whether counsel be in-house or retained," and in particular, any "competitive decisionmaking" by the counsel, should be examined.  *Id.*  The Federal Circuit coined "competitive decisionmaking" as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."  *Id.* at 1468 n.3.  The risks and safeguards

- 17 -

surrounding inadvertent disclosure and the competing interest of any hardship to the opposing party must also be considered. *See id.* at 1468.

The Federal Circuit expanded upon *U.S. Steel* in *Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577 (Fed. Cir. 1991). In *Matsushita*, the Federal Circuit reviewed a Court of International Trade decision excluding an individual acting as the appellant's general counsel, senior vice president, and secretary from accessing confidential information under a protective order. *Id.* at 1579. The individual in that case swore in an affidavit he was not involved in competitive decisionmaking activities such as pricing, product design, vendor selection, or marketing. *Id.* At 1579–80. The Federal Circuit assumed the "unrebutted statements [we]re true" and held "they form[ed] a reasonable basis . . . to conclude . . . [the individual] was sufficiently insulated from competitive decisonmaking [and] . . . there was no 'risk of inadvertent disclosure' sufficient to justify denying him access under the [protective order]." *Id.* At 1580. The court held it was "largely irrelevant" "his positions brought him into 'regular contact' with executives who were 'involved in day-to-day pricing and policy decisions,' 'in the context of what necessarily are *competitive decisionmaking meetings.*'" *Id.* (citation omitted). "It is a natural extension of the rule enunciated by this court in *U.S. Steel* that a denial of access sought by in-house counsel on the sole ground of status as a corporate officer is error." *Id.*; *see also U.S. Steel*, 730 F.2d at 1468 (noting "some retained counsel enjoy long and intimate relationships and activities with one or more clients, activities on occasion including retained counsel's service on a corporate board of directors[,]" and holding such a fact alone is not a reason to deny protective order access); *In re Sibia Neurosciences, Inc.*, 132 F.3d 50 (unpublished table decision) (Fed. Cir. 1997) ("[D]enying access to [a party]'s outside counsel on the ground that they also prosecute patents for [the party] is the type of generalization counseled against in *U.S. Steel*.").

Finding a risk of inadvertent disclosure or misuse does not end the Court's inquiry. "Even if [the Court] is satisfied that such a risk exists, the . . . [C]ourt must balance this risk against the potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice." *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d 1373, 1380 (Fed. Cir. 2010) (citing *U.S. Steel*, 730 F.2d at 1468; *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)). "In balancing these conflicting interests the . . . [C]ourt has broad discretion to decide what degree of protection is required." *Id.* (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)).

District courts around the country are regularly faced with disputes over access under a protective order in patent infringement cases.[5] Most analogous here, in *Blackbird Tech*, the

---

[5] *See, e.g., Razor USA LLC v. DGL Grp., Ltd.*, No. 19-12939, 2020 WL 3604081, at *3 (D.N.J. July 2, 2020) (finding, in a patent case involving competitors, a party's sole in-house counsel was not a "competitive decisionmaker" and could access AEO information, even though he was a part of senior management, offered compliance advice, negotiated licenses but did not decide "which licenses to give or pursue[,]" and reported directly to the CEO); *Koninklijke Philips N.V. v. Amerlux, LLC*, 167 F. Supp. 3d 270, 272–73 (D. Mass. 2016) (granting, in a patent infringement case involving competitors in which the plaintiff's suit was part of a licensing program, three of the plaintiff's in-house counsel to access AEO information even though all three "identify potential licensees, negotiate license agreements, oversee procurement and reverse-engineering of potentially infringing products, and pursue enforcement actions"); *Sanofi-Aventis U.S. LLC v. Breckenridge Pharm., Inc.*, Nos. 15-289, 15-1836, 2016

district court applied the *U.S. Steel* standard to a dispute over "the degree of access that should be afforded to [plaintiff's] in-house counsel and the scope of the proposed patent prosecution bar." 2016 WL 2904592, at *1. The plaintiff was a nonpracticing entity in the business of acquiring and asserting patent rights, but the court found it was still a competitor in the sense the parties competed over intellectual property utilization. *Id.* at *4. The *Blackbird* court found three in-house attorneys—including officers and cofounders—were all competitive decisionmakers due to their active roles in patent acquisition, litigation strategy, and licensing. *Id.* The court found there was accordingly a "risk of inadvertent disclosure and misuse[,]" but "the only competitive harm . . . arises out of litigation." *Id.* at *5. The court continued, "if the threat of future litigation is taken off the table, there is significantly less likelihood of harm[,]" and the plaintiff "would suffer harm if prevented from using the attorneys of its choice, even if those attorneys are its own." *Id.* Balancing the parties' interests as directed by Federal Circuit precedent, the *Blackbird* court held "a prosecution bar and covenant not to sue" in the relevant industry "would adequately protect" the defendants' interests and allow the plaintiff to pursue the case "with its in-house lawyers." *Id.* at *6. The prosecution bar prevented the in-house attorneys from participating in any prosecution activity related to the relevant technology for the pendency of the case plus one year after. *Blackbird Tech*, 2016 WL 2904592, at *6. The CNS covered any patents over the relevant technology acquired between protective order entry and one year after the case's conclusion. *Id.* ("To be clear, if [plaintiff] acquires a patent on [the relevant] technology during the restricted time period, it may never assert that specific patent against these [d]efendants." (footnote omitted)). The court concluded "these limitations are a

---

WL 308795, at *4–5 (D.N.J. Jan. 25, 2016) (holding in-house counsel of a small company in a patent case who also was represented by outside counsel was not a competitive decisionmaker and could view "outside counsel eyes only" information; although the in-house counsel negotiated settlement agreements, he did not engage in pricing, product design, patent prosecution, or product decisions and he maintained separate computing and storage facilities from other counsel); *Mad Catz Interactive, Inc. v. Razor USA, Ltd.*, No. 13-2371, 2014 WL 4161713, at *3–6 (S.D. Cal. Aug. 19, 2014) (modifying, in a patent infringement action involving competitors, the protective order to permit an individual serving as general counsel, secretary, and VP access to highly confidential information; although the individual was the company's "second-largest shareholder" who made "competitive decisions" for at least one aspect of the business, the court found he was not involved in "competitive decisionmaking" as it concerned the opposing party); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 274 F.R.D. 576, 578–84 (E.D. Va. 2010) (granting, in a patent infringement case in which the defendant had outside counsel and which would "necessarily involve the disclosure of trade secrets," several in-house lawyers access to the protective order because they were not competitive decisionmakers, including a VP "responsible for all intellectual property matters"); *Pfizer Inc. v. Apotex Inc.*, 744 F. Supp. 2d 758, 763–66 (N.D. Ill. 2010) (finding, in a patent infringement action involving competitors, outside counsel who may become involved in licensing and settlement discussions are not competitive decisionmakers because licensing is not per se competitive decisionmaking); *Merial Ltd. v. Virbac SA*, No. 10-181, 2010 WL 11534378, at *2–7 (N.D. Tex. June 10, 2010) (permitting, in a patent infringement action in which the plaintiff was represented by outside counsel, an in-house intellectual property attorney to view AEO documents because negotiating licenses as part of settlements was not "a routine part of" her work and she was "not involved in the decision-making process of the business terms of any licensing agreements"); *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, No. 7-346, 2008 WL 5634214, at *1–7 (E.D. Tex. Mar. 14, 2008) (finding, in a patent infringement action, outside counsel was a competitive decisionmaker for a host of reasons; namely, he had served in many capacities, legal and business, across an array of related patent-holding entities that had "previously sued the[] same [d]efendants a number of times in just over three years"); *Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 56–58 (D.D.C. 2007) (finding, in a patent action involving competitors represented by outside counsel, in-house counsel was not a competitive decisionmaker and noting in-house counsel was not involved in negotiating settlement licensing terms); *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 530 (N.D. Cal. 2000) (finding in-house counsel was a competitive decisionmaker "because her advice and counsel necessarily affect licensing decisions . . . [and] she is actively involved in negotiating the terms of licensing agreements as part of settling lawsuits").

- 19 -

necessary byproduct of [plaintiff]'s business model, in particular, its desire to have its officers litigate cases."  *Id.*  Like *Blackbird*, the Court will apply the *U.S. Steel* standard to analyze whether Yorio's access to confidential information should have been limited.  *See* 730 F.2d 1465.

### i.     Whether Yorio is a Competitive Decisionmaker

The Court finds and the parties agree Yorio is not "in-house counsel" at Mynette.  Tr. at 56:14–57:4; *see supra* Section V.A.2.  The Court therefore must analyze:  (1) whether Mynette is a competitor to defendants; and (2) whether Yorio's roles as Mynette [XXXX] shareholder and director make Yorio a competitive decisionmaker.  *See U.S. Steel*, 730 F.2d at 1468.

Plaintiffs argue Mynette is not a competitor to defendants because it does not compete in the market.  Pls.' Resp. at 20–22.  Plaintiffs assert *Blackbird* was wrong to hold the nonpracticing entity plaintiff was a competitor of defendants because patents only provide a "limited right to exclude[,]" not an "affirmative right" to produce an invention.  Pls.' Suppl. Br. at 27 n.12 (quoting *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 131 F.3d 1011, 1015 (Fed. Cir. 1997)).  Plaintiffs contend they are "simply seeking a monetary remedy for a property right trespass; Mynette has no 'exclusive right' to exploit its technology in any market and is not selling in any market."  *Id.*  Though plaintiffs' statements about the "patent system" may be true, these statements do not make Mynette any less of a competitor to defendants.  *See ST Sales Tech Holdings, LLC*, 2008 WL 5634214, at *6.  "Plaintiff[s] and [d]efendants all seek to utilize, in one manner or another, intellectual property as part of a business model for pecuniary gain."  *Id.*  The fact Mynette is seeking monetary damages for the use of its patented inventions indicates Mynette views defendants as competitors for the right to profit from the inventions.  *See id.* (citing *MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 500–01 (D. Kan. 2007)); *see also Blackbird Tech*, 2016 WL 2904592, at *4.  The AEO information at issue certainly could be of value to Mynette, whose business model is "the pursuit of claims and licensing opportunities against the United States[.]"  Funding Agreement at 2.  "It is that ultimate potential for damaging use of the confidential information that underlies the concerns of . . . the *U.S. Steel Corp.* 'competitive decisionmaker' analysis."  *ST Sales Tech Holdings, LLC*, 2008 WL 5634214, at *6.  Mynette is accordingly a competitor to defendants because Mynette seeks monetary damages for the use of its patented inventions to profit from the inventions.  *See id.*; *Blackbird Tech*, 2016 WL 2904592, at *1 (citing *U.S. Steel*, 730 F.2d at 1468 & n.3), 4.

The Court must now determine if Yorio in his roles at competitor-Mynette is a competitive decisionmaker.  [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX][6]; [XXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX].  Although Mynette has only pursued one patent infringement suit and only one license has arisen from its patent portfolio since its formation, Yorio has played a key role in both.  Colby Decl. ¶ 20; Tr. at 119:24–120:8.  Yorio is "intimately involved in the case management, in the infringement contentions[,]" and similar items.  Tr. at 138:7–10 (quoting plaintiffs' counsel).  Regarding the

---

[6] *See* U.S. Patent Nos.:  10,431,063; 10,503,940 (assigned to Mynette); 10,810,578; 11,295,095 (assigned to Mynette); 11,170,185; 10,592,709; 10,417,462; 10,417,463; and 10,956,689 (assigned to Mynette).

pursuit of the present claims against the government, Colby testified the basis for the infringement allegations is information he learned from Yorio. 2nd Colby Depo. at 286:3–12. Yorio was "involved in the settlement of one of the [d]efendants" in this case and negotiated Mynette's only license. Tr. at 139:24–25. Mynette's sole business and founding purpose is patent litigation and licensing. Funding Agreement at 2. These activities fall under Yorio's purview; Yorio is therefore a competitive decisionmaker. *See U.S. Steel*, 730 F.2d at 1468; *Blackbird Tech*, 2016 WL 2904592, at *4; *see supra* note 5.

Plaintiffs argue Yorio's responsibilities are merely those of any outside counsel, so he must not be a competitive decisionmaker. Pls.' Resp. at 20–22. Yorio's status as outside counsel and a partner at Carr & Ferrell for purposes of his representation of plaintiffs in this lawsuit does not undermine his status as a Mynette competitive decisionmaker. *See U.S. Steel*, 730 F.2d at 1468. Under Mynette's organizational resolutions, the officers [XXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXX]. *See* Org. Resolutions at 4; Mynette Bylaws. So, while plaintiffs testify it was Colby who chose Yorio to represent them, Tr. at 41:1–3, once Mynette was formed, it is not clear whether plaintiffs ever could have hired someone else without Yorio's consent. Tr. at 37:4–40:3 (plaintiffs' counsel explaining at oral argument Yorio "could exert some control over" decisions as [XXXX] shareholder). The fact Yorio represents Mynette through his law firm as outside counsel on a contingency fee basis does not make him less of a competitive decisionmaker within Mynette. The Court's inquiry looks to Yorio's "relationship and activities [with Mynette], not solely . . . [Yorio's] status as in-house or retained." *U.S. Steel*, 730 F.2d at 1468. Plaintiffs' arguments do not diminish Yorio's status as a competitive decisionmaker within competitor Mynette. *Id.*

### ii.   Whether Yorio Presents a Risk of Inadvertent Disclosure

Whether Yorio's status as a competitive decisionmaker precludes his access to defendants' confidential information depends upon the specific facts of this case. *See supra* note 5; *Blackbird Tech*, 2016 WL 2904592. As such, the Court next assesses Yorio's risk of inadvertent disclosure to Colby, who could misuse defendants' confidential information in patent prosecution. *See U.S. Steel*, 730 F.2d at 1468.

Defendants argue "Yorio's close relationship with Colby, and their status as the only two principals of a patent assertion entity, renders th[e] risk [of inadvertent disclosure to Colby] impermissibly high." Defs.' Reply at 15. "Yorio's access pits his fiduciary duties to Mynette's stated business of accusing the [g]overnment and its passports of patent infringement, against his ethical obligations to refrain from disclosing [d]efendants' confidential information about the [g]overnment's passports." *Id.* at 16. The Federal Circuit counsels, however, "[d]enial or grant of access . . . cannot rest on a general assumption that one group of lawyers are more likely or

less likely inadvertently to breach their duty under a protective order." *U.S. Steel*, 730 F.2d at 1468.  The Court cannot find a risk of inadvertent disclosure based solely on Yorio's "long and intimate relationship[]" with Colby, *id.*, Yorio's "service on [Mynette's] board of directors[,]" *id.*, Yorio's former "status as a corporate officer[,]" *Matsushita Elec. Indus. Co.*, 929 F.2d at 1580, or Yorio's share ownership, *Mad Catz Interactive, Inc.*, 2014 WL 4161713, at *3–6.  *See supra* note 5.  To the contrary, ample evidence supports Yorio not being a risk of inadvertent disclosure, despite these facts:  Yorio has never prosecuted or supervised prosecution of Mynette's or Colby's patent applications; Yorio is subject to the protective order's prosecution bar; Colby and Mynette do not acquire patents and do not intend to acquire patents in the future; Yorio and Colby "work in separate offices in separate buildings"; Yorio and Colby reside in different states for a [XXXX] of the year; neither Yorio or Colby can access the other's files or computers; and Yorio and Colby "rarely speak . . . outside the context of this lawsuit[.]"  Pls.' Suppl. Resp. at 5 (citing Colby Decl. ¶¶ 2, 14–27; Yorio Decl. ¶¶ 1, 4–11; Pls.' Suppl. Br. at 4–7).  Yorio's and Colby's declarations to these facts "are entirely unrebutted by any other evidence in the record" and "form a reasonable basis . . . to conclude" there is no risk of inadvertent disclosure or misuse.[7]  *Matsushita Elec. Indus. Co.*, 929 F.2d at 1580 (rejecting a rule that would disqualify counsel based on "regular contact" with corporate officers).

### iii.    Balancing the Parties' Conflicting Interests

The Court must lastly balance the "risk" of harm to defendants from Yorio's access to AEO information "against the potential harm to [plaintiffs] from restrictions imposed on [their] right to have the benefit of counsel of [their] choice."  *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d at 1380 (citing *U.S. Steel*, 730 F.2d at 1468; *Brown Bag Software*, 960 F.2d at 1470).

This case presents facts analogous to *Blackbird Tech*.  2016 WL 2904592, at *4–6.  Like counsel in *Blackbird*, as discussed *supra*, Yorio is a competitive decisionmaker involved in Mynette's litigation and licensing strategy, and Mynette is a nonpracticing entity that competes with defendants.[8]  Unlike *Blackbird*, Mynette and Colby do not acquire patents—rather, Colby prosecutes his own patent applications, a process in which Yorio is not involved.  Tr. at 17:23–18:3, 41:19–42:10.  Further, Yorio does not present the same risks of inadvertent disclosure as the *Blackbird* counsel did.  *See Blackbird Tech*, 2016 WL 2904592, at *4–6; *Matsushita Elec. Indus. Co.*, 929 F.2d at 1580.  Given Yorio's role at Mynette and Mynette's business practices, "the only competitive harm [Mynette] realistically poses to any of the

---

[7] Defendants attempt to discredit Yorio's testimony through citation to a state bar disciplinary action against Yorio for his conduct in a December 1987 state court trial. Defs.' Mot. for Sanctions at 21 n.16. The Court finds little probative value from Yorio's single instance of misconduct from thirty-five years ago and accordingly has no reason to doubt the credibility of Yorio's declaration. Defendants also attempt to discredit Colby through citation to his original incorrect deposition testimony stating he has never filed a malpractice action and Yorio is a Mynette officer. Defs.' Suppl. Br. at 4–5; Tr. at 192:1–22. The Court also finds little probative value from Colby's misstatements regarding a significantly personal and irrelevant matter. Further, Colby twice corrected his original testimony as to Mynette's officers, and given Yorio is a former officer, the Court has no reason to doubt Colby "misremembered" or the credibility of his corrected testimony. Tr. at 51:6–8.

[8] The plaintiff in *Blackbird* did not have outside counsel. *See Blackbird Tech*, 2016 WL 2904592. For most of the relevant time period of this dispute, however, plaintiffs were represented solely by Yorio at Carr & Ferrell, and as of "spring of 2021[,]" plaintiffs now have additional counsel representing them on this case. Tr. at 138:5–6 ("Boies Schiller became involved in spring of 2021.").

[d]efendants arises out of litigation." *Blackbird Tech*, 2016 WL 2904592, at *5.  Indeed, the main concern identified in defendants' briefs is Yorio's use of AEO "information to guide Mynette's future lawsuits" and Colby's continued patent prosecution.  Defs.' Reply at 16 ("These patents can be used in future lawsuits against Defendants—a risk that is heightened because litigation is Mynette's *only* business activity."); Defs.' Suppl. Resp. at 26–28. Defendants make the strained argument Yorio will use their AEO information to aid Colby's patent prosecution; however, doing so would violate several provisions of the protective order, and the Court cannot assume Yorio is more likely than defendants' counsel to breach the protective order.  *See U.S. Steel*, 730 F.2d at 1468.  Defendants also allege plaintiffs' use of defendants' AEO information in the *present* litigation has prejudiced them; however, defendants do not explain how Yorio's use of AEO information to further plaintiffs' litigation positions in *this* case is any different than how other counsel would use the same information.  Defs.' Suppl. Resp. at 26; *see Sanofi-Aventis U.S. LLC*, 2016 WL 308795, at *4 ("It is common practice for corporate litigants to exchange such information during a suit and then expect advice from their litigation counsel as to how best to settle their dispute."); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 4-5312, 2006 WL 1994541, at *2 (N.D. Ill. July 13, 2006) ("The settlement of patent cases, usually by licensing, is part of litigation.").  "Accordingly, if the threat of future litigation is taken off the table, there is significantly less likelihood of harm to [d]efendants" from Yorio viewing AEO information.  *Blackbird Tech*, 2016 WL 2904592, at *5.

Plaintiffs, on the other hand, "would suffer harm if prevented from using the attorney[] of [their] choice, even if th[at] attorney[]" is Mynette's director and [XXXX] shareholder. *Blackbird Tech*, 2016 WL 2904592, at *5.  Mynette's contingency "litigation model [with Yorio] allows it to enforce patents that might not otherwise justify the high costs of hiring [hourly] outside patent counsel." *Id.*  The Court, like the *Blackbird* court, "acknowledge[s] that this is a problem of [Mynette]'s own creation," but it nevertheless constitutes "some level of harm" the Court must balance against defendants' asserted harm. *Id.*  Defendants argue Mynette should never have been allowed to select Yorio as its attorney of record and enable him to view AEO information.  Tr. at 141:15–144:5.  Defendants contend any nonpracticing entity "actively prosecuting patents in the same space at the same time" as the attorney of record, like Mynette, must always hire other counsel.  Tr. at 143:22–144:5 (defendants' counsel arguing this and then stating there is no case that supports this).  While defendants' concerns fit into the Court's balancing analysis, the Court cannot adopt such a categorical rule against nonpracticing entities. *See U.S. Steel*, 730 F.2d at 1468; *Matsushita Elec. Indus. Co.*, 929 F.2d at 1580.

"In balancing these conflicting interests the . . . [C]ourt has broad discretion to decide what degree of protection is required." *In re Deutsche Bank Tr. Co. Americas*, 605 F.3d at 1380 (citing *Seattle Times Co.*, 467 U.S. at 36).  If presented with this dispute prior to protective order entry, or at minimum prior to Yorio receiving defendants' confidential information, the Court may likely have fashioned a remedy similar to the remedy in *Blackbird Tech*, 2016 WL 2904592, at *6, and allowed Yorio access to restricted and AEO information.  First, the *Blackbird* court found a prosecution bar was necessary to protect defendants' interests—this Court agrees, and one is already present here. *Id.*; *see* PO.  Second, the *Blackbird* court required a CNS; the Court would have required plaintiffs to agree to a CNS, tailored to Mynette's prosecution-centric business model. *See Blackbird Tech*, 2016 WL 2904592, at *6.  Both the prosecution bar and CNS would have been specific to the technology in this suit and would have lasted for the

pendency of this case and one year after. *Id.* "[T]hese limitations are a necessary byproduct of [Mynette]'s business model, in particular, its desire to have its [[XXXX] shareholder and director] litigate cases." *Id.* These remedies would eliminate the risk of harm to both parties.

This dispute, however, was not presented to the Court before entry of the protective order. Rather, plaintiffs failed to disclose the Yorio-Mynette relationship until Colby's first deposition on 8 July 2021, nearly five years after this case began. *See infra* Section V.B.1. Significantly, in every single case the parties rely on, *see supra* note 5, the courts were deciding an individual's access to confidential information under a protective order *before* the individual received said information. Here, the ship has long since sailed; the Court must exercise its "broad discretion" and craft a remedy accordingly. *See In re Deutsche Bank Tr. Co. Americas*, 605 F.3d at 1380; *infra* Sections V.B–C.

### B.      Whether Plaintiffs Breached Their Duty of Candor

Defendants argue plaintiffs breached their duty of candor for failing to disclose the Yorio-Mynette relationship: (1) during protective order negotiations; (2) in initial disclosures; (3) in response to Gemalto's first interrogatory; (4) in response to Gemalto's RFP 24; and (5) when requesting a litigation counsel privilege log exception.[9]  Defs.' Mot. for Sanctions at 10, 20–21, 24; *see supra* Section I.C.  In analyzing defendants' duty of candor allegations below, the Court draws from the facts set forth *supra* Section I.C without restating them.

The RCFC do not explicitly incorporate the ABA Model Rules of Professional Conduct. "Nonetheless, the Court uses the ABA model rules to provide guidance regarding counsel's obligations to the Court." *AEG Invs., LP v. United States*, 147 Fed. Cl. 537, 538 (2020) (quoting *FMS Inv. Corp. v. United States*, 137 Fed. Cl. 99, 102 (2018)) (cleaned up); *see also In re Reines*, 771 F.3d 1326, 1329 (Fed. Cir. 2014) (holding under an analogous attorney misconduct rule "courts are to be guided 'by case law, applicable court rules, and "the lore of the profession," as embodied in codes of professional conduct,'" and then applying the Model Rules of Professional Conduct (quoting *In re Snyder*, 472 U.S. 634, 644–45 (1985))); *Rocky Mountain Helium, LLC v. United States*, No. 15-336, 2019 WL 2246209, at *1 n.2 (Fed. Cl. May 24, 2019) (using the Model Rules of Professional Conduct because "the Supreme Court has held that federal courts may use state codes of professional conduct in determining appropriate conduct before a federal court" (citing *In re Snyder*, 472 U.S. at 645 & n.6)).

The duty of candor is embodied in Rule 3.3 ("Candor Toward the Tribunal") of the Model Rules of Professional Conduct.  "Rule 3.3(a)(1) provides that '[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]'" *Level 3 Commc'ns, LLC v. United States*, 724 Fed. App'x 931, 934 (Fed. Cir. 2018) (quoting Model Rules of Prof. Conduct R. 3.3(a)(1)).  Other relevant model rules include:  3.4 ("Fairness to

---

[9] For the first time at oral argument, defendants raised the Court's attorney admission oath as a relevant standard Yorio allegedly violated.  Tr. at 109:13–111:13; *see* RCFC 83.1(b)(3) ("I, _____, do solemnly swear (or affirm) that I will support the Constitution of the United States and that I will conduct myself in an upright manner as an attorney of this court.").  Defendants did not cite any case, and the Court could not find one, where a party was sanctioned for violating the Court's attorney admission oath.

Opposing Party & Counsel"); 4.1 ("Truthfulness in Statements to Others"); and 8.4 ("Misconduct"). Rule 3.4(a) states: "[a] lawyer shall not[] . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value." Model Rules of Prof. Conduct R. 3.4(a). Rule 4.1(b) states: "[i]n the course of representing a client[,] a lawyer shall not knowingly[] . . . fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client . . . ."[10] Model Rules of Prof. Conduct R. 4.1(b). Lastly, Rule 8.4(c) states: "[i]t is professional misconduct for a lawyer to[] . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" Model Rules of Prof. Conduct R. 8.4(c).

"The duty of candor is paramount, surpassing generalized notions relating to counsel's obligations to other counsel, and in many respects, to the client." *Hanover Ins. Co. v. United States*, 146 Fed. Cl. 447, 450 (2019). As described by Judge Bruggink in *In re Mattox*:

> This standard reflects the truism that it is essential that members of the bar be trustworthy and that their statements be completely reliable. Public confidence in the integrity of both the bench and the bar requires no less. That confidence, in turn, is essential to the continued vitality of the legal system, as well as to the maintenance of an independent bar. As Justice Frankfurter has stated: "It is a fair characterization of the lawyer's responsibility in our society that he stands 'as a shield' . . . in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of strictest observance of fiduciary responsibility, that have, throughout the centuries been compendiously described as 'moral character.'"

35 Fed. Cl. 425, 429 (1996), *aff'd*, 106 F.3d 426 (Fed. Cir. 1997) (quoting *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 247, (1957) (Frankfurter, J., concurring)). The Court will review each alleged breach of candor under these standards.

### 1.    Protective Order Negotiations

Defendants allege plaintiffs' "deception began no later than October 2018, when Mynette and the [g]overnment negotiated a protective order . . . that specifically excluded all identified party insiders[,]" but failed to disclose the Yorio-Mynette relationship. Defs.' Suppl. Br. at 3. Defendants allege the only reason the protective order does not "explicitly" exclude Yorio from AEO access is "because there was fraud by omission in the formation of the protective order." Tr. at 60:2–61:10. According to defendants, plaintiffs then "[mis]represented to the Court . . . '[t]he parties have conferred *in good faith* to negotiate the proposed terms of a protective order.'" Defs.' Suppl. Br. at 3 (quoting J. Mot. PO) (citing RCFC 26(c) (requiring certification of good

---

[10] Applying this rule to omissions in settlement negotiations after an exhaustive survey of federal caselaw, the District Court for the District of Maryland held four questions must be answered in determining if Rule 4.1(b) has been violated: "(1) what is the statement or omission in dispute? (2) is it untrue or deceptively incomplete in any significant respect? (3) reasonably viewed, is it important to the subject that is being negotiated? and (4) at the time it was made, did the attorney know or should have known under the circumstances that the statement was untrue?" *Ausherman v. Bank of Am. Corp.*, 212 F. Supp. 2d 435, 451 (D. Md. 2002).

faith to obtain protective order)).  As a result of these negotiations, the parties agreed to use the Court's standard form protective order with minor, non-substantive changes.  *See* PO; Tr. at 101:8–102:7.

Plaintiffs' state they "did not believe there to be any issue with [Yorio's] role at Mynette under that standard [protective order] language."  Pls.' Resp. at 24.  Yorio understood "he was an outside contingency lawyer for both Mynette and Dr. Colby[, and] . . . any financial interest he had in the outcome of the case was that of a partner working at a contingency law firm."  *Id.* Plaintiffs argue they accordingly did not knowingly fail to disclose a material fact, make any false statements, or "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Pls.' Resp. at 24 (quoting Model Rules of Prof. Conduct R. 8.4).  "At a minimum, at the time of the fall 2018 [protective order] 'negotiations,' Mynette and Dr. Colby had a reasonable basis to believe that they had no duty to disclosure [sic] the Mynette-Yorio relationship."  Pls.' Suppl. Br. at 32.

The only "false statement . . . to [the] tribunal[,]" Model Rules of Prof. Conduct R. 3.3(a)(1), defendants claim plaintiffs made was the parties "conferred in good faith to negotiate the proposed terms of [the] protective order[.]"  Defs.' Suppl. Br. at 11 (quoting J. Mot. PO at 1). The Court finds *supra* Section V.A.1 Yorio ceased being a Mynette officer before this case began.  The Court then finds *supra* Section V.A.2 plaintiffs did not violate the plain terms of the protective order by virtue of Yorio's shareholder and director status with Mynette.  *Supra* Section V.A.3, however, the Court determines it would not have entered the protective order as written if presented with this dispute before protective order entry.  Rather, after thorough review of the relevant caselaw, the Court holds it would have required the protective order include a CNS.  *See supra* Section V.A.3.  In reviewing the caselaw, the Court notes not a single case presented the facts now before the Court—in every case, the parties sought permission to view confidential information before any access occurred.  *See supra* note 5.  As such, plaintiffs represented the parties conferred in "good faith" under the reasonable belief they would not violate the proposed protective order, J. Mot. PO, but caselaw otherwise required them to raise the question of Yorio's access prior to viewing confidential materials, *see supra* note 5.

"The phrase 'good faith' in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation."  *Arnold M. Diamond, Inc. v. Dalton*, 25 F.3d 1006, 1010 (Fed. Cir. 1994).  By contrast, "[b]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Level 3 Commc'ns, LLC*, 724 F. App'x at 934–35 (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)).  As plaintiffs failed to raise the question of Yorio's access during protective order negotiations as the law requires, *see supra* note 5, plaintiffs failed to be "faithful to [their] duty or obligation."  *Arnold M. Diamond, Inc.*, 25 F.3d at 1010.  The Court cannot doubt plaintiffs knew Yorio was Mynette's [XXXX] shareholder, director, and former officer when negotiating the protective order.  *See* Org. Resolutions.  Plaintiffs are "presumed to know the law" and should have known the Yorio-Mynette relationship was material to the protective order, and Yorio's access should have been litigated before he viewed any confidential materials.  *Meidl v.*

*United States*, 100 Fed. Cl. 1, 7 (2011) (quoting *Page v. United States*, 51 Fed. Cl. 328, 339 n.13 (2001), *aff'd*, 50 F. App'x 409 (Fed. Cir. 2002)); *see supra* Section V.A.3 & note 5.  Plaintiffs failed to fulfill this duty but did so under the reasonable belief they would not violate the protective order because Yorio had resigned as officer, Yorio was outside counsel, and the protective order does not place any limitations on shareholders or directors.  *See supra* Section V.A.1; Tr. at 56:14–57:4 (defendants counsel agreeing they "have not alleged [Yorio is] in-house counsel").  These facts may lead to an inference of impropriety on the part of plaintiffs because, at minimum, plaintiffs obtained a protective order while withholding material information.  *See supra* Section V.A.3.  Plaintiffs' actions were at best the result of "bad judgment or negligence" and at worst the result of a "dishonest purpose[.]"  *Level 3 Commc'ns, LLC*, 724 F. App'x at 934–35.  In either case, plaintiffs were not "faithful to [their] duty" to disclose the Yorio-Mynette relationship, so the Court cannot find plaintiffs "conferred in good faith to negotiate the proposed terms of [the] protective order."  *Arnold M. Diamond, Inc.*, 25 F.3d at 1010; J. Mot. PO at 1.  As such, plaintiffs' representation the parties conferred in "good faith[,]" *id.*, constitutes a "false statement . . . to [the] tribunal," Model Rules of Prof. Conduct R. 3.3(a)(1).

Plaintiffs' failure to disclose the Yorio-Mynette relationship during protective order negotiations further violates their duty to be truthful to opposing counsel under Model Rule 4.1(b).  Defendants contend plaintiffs obtained the protective order at issue through "fraud by omission[.]"  Tr. at 60:6–61:10.  Had plaintiffs disclosed this information at the onset, as the Court holds *supra* Section V.A.3, they would not have been able to obtain the protective order as it was entered.  The Court's analysis *supra* Section V.A.3 demonstrates the Yorio-Mynette relationship is a material fact.  The failure to disclose that material fact directly assisted plaintiffs in obtaining a protective order containing a gap that allowed Yorio to view defendants' AEO information without risk of a protective order violation.  *See supra* Section V.A.2.  Plaintiffs either knew "or should have known under the circumstances" Yorio's status as [XXXX] shareholder and director was material to the Court's entry of the protective order.  *Ausherman*, 212 F. Supp. 2d at 451.  If plaintiffs had reviewed any caselaw on protective order access, they would have realized their duty to disclose arose prior to Yorio's access.  *See supra* note 5; *Meidl*, 100 Fed. Cl. at 7 ("[I]t is a 'well-established rule that a citizen is presumed to know the law, and that ignorance of the law will not excuse.'" (quoting *Page*, 51 Fed. Cl. at 339 n.13)).  Accordingly, the Court finds plaintiffs breached their duty under Model Rule 4.1(b).[11]

## 2.      Initial Disclosures

---

[11] Model Rule 3.4(a) involves access to evidence, so the Court finds it inapposite to plaintiffs' failure to disclose the Yorio-Mynette relationship during protective order negotiations.  *See* Defs.' Mot. Sanctions at 21 n.15.  In addition to a breach of Model Rule 4.1(b), it is important to emphasize the Court is troubled by plaintiffs' counsel's behavior and decisions with respect to this particular incident.  Such conduct is out of the ordinary and may well support a finding of "professional misconduct" under Model Rule 8.4(c) as well.  *See United States v. Sierra Pac. Indus.*, 759 F. Supp. 2d 1215, 1218 (E.D. Cal. 2011) ("The ABA Model Rules forbid all 'conduct involving dishonesty, fraud, deceit, or misrepresentation.'  Model Rule of Professional Conduct R. 8.4(c).  These rules not only forbid affirmative false statements of fact, but misleading omissions.  'Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative statements.'  Model Rule of Professional Conduct 4.1, Comment 1.").

Defendants argue plaintiffs were obligated to identify Yorio in their initial disclosures. Defs.' Mot. Sanctions at 7. At oral argument, defendants conceded this "rule is limited to the evidence [a party] intend[s] to rely upon[.]" Tr. at 70:9–10. Defendants also conceded if an individual is "not a fact witness," their identification in initial disclosures "is not required[.]" Tr. at 70:17–20. Plaintiffs state they did not identify Yorio in initial disclosures "because they didn't intend to use his testimony to support any claim or defense." Pls.' Resp. at 13. Despite the fact Yorio is not one of plaintiffs' fact witnesses, Yorio "is a robust source" of information, so defendants argue he "typically is listed in initial disclosures." Tr. at 70:12–13. Defendants argue Chief Judge Connolly in the District of Delaware requires shareholders "be disclosed under a standing order at the beginning of the case[,]" and that same requirement ought to apply here. Tr. at 57:24–58:12; Defs.' Suppl. Br. at 20 (citing Connolly, C.J., D. Del. S.O. Re FRCP 7.1 Disclosure Statements, ECF No. 142-3 (Defs.' Ex. II)).

RCFC 26(a)(1)(A)(i) obligates adverse parties to disclose without a discovery request, in relevant part, "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses[.]" "The 2000 amendments eliminated the requirements that the parties disclose information concerning individuals or documents that might be detrimental to their cases or that might have knowledge or contain information 'relevant to disputed facts alleged with particularity in the pleadings,' even though the disclosing party had no intention of using the individual or document in the presentation of its case." 6 Moore's Federal Practice - Civil § 26.22 (2022). "Sanctions should not be imposed under Rule 37(c)(1) where the failure to disclose was substantially justified. For purposes of Rule 37(c)(1), a party's failure to disclose is substantially justified where the non-moving party has a reasonable basis in law and fact, and where there exists a genuine dispute concerning compliance." *Poitra v. Sch. Dist. No. 1 in the Cnty. of Denver*, 311 F.R.D. 659, 668 (D. Colo. 2015) (citing *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995) (granting in part a motion to exclude the testimony of an expert witness because of the proffering party's failure to disclose a list of other cases in which the expert had testified)) (imposing sanctions for a party's failure to include a witness it intended to call in initial disclosures). Defendants admit the text of RCFC 26(a)(1) does not require plaintiffs to identify Yorio in initial disclosures. Tr. at 70:9–20. Plaintiffs state they did not identify Yorio in initial disclosures "because they didn't intend to use his testimony to support any claim or defense." Pls.' Resp. at 13. The Court agrees with plaintiffs—plaintiffs did not breach their RCFC 26(a)(1) initial disclosure obligations, and plaintiffs shall not be sanctioned for this conduct as they had "a reasonable basis in law and fact" under the text of the rule not to include Yorio. *Poitra*, 311 F.R.D. at 668.

Chief Judge Connolly's standing order says nothing of a party's Rule 26(a)(1) initial disclosure obligations. Connolly, C.J., D. Del. S.O. Re FRCP 7.1 Disclosure Statements. Rather, the standing order adds an additional obligation for parties' Rule 7.1 disclosure statements. *Compare id.* (requiring a Rule 7.1 disclosure statement include "the name of every owner, member, and partner of the party, proceeding up the chain of ownership until the name of every individual and corporation with a direct or indirect interest in the party has been identified"), *with* Fed. R. Civ. P. 7.1(a)(1) (requiring a disclosure statement "identif[y] any parent corporation and any publicly held corporation owning 10% or more of its stock"). Even if the standing order did concern Rule 26(a)(1) initial disclosures, all it would demonstrate is

general identification of shareholders or directors is ordinarily not required.  Defendants fail to show breach of any duty regarding plaintiffs' initial disclosures.[12]

### 3.    Gemalto's First Interrogatory

Defendants argue plaintiffs were required to disclose Yorio's ownership of Mynette when Gemalto requested "the identities of the persons or entities with any interest (including ownership and security interests) in the [a]sserted [p]atents at any time[.]"[13]  Defs.' Mot. for Sanctions at 8 (emphasis removed).  Defendants contend "[XXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXX]."  Id. (citations omitted).  Plaintiffs stated in a supplement to their response to this interrogatory "[XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXX]."  Id. at 9 (citation omitted).  [XXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXX].  Id.

Plaintiffs respond:  "Mynette owns the patents; under Delaware law Mr. Yorio does not have an ownership (or security) interest in them."  Pls.' Resp. at 13.  "No matter the esoteric and out-of-context statements [d]efendants may cite from unpublished chancery court decisions, this standard 'ownership history' interrogatory does not reasonably seek the names of each corporate stockholder (imagine Apple having to disclose its shareholders)."  Pls.' Suppl. Br. at 11–12.

Defendants do not argue Yorio has a direct ownership interest in the asserted patents, so the only issue is whether Yorio's Mynette share ownership was responsive to Gemalto's interrogatory requesting the identities of those with an interest in the patents.  Defs.' Mot. for Sanctions at 8.  Mynette is a corporation organized in the state of Delaware.  Mynette Certificate of Inc.  In 1930, the United States Supreme Court held:  "The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members."  Klein v. Bd. of Tax Supervisors of Jefferson Cnty., Ky., 282 U.S. 19, 24 (1930).  More recently, the Delaware Supreme Court ruled being a "stockholder . . . does not give [one] a claim over any specific asset of [the corporation]."  Cohen v. State ex rel. Stewart, 89 A.3d 65, 95 (Del. 2014).  "[T]he corporation is the legal owner of its property and the stockholders do not have any specific interest in the assets of the corporation."  Id. at 95 n.130 (citation omitted).  "The property of the corporation is its property and not that of the shareholders as owners, even if there is only one [s]hareholder."  Id. (citation omitted); see also Americas Mining Corp. v.

---

[12] Chief Judge Connolly's standing order is further under review by the Federal Circuit as a plaintiff affected by the order filed a petition for a writ of mandamus seeking appellate review of the party disclosures required.  In re Nimitz Techs. LLC, No. 23-103 (Fed. Cir. Nov. 17, 2022).  The first question presented in the petition provides:  "Did the district court abuse discretion in entering its Standing Order Regarding Third-Party Litigation Funding Arrangements because third-party funding is not relevant to any issue that the district court may consider?"  Pet. Writ Mandamus at 4, In re Nimitz Techs. LLC, No. 23-103 (Nov. 16, 2022), ECF No. 2.  Since issuance, the standing order has prompted much discussion within the patent bar.  See, e.g., Andrew Strickler, Del. Judge's Tough Stance On Disclosures Roils Patent Bar, Law360 (Dec. 2, 2022, 4:33 PM).

[13] Supra Section I.C.3 fully details the parties' communications regarding Gemalto's first interrogatory.

*Theriault*, 51 A.3d 1213, 1265 (Del. 2012) (Berger, J., concurring in part) ("No stockholder, including the [XXXX] stockholder, has a claim to any particular assets of the corporation."). "In a general and liberal sense, statements are sometimes made that the shareholders of a corporation are the real equitable owners of any property held by it; but that statement is not strictly correct. Until legally dissolved, a corporation is the *absolute owner* of all of its property." *Wilmington Tr. Co. v. Wilmington Soc. of Fine Arts*, 34 A.2d 308, 311 (Del. Ch. 1943) (emphasis added) (citations omitted), *aff'd sub nom. Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476 (Del. 1945). Accordingly, as a Mynette shareholder, Yorio does not have a property interest in the asserted patents and identifying his ownership of Mynette would not be responsive to Gemalto's interrogatory. Defendants' arguments to the contrary are unpersuasive. *See* Defs.' Reply at 5 (citing 1 Fletcher Cyc. Corp. § 31; *Norte & Co. v. Manor Healthcare Corp.*, 11 Del. J. Corp. L. 959, 964 (Del. Ch. Nov. 21, 1985)).

Defendants place great weight on plaintiffs' supplemental response to this interrogatory where plaintiffs stated: "Colby has an indirect interest in this action by virtue of his ownership of Mynette shares." Mynette 2nd Suppl. Interrog. Resp. at 6. Although plaintiffs offered this statement in response to defendants' request for supplementation, this statement is neither responsive to the initial interrogatory nor does it obligate any disclosure pertaining to Yorio. First, the interrogatory concerns anyone with an interest in the *asserted patents*, not an interest in *this action* broadly. *See* Gemalto 1st Interrog. at 8. As such, even if "Yorio also 'has an indirect interest in this action by virtue of his ownership of his Mynette shares" as defendants contend, plaintiffs would have no reason to disclose that fact in response to this interrogatory. Defs.' Mot. for Sanctions at 9 (emphasis removed). Plaintiffs' oversharing in response to a question asking them to "specify Dr. Colby's 'interest' in this case" does not alter this conclusion. Gemalto 2nd Deficiency Letter at 1. Second, Gemalto's requests for supplementation focused exclusively on Colby and his Mynette ownership. Gemalto Deficiency Letter at 2 (requesting "Colby's ownership stake in Mynette"); Gemalto 2nd Deficiency Letter at 1 (requesting "Mynette's capital structure or Steven Colby's contribution" and "identif[ication of] the value of those shares and specify Dr. Colby's 'interest' in this case"). As such, when plaintiffs responded further detailing Colby's ownership of Mynette and the consideration received for assigning the asserted patents to Mynette, they fulfilled their obligations. *See* Mynette 2nd Suppl. Interrog. Resp. at 6. Defendants fail to show breach of any duty regarding plaintiffs' responses to Gemalto's first interrogatory. *Cf. Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976) (finding trial judge did not abuse discretion in sanctioning party "[a]fter seventeen months where crucial interrogatories remained substantially unanswered despite numerous extensions granted at the eleventh hour and, in many instances, beyond the eleventh hour, and notwithstanding several admonitions by the [c]ourt and promises and commitments by the [sanctioned party]") (citation omitted).

### 4.   Gemalto's RFP 24

Defendants assert, in response to Gemalto's 9 December 2019 RFP 24, plaintiffs "produced only documents that do not identify Yorio or Mynette's other Officers, and withheld Mynette's Organizational Resolutions that disclose the ownership and formation of the company." Defs.' Mot. for Sanctions at 10 (emphasis removed) (citation omitted); *see* Gemalto

1st RFP at 14.  "Only after Colby identified Yorio's ownership in [a] deposition did Mynette finally produce them" on 17 September 2021.  Defs.' Mot. for Sanctions at 10.

Plaintiffs agree Mynette's organizational resolutions were responsive to RFP 24 and "regret[] not producing documents showing Mr. Yorio was a director sooner[.]"  Pls.' Resp. at 14.  Plaintiffs contend Mynette's founding documents are kept as separate files, and plaintiffs' failure to produce the resolutions sooner was unintentional.  Tr. at 82:9–85:20.  Plaintiffs argue they did not certify production was complete until the close of discovery, so since they produced the resolutions before discovery closed, there is no breach.  Tr. at 88:24–89:9 (plaintiffs' counsel stating:  "I have not seen any certification that, for example, [our] production in response to RFP [24] . . . is complete in any of these emails.  It's just been rolling productions . . . from paralegals from both sides.").

RCFC 26 provides the Court's "General Provisions Governing Discovery."  RCFC 26(g)(1)(B)(ii) requires:  "every discovery . . . response . . . must be signed by the attorney of record in the attorney's own name . . . .  By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry[,] with respect to a discovery . . . response . . . it is . . . not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation . . . ."  RCFC 26(g)(3) states:  "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both."  *See also supra* Model Rules of Prof. Conduct Rs. 3.4(a) & 8.4(c).  In *National Hockey League v. Metropolitan Hockey Club, Inc.*, the Supreme Court found the trial judge did not abuse discretion in sanctioning a party which "fail[ed] to file [its] responses [to interrogatories] on time, [and] the responses which [it] ultimately did file were . . . grossly inadequate."  427 U.S. at 642.

RFP 24 solicited:  "Documents sufficient to show the organizational structure of Mynette, including the name and position or title of Mynette's current officers, directors, and managing agents, by position and/or title."  Gemalto 1st RFP at 14.  It is undisputed "[p]laintiffs produced Mynette's Bylaws and Certificate of Incorporation" in response to RFP 24, neither of which identifies the current officers or directors.  Defs.' Suppl. Resp. at 5 n.1; Defs.' Mot. for Sanctions at 10 n.5; *see* Mynette Certificate of Inc.; Mynette Bylaws.  It was only after Colby's first deposition where he disclosed the Yorio-Mynette relationship, and after Gemalto threatened to file a motion to compel plaintiffs to produce documents responsive to RFP 24, plaintiffs finally produced the organizational resolutions.  *See* Gemalto Demand Email at 1–2.  Plaintiffs offer no explanation why responsive documents were not produced prior to the threat of a motion to compel.  Tr. at 82:9–85:20.

Plaintiffs' failure to produce the organizational resolutions with their initial RFP 24 response is at best the result of plaintiffs' failure to conduct "a reasonable inquiry," or at worst was "interposed for an[] improper purpose."  RCFC 26(g)(1)(B)(ii).  As far as the Court is aware, the organizational resolutions document is not just responsive to RFP 24—it is the only responsive document to this inquiry.  *Compare* Org. Resolutions, *with* Mynette Certificate of Inc., *and* Mynette Bylaws.  The organizational resolutions document is the only document identifying Mynette's officers and directors.  *See* Org. Resolutions at 2.  The resolutions formally

adopted Mynette's Bylaws, and the organizational resolutions document includes the bylaws as an attachment. *Id.* at 1 ("RESOLVED, that the Bylaws presented to this Board, attached hereto as Exhibit A are hereby adopted as the Bylaws of the Company . . . ." (emphasis removed)); *but see* Tr. at 83:19–84:13 (Yorio explaining the bylaws were kept as a separate electronic file). Plaintiffs produced the bylaws but did not produce the organizational resolutions. Further, the organizational resolutions are one of few Mynette founding documents. *See supra* Section I.B. The organizational resolutions document was signed by both Colby and Yorio when forming Mynette, [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXX]. It is accordingly difficult to conceive of any plausible scenario where plaintiffs respond to RFP 24 without producing Mynette's organizational resolutions. At minimum, the Court cannot find plaintiffs properly responded to RFP 24 after conducting the required "reasonable inquiry" as required by RCFC 26(g)(1)(B)(ii). Given plaintiffs' failure to disclose the Yorio-Mynette relationship during protective order negotiations, however, it seems likely plaintiffs may have withheld the organizational resolutions for "an[] improper purpose." *Id.*

Plaintiffs argue the practice of all parties in this suit was to provide "rolling productions[,]" and they did not provide a Rule 26 certification on their first RFP 24 response, so they did not breach any duty. Pls.' Suppl. Br. at 31; Tr. at 86:15–20. Whether plaintiffs certified their "production in response to RFP [24] . . . is complete" is irrelevant.[14] Tr. at 88:24–89:9. RCFC 26(g)(1) requires "*every discovery . . . response . . . must be signed* by the attorney of record in the attorney's own name[.]" (emphasis added). RCFC 26(g)(2) states: "Other parties have no duty to act on an unsigned . . . response . . . until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention." As such, either plaintiffs supplied a procedurally deficient response to RFP 24 that has the effect of not responding at all, or plaintiffs' RFP 24 response contains some element of a signature from Yorio (email signature or otherwise) that satisfies RCFC 26(g)(1). In either case, plaintiffs failed to produce their only responsive document in response to RFP 24, creating an appearance of impropriety.

Although plaintiffs failed initially to produce a document responsive to RFP 24, they did not entirely fail to respond—plaintiffs produced Mynette's incorporation certificate and bylaws and later produced the resolutions. *See Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1363 (Fed. Cir. 1990) (reversing a grant of sanctions when a "response was not so evasive and misleading as to constitute a failure to respond"). When defendants discovered plaintiffs failed to adequately respond to RFP 24, they threatened to file an RCFC 37(a) motion to compel. Gemalto Demand Email at 1–2. If plaintiffs continued withholding the organizational resolutions, Gemalto's threatened motion to compel would have been justified. RCFC 37(a)(1), however, required Gemalto to "confer with" plaintiffs before filing such a motion. In response, plaintiffs produced the responsive organizational resolutions, thereby extinguishing Gemalto's

---

[14] Following oral argument, the parties sent the Court four substantive emails on this point, discussing a treatise on sanctions and various other rules within the RCFC. As these belated email-briefs are not a part of the docket, and the Court has not granted any party leave to file another round of supplemental briefing, the Court will not consider or address these arguments.

basis for the motion.  Plaintiffs accordingly cured their response's deficiency once defendants notified them of the problem and did not "fail[] to respond."  *Badalamenti*, 896 F.2d at 1363.

The timing of the Mynette organizational resolutions production is questionable.  Absent Colby's deposition testimony and Gemalto's threat of compulsion, plaintiffs may never have produced the organizational resolutions.  The only explanation plaintiffs offer is regret and counsel's statement it was "unintentional."  Tr. at 82:9–85:20; Pls.' Resp. at 14.  Plaintiffs do not explain how they conducted a reasonable inquiry when responding to RFP 24 and how that inquiry resulted in their failure to produce the resolutions.  *See* RCFC 26(g)(1)(B)(ii).  Considering plaintiffs offer no reasonable basis for their failure to produce the organizational resolutions in their initial RFP 24 response—and plaintiffs failed to disclose the Yorio-Mynette relationship during protective order negotiations—the Court must conclude plaintiffs did not conduct a "reasonable inquiry" before their initial RFP 24 response and, based on plaintiffs' conduct during this litigation, can infer plaintiffs initially responded to RFP 24 with "an[] improper purpose[.]"  RCFC 26(g)(1)(B)(ii).[15]  Accordingly, plaintiffs violated RCFC 26 "without substantial justification," so the Court "must impose an appropriate sanction[.]"  RCFC 26(g)(3); *see also Nat'l Hockey League*, 427 U.S. at 642.  In imposing "an appropriate sanction" *infra* Section V.C, the Court will take into account plaintiffs' cooperation with defendants' RCFC 37(a) demand but infer, based on plaintiffs' conduct throughout this litigation, their response was sent with "an[] improper purpose[.]"  RCFC 26(g)(1)(B)(ii), (g)(3).

### 5.    Litigation Counsel Privilege Log Exception

Defendants argue "the parties negotiated and reached an agreement [on a litigation counsel privilege log exception], all while Yorio and [p]laintiffs withheld information highly relevant to th[e] agreement[]."  Defs.' Mot. for Sanctions at 10.  "Unaware that [p]laintiffs' 'litigation counsel' was also Mynette's [XXXX] owner and an officer and director of the company, Gemalto (with whom Mynette agreed to exchange logs) agreed, only to later find out that [p]laintiffs withheld correspondence between the two owners of . . . Mynette 'on the basis of privilege' due to 'the agreed upon exception for litigation counsel[.]'"  *Id.* (citation omitted).  Defendants state Mynette's first privilege log did not list any communications between Yorio and Colby, but Mynette later supplemented to list two communications.  *Id.* at 10 n.6.

Plaintiffs respond:  "Such an exception is widely used in patent litigations to avoid the burden of logging the many work product emails and documents created by or for counsel as a result of the litigation."  Pls.' Resp. at 14.  Plaintiffs state defendants "fail to explain how, absent this agreement, Mr. Yorio's interest in Mynette would have been revealed."  *Id.*  "To the extent there are privileged entries about Mynette's corporate form, a log listing communications with counsel about Mynette would not have revealed any of the information [d]efendants' [sic] claim was concealed."  *Id.* at 14–15.

Defendants do not explain how plaintiffs' request for a privilege log exception violates any of the Model Rules of Professional Conduct, how the privilege log otherwise would have

---

[15] The Court notes ABA Model Rules 3.4(a) & 8.4(c) may be applicable to plaintiffs' failure to adequately respond to RFP 24.  *See* Model Rules of Prof. Conduct Rs. 3.4(a) & 8.4(c); *supra* note 11.  As the Court finds a sanctionable violation of its own rules, however, the Court will not assess the applicability of the ABA's rules here.

revealed the Yorio-Mynette relationship, or how the Yorio-Mynette relationship is "highly relevant" to the exception.  Defs.' Mot. for Sanctions at 10; *see* Yorio Priv. Log Email at 1. Defendants do not disagree Yorio is plaintiffs' litigation counsel, despite his share ownership and board membership.  Tr. at 56:14–57:4 (defendants' counsel agreeing they "have not alleged [Yorio is] in-house counsel").  As such, some of Yorio's communications with plaintiffs involve him acting in his capacity as litigation counsel, are privileged, and are irrelevant to his relationship with Mynette.  *See Ritchie v. Sempra Energy*, No. 10-1513, 2014 WL 12638874, at *1 (S.D. Cal. Aug. 4, 2014) ("[B]ecause the parties have agreed and their agreement is likely to streamline the litigation to a certain degree, communications involving in-house or outside counsel created after the filing of plaintiff's original Complaint need not be listed on a privilege log.").  On the other hand, Yorio remains [XXXX] shareholder and director, so some of his communications with plaintiffs involve him acting in this capacity and do not fall under the exception.  In either case, whether the Yorio-Mynette relationship was disclosed or not, this privilege log exception would be the same—Yorio's communications as litigation counsel would be excluded from the log, and his business communications would not.  As such, the Court does not find the Yorio-Mynette relationship material to this issue.  Whether plaintiffs are misusing this exception by failing to log Yorio's business communications with plaintiffs is not before the Court.  Defs.' Mot. for Sanctions at 10 n.6; Tr. at 91:21–23 (defendants' counsel stating they "have seen zero documents, zero emails of any kind between Mr. Yorio and Mr. Colby and there's no way all of those documents are privileged").

### C.    The Appropriate Remedy for Plaintiffs' Conduct

Defendants argue:  "Plaintiffs engaged in a years-long, willful campaign of omissions, deception, and gamesmanship to avoid disclosing the fact that AEO documents were being handed directly to Mynette.  These actions have prejudiced the [d]efendants and third parties, and no sanction but dismissal will remedy that harm."  Defs.' Mot. for Sanctions at 23. Defendants contend plaintiffs have acted in bad faith, and alternative sanctions cannot remedy the severe prejudice.  *Id.* at 23–26.  Although defendants argue lesser sanctions would be inadequate, plaintiffs should alternatively be prohibited from using any AEO information in this action, "as such documents are the fruits of Mynette's violations."  *Id.* at 26–27.  Defendants also request a perpetual covenant not to sue defendants for all patents owned by plaintiffs and Yorio now or in the future.  Defs.' Suppl. Br. at 16.  Defendants finally argue the doctrine of unclean hands supports their motion for sanctions.  *Id.* at 20.

Plaintiffs respond defendants face no prejudice from Yorio viewing AEO information as his relationship is no more advantageous to plaintiffs than defendants' outside counsel is to their clients.  Pls.' Resp. at 27.  Plaintiffs argue defendants' asserted prejudice is manufactured as they have not identified any produced AEO documents that would benefit plaintiffs in future litigation.  *Id.*  Plaintiffs also note Yorio "is subject to the [protective order] prosecution bar[,]" and Colby cannot access Yorio's files, so the AEO information cannot benefit plaintiffs' patent prosecution.  Pls.' Suppl. Resp. at 17.  Plaintiffs contend defendants have over-designated documents as AEO, and the doctrine of unclean hands precludes sanctions as defendants also delayed discovery.  Pls.' Suppl. Br. at 39–40.  Although plaintiffs do not believe sanctions are warranted, plaintiffs believe a limited CNS would be more appropriate than defendants' proposed sanctions.  *Id.* at 38–39.

"The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." *Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1450 (Fed. Cir. 1988) (citing *Adkins v. United States*, 816 F.2d 1580, 1581 (Fed. Cir. 1987); *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed. Cir. 1986)). "But a trial court's discretion to impose sanctions is not unfettered, especially when the de facto result of the sanction is dismissal." *Id.* at 1451. "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 209 (1958). "There is a strong policy favoring a trial on the merits and against depriving a party of his day in court." *Ingalls Shipbuilding, Inc.*, 857 F.2d at 1451 (quoting *Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989, 996 (8th Cir. 1975)).

A sanction of dismissal "is a harsh remedy, which should be reserved for only the most severe abuses of the discovery process." *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1423 (Fed. Cir. 1997) (quoting *Hendler v. United States*, 952 F.2d 1364, 1382 (Fed. Cir. 1991)) (citing *Dahl v. City of Huntington Beach*, 84 F.3d 363, 366 (9th Cir. 1996) (holding dismissal "is so harsh a penalty it should be imposed as a sanction only in extreme circumstances")) (collecting cases); *see also Mancon Liquidating Corp. v. United States*, 210 Ct. Cl. 695, 696 (1976) (holding the sanction of "dismissal is a drastic action to be used only when clearly authorized"). "Because dismissal is universally recognized as a sanction of last resort, courts are required, before imposing that sanction, to consider fully all the surrounding circumstances, such as the degree of culpability, the amount of prejudice, and the availability of less drastic sanctions." *Genentech, Inc.*, 122 F.3d at 1423 (collecting more cases). "Alternative sanctions include:  a warning; a formal reprimand; placing the case at the bottom of the calendar; a fine; the imposition of costs or attorney fees; the temporary suspension of the culpable counsel from practice before the court; preclusion of claims or defenses; the imposition of fees and costs upon plaintiff's counsel; and providing plaintiff with a second or third chance." *Colbert v. United States*, 30 Fed. Cl. 95, 99 (1993) (cleaned up) (citation omitted).

Dismissal is appropriate where the failure to comply with a pretrial discovery order is due to "willfulness, bad faith, or . . . fault" on the part of a litigant. *Societe Internationale*, 357 U.S. at 212; *see also Nat'l Hockey League*, 427 U.S. at 643 (finding dismissal under Rule 37 was justified where there was "flagrant bad faith" and counsel displayed "callous disregard" for their responsibilities); *Mancon*, 210 Ct. Cl. at 696–97 (holding sanctions were not warranted where there was no evidence of willfulness). "[A] sanction tantamount to dismissal . . . is inappropriate" if based on "[a] party's simple negligence, grounded in confusion or sincere misunderstanding[.]" *Ingalls Shipbuilding, Inc.*, 857 F.2d at 1451 (quoting *Marshall v. Segona*, 621 F.2d 763, 768 (5th Cir. 1980)) (citing *Equal Emp. Opportunity Comm'n v. Troy State Univ.*, 693 F.2d 1353, 1357 (11th Cir. 1982); *United Artists Corp. v. Freeman*, 605 F.2d 854, 856–57 (5th Cir. 1979)).

As discussed *supra* Sections V.A–B, plaintiffs' failed to disclose the Yorio-Mynette relationship during protective order negotiations and initially failed to produce documents revealing the Yorio-Mynette relationship. *Field Turf USA, Inc. v. Sports Construction Group,*

*LLC* is "the only case [d]efendants have found in which a lawyer similarly accessed AEO material after concealing his ownership stake in the party he represented." Defs.' Suppl. Br. at 8 (citing No. 6-2624, 2007 WL 4412855 (N.D. Ohio Dec. 12, 2007)).  Similar to the action here, *Field Turf* is a patent infringement case in which the plaintiff accused the defendant's counsel of violating the protective order because, although he claimed to be outside counsel, he also was an officer, "Class B Member[,]" and had an ownership interest.  2007 WL 4412855, at *1–3.  The court found the defendant's counsel "ha[d] revealed only so much information as they deemed necessary, even after the Court made clear that it expected full candor and disclosure."  *Id.* at *5. The court then determined the sanction of dismissal was appropriate based on the following facts:  defendant's counsel delayed discovery into the defendant's ownership structure; defendant's counsel refused to provide discovery into the relationship even after plaintiffs put them on notice of a potential protective order violation; defendant's counsel "affirmatively misled" opposing counsel and the court "by material omissions[,]" including misstatements at a status conference, silence in the face of such misstatements, and misleading and incomplete affidavits; and defendant's counsel failed to disclose counsel's officer position at the defendant-company, which shares the same address as defendant's counsel.  *Id.* at *5–6.  The court concluded the defendant's counsel "acted in bad faith" and violated a court order but did not violate the protective order.  *Id.* at *6.  The court denied the plaintiffs' motion for default judgment, dismissed the defendant's counterclaims, and disqualified the defendant's counsel from representing the defendant any further in the matter.  *Id.* at *6–7 (noting it "may have been enough" if the defendant and counsel "had admitted their relationship and confronted the issue when the [protective order] was being negotiated").

   "[C]onsider[ing] fully all the surrounding circumstances," plaintiffs' conduct in this case is far less culpable than counsel's conduct in *Field Turf*.  *Genentech, Inc.*, 122 F.3d at 1423.  Plaintiffs have not engaged in "contumacious conduct . . . since this issue was raised before the Court" like the defendant in *Field Turf*, 2007 WL 4412855, at *6—rather, plaintiffs have not engaged in "contumacious conduct" at all.  When defendants in this case discovered what they believed to be a protective order violation and raised this issue with plaintiffs, *see* Gemalto Demand Email at 1–2, plaintiffs agreed to many of Gemalto's requests, including fully disclosing the Yorio-Mynette relationship and supplementing their RFP 24 response.  Defs.' Mot. for Sanctions at 10; Pls.' Suppl. Br. at 8.  Plaintiffs have not attempted to mislead the Court during status conferences or oral argument.  *Cf. Field Turf USA, Inc.*, 2007 WL 4412855, at *5–6.  Plaintiffs also have not submitted misleading affidavits and letters to obscure the nature of the Yorio-Mynette relationship or violated any court orders.  *Cf. id.*  Although the Court finds *supra* Section V.B.1 plaintiffs submitted a false statement to the Court when they certified protective order negotiations were conducted in good faith, the Court notes plaintiffs' actions were likely the result of "bad judgment or negligence," *Level 3 Commc'ns, LLC*, 724 F. App'x at 934–35.  Further, although plaintiffs failed to produce the responsive Mynette organizational resolutions in their first response to RFP 24, *see supra* Section V.B.4, plaintiffs subsequently complied with defendants' requests and did not delay discovery any further.  Defs.' Mot. for Sanctions at 10; Pls.' Suppl. Br. at 8.  Defendants provide the Court with no evidence of plaintiffs' "flagrant bad faith" or "callous disregard" for their responsibilities.  *Nat'l Hockey League*, 427 U.S. at 643; *see also Mancon*, 210 Ct. Cl. at 696 (holding sanctions were not warranted where there was no evidence of willfulness).  Rather, defendants provide the Court with a set of facts sufficient for the Court to infer, but not confirm, impropriety on the part of

plaintiffs.  The Court considers plaintiffs' failure to disclose the Yorio-Mynette relationship a serious matter, but absent more, the Court must attribute it to "simple negligence[.]"  *Ingalls Shipbuilding, Inc.*, 857 F.2d at 1451

Regarding prejudice, defendants contend plaintiffs' conduct "is so severe" only dismissal will suffice to "cure the prejudice inflicted and . . . deter such conduct in the future."  Defs.' Suppl. Br. at 12; *but see Genentech, Inc.*, 122 F.3d at 1423.  "Lesser sanctions would . . . come at substantial cost to the integrity of future litigation before the Court, as well as the [g]overnment's ability to enter into contracts necessary for it to fulfil[l] its functions."  Defs' Suppl. Br. at 12–13.  First, as discussed *supra* Section V.A.3.iii, the only concern defendants identify with Yorio's access to confidential information is the use of AEO "information to guide Mynette's future lawsuits" and Colby's continued patent prosecution.  Defs.' Reply at 16 ("These patents can be used in future lawsuits against [d]efendants—a risk that is heightened because litigation is Mynette's *only* business activity."); *see also* Defs.' Suppl. Resp. at 26–28.  The Court finds a similar prosecution bar and CNS to those in *Blackbird Tech*, 2016 WL 2904592, would adequately remedy this risk of harm.  *See supra* Section V.A.3.iii.  Second, defendants argue weaker sanctions may invite future litigants to disregard their ethical duty to disclose because of the lack of a serious risk of punishment.  Defs.' Suppl. Br. at 14.  Without an adequate deterrent, defendants assert the government will face difficulty contracting if it cannot assure contractors their confidential information will be protected in litigation.  *Id.* at 14–15; *see also* Tr. at 188:3–189:21 (government counsel explaining the government's perceived prejudice).  The Court takes this prejudice to defendants seriously and weighs it in considering the appropriate sanctions here.  *See Nat'l Hockey League*, 427 U.S. at 643 (holding sanctions are "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent").

The Court lastly considers "the availability of less drastic sanctions."  *Genentech, Inc.*, 122 F.3d at 1423.  At a minimum, as the Court discusses *supra* Section V.A.3.iii, a prosecution bar and CNS, like in *Blackbird Tech*, 2016 WL 2904592, is required to remedy Yorio's access to confidential information as a competitive decisionmaker.  As defendants note, however, "the covenant in *Blackbird* was *not a sanction*—[p]laintiffs there were forthright at the onset regarding the protective order issues."  Defs.' Suppl. Resp. at 31.  So, while a *Blackbird* covenant will adequately remedy the risk of harm defendants face from Yorio's access to AEO information in this case, this remedy would have been proper before Yorio accessed any such material.  *See supra* Section V.A.3.iii.  A *Blackbird* covenant alone therefore would do nothing to address plaintiffs' failure to disclose the Yorio-Mynette relationship during protective order negotiations and would not deter future litigants from doing the same.  *See Nat'l Hockey League*, 427 U.S. at 643.

The parties have already provided the Court with their suggestions for "less drastic sanctions" which incorporate a *Blackbird* covenant.  *Genentech, Inc.*, 122 F.3d at 1423.  In supplemental briefing, plaintiffs propose the Court modify the protective order to:  "grant a covenant not to sue any of the [d]efendants on any patents acquired during the Relevant Time based on the manufacture, use, or issuance of passports," "includ[ing] patents arising from applications filed during the Relevant Time period."  Pls.' Suppl. Resp. at 19 (defining "Relevant Time" as between 9 November 2018 and one year after the conclusion of this case—what would

- 37 -

be comparable to the *Blackbird* time period). "Defendants propose an alternate sanction of[:] (1) a perpetual covenant not to sue [defendants] on all patents owned by Mynette, Yorio, and/or Colby now or in the future; and (2) a prohibition/evidentiary exclusion for any use, including in this litigation, of all documents or information labeled AEO at the time of production to Mynette officers or shareholders, and all information produced to or improperly accessed by shareholders or officers of Mynette." Defs.' Suppl. Br. at 16. At oral argument, plaintiffs' counsel clarified plaintiffs would agree to "expand the covenant to cover . . . all of Mynette's patents [and] patent applications, no matter when filed or acquired," specific to the technology at issue in this suit. Tr. at 183:17–186:23. Counsel for all parties then discussed how the AEO information disclosed in this lawsuit extends beyond just passports and what implications this might have on a CNS. Tr. at 198:15–202:22 (plaintiffs' counsel remarking, "this is something I wish we could have discussed in the meet-and-confer," and the Court agreeing). Counsel for Idemia then suggested the Court "provide [the parties] with some guidance" so they can meet-and-confer once more "and be rational about coming up with a proposal[.]" Tr. at 203:5–11. As demonstrated by the parties, "less drastic sanctions" which incorporate a *Blackbird* covenant are available to address plaintiffs' failure to disclose and will provide an adequate deterrent. *Genentech, Inc.*, 122 F.3d at 1423.

Considering the "degree of culpability, the amount of prejudice, and the availability of less drastic sanctions[ discussed *supra*,]" *Genentech, Inc.*, 122 F.3d at 1423, the Court will order the parties to meet and confer and jointly propose an appropriate CNS.[16] Defendants fail to show plaintiffs acted in "flagrant bad faith" or "callous disregard" for their responsibilities during protective order negotiations, so the Court declines to enter sanctions dismissing the case.

---

[16] Plaintiffs and defendants both contend the doctrine of "unclean hands" supports their case. *See* Defs.' Reply at 20; Defs.' Suppl. Br. at 18–20; Defs.' Suppl. Resp. at 32–33; Pls.' Resp. at 29–30; Pls.' Suppl. Br. 39–40; Pls.' Suppl. Resp. at 15–16. Plaintiffs argue defendants delayed by fifteen weeks in bringing their motion for terminating sanctions and misrepresented deposition questioning by plaintiffs when Yorio asked about future products. Pls.' Resp. at 29–30. Plaintiffs also argue defendants "delayed producing key discovery" just the same as plaintiffs. Pls.' Suppl. Br. at 39–40. Defendants use the doctrine of unclean hands as a separate basis for the Court to enter terminating sanctions. Defs.' Suppl. Resp. at 32–33. The Court finds the parties' invocation of the doctrine of unclean hands inapposite to this case. "[A] determination of unclean hands may be reached when 'misconduct' of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation[.]'" *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (applying the doctrine "only where some unconscionable act" was committed)). The fact defendants delayed fifteen weeks in bringing this motion is not "misconduct" and does not have an "immediate and necessary relation" to plaintiffs' failure to disclose the Yorio-Mynette relationship. *Id.* The Court also does not credit defendants' arguments regarding Yorio soliciting future product information during discovery because the remedy reached here is a CNS that would protect defendants from misuse of such information. Lastly, the Court does not find plaintiffs' discovery delays alone to be sanctionable misconduct in this case; what is sanctionable is plaintiffs' failure to conduct a reasonable inquiry when responding to discovery and the appearance of responding with an improper purpose. *See supra* Section V.B.4. While the Court does not decide whether defendants' discovery tactics were needlessly dilatory, such delays do not have an "immediate and necessary relation" to plaintiffs' failure to disclose the Yorio-Mynette relationship. *Gilead Scis., Inc.*, 888 F.3d at 1239; *see also* Tr. at 92:10–94:24 (Gemalto's counsel explaining their discovery delays: "Gemalto is a large corporate organization. There are multiple data sources. . . . [We] found additional data sources that we weren't otherwise aware of and produced those documents when we became aware of those data sources. Learning of a new data source is not the same scenario as taking documents that you've had all along because you have them in one place and . . . trickling them out and producing them at the end of the case."). The parties' additional "unclean hands" arguments are repeated arguments from other sections of their briefs, already reviewed in this Opinion and resolved by the remedy issued.

*Nat'l Hockey League*, 427 U.S. at 643.  A sanction of dismissal "is a harsh remedy, which should be reserved for only the most severe abuses of the discovery process[,]" and plaintiffs' conduct here does not rise to that level.  *Genentech, Inc.*, 122 F.3d at 1423; *see also Dahl*, 84 F.3d at 366 (holding dismissal "is so harsh a penalty it should be imposed as a sanction only in extreme circumstances" (citation omitted)).  Although defendants identify circumstantial facts sufficient for an inference of impropriety, defendants do not supply any evidence of willfulness sufficient to support dismissal.  *See Mancon*, 210 Ct. Cl. at 696.  The Court also declines to impose an evidentiary exclusion on AEO information as proposed by defendants.  Defs.' Suppl. Br. at 16.  "[T]he sanction must be specifically related to the particular 'claim' . . . at issue[,]" and an evidentiary exclusion is not so related here.  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).  The issue here is not plaintiffs' or Yorio's use of AEO information in *this case*; as the Court discusses *supra* Section V.A.3.iii, such conduct is normal and expected of litigants.  Rather, the issue is plaintiffs' failure to disclose, the need to prevent future misuse of AEO information, and the need to deter others from similar conduct.  *Cf. Ingalls Shipbuilding, Inc.*, 857 F.2d at 1451 (holding "a sanction tantamount to dismissal" "is inappropriate" where dismissal itself would be inappropriate).  An evidentiary exclusion is not related to this issue, and defendants' cited cases where evidentiary exclusions were warranted demonstrate as much.  *See, e.g.*, *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257 (2007) (case involving repeated spoliation of evidence); *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319 (S.D.N.Y. 1997) (case involving stolen evidence); *Burt Hill, Inc. v. Hassan*, No. 9-1285, 2010 WL 419433 (W.D. Pa. Jan. 29, 2010) (excluding "sketch[y]" documents delivered to the defendants anonymously in manila envelopes); Defs.' Mot. for Sanctions at 14, 28.  The Court instead requires the parties to meet-and-confer once more, Tr. at 202:6–203:11, and jointly draft a modification to the protective order to add a covenant not to sue.  The scope of the covenant shall exceed the *Blackbird* covenant to properly sanction plaintiffs' actions and deter future misconduct; it shall include *all* of Mynette's current and future patents (regardless of the date filed or acquired) related to the technology in discovery production at issue in this suit.  At oral argument, counsel for Idemia requested the Court "keep in mind that we're not just dealing with the passport booklets themselves, but also the hardware for reading those booklets[,]" Tr. at 198:21–23, and counsel for Gemalto added Mynette has patents on RFID chips not limited to the passport context, and documents on RFID chips have been produced during discovery, Tr. at 200:1–9, 201:3–10.  The Court agrees with this general summary of the technology, however, as the scope of the discovery production technology in this case and its impact on the covenant not to sue have not been briefed, the Court will leave these issues to the parties to finalize during a future meet-and-confer, *see* Tr. at 202:6–203:11.  The covenant not to sue remedy will adequately address the risk of harm defendants face from Yorio, a Mynette competitive decisionmaker, viewing AEO information as plaintiffs' attorney of record and the risk of that shared information to defendants now and into the future.

## VI.     Conclusion

For the foregoing reasons, the Court **GRANTS in PART** and **DENIES in PART** defendants' motion for terminating sanctions, ECF No. 125.  Accordingly, the parties shall meet and confer and **SHALL FILE** a joint motion to vacate the Court's protective order, ECF No. 74, and a stipulated amended protective order consistent with this Opinion on or before **19 December 2022**.  Before the Court lifts the stay of proceedings entered on 8 March 2022, ECF

No. 133, the parties **SHALL FILE** a joint status report proposing a timeline for further proceedings consistent with this Opinion on or before **4 January 2023**.

      **IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge
