# In the United States Court of Federal Claims

No. 16-1647

(Filed:  13 March 2024)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MYNETTE TECHNOLOGIES, INC. AND STEVEN M. COLBY, | \* \* \* |
| Plaintiffs, | \* \* |
| v. | \* \* |
| THE UNITED STATES, | \* \* |
| Defendant, | \* \* |
| GEMALTO, INC., | \* \* |
| Third-Party Defendant, | \* \* |
| and | \* \* |
| IDEMIA IDENTITY & SECURITY USA, LLC, | \* \* \* |
| Third-Party Defendant. | \* \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Robert J. Yorio*, Carr & Ferrell LLP, Menlo Park, CA, with whom was *Eric J. Maurer*, Boies Schiller Flexner LLP, Washington, DC, for plaintiffs.

*Michel E. Souaya*, with whom were *Gary L. Hausken*, Director, Commercial Litigation Branch, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, all of Washington, DC, for defendant.

*Edward D. Johnson*, Mayer Brown LLP, Palo Alto, CA, for third-party defendant Gemalto, Inc.

*Richard L. Brophy*, Armstrong Teasdale LLP, St. Louis, MO, for third-party defendant Idemia Identity & Security USA, LLC.

---

[*] This opinion was originally filed under seal on 8 March 2024 pursuant to the protective order in this case. The Court provided the parties an opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 11 March 2024 at 5:00 p.m. (ET). The parties proposed redactions by the deadline. The Court accepts the parties' proposed redactions and reissues the order, with redacted language removed as follows: "[XXXXX]."

## OPINION AND ORDER

Mynette Technologies, Inc. and Steven M. Colby allege the government infringes their patents through technology produced by government contractors and defendant-intervenors Gemalto, Inc. and Idemia Identity and Security USA, LLC.  Due to plaintiffs' failure to disclose their attorney's relationship with the company before negotiating a protective order, defendants filed a Motion for Sanctions, which the Court granted in part.  The Court determined plaintiffs' actions did not create a risk of harm in this case, but they did create a risk of harm in future patent prosecution and litigation.  Defendants had requested, in part, the parties propose a covenant not to sue.  During oral argument, the Court discussed with the parties the technology scope of a potential covenant, should the Court require one.  As the technology scope of disclosed confidential information had not been briefed, defendants asserted they could "put [their] heads together and be rational about coming up with a proposal [for the technology scope] or at least distill it down into a set of disputes" for the Court to address.  The Court ultimately decided, as a remedy, a covenant not to sue would adequately address the risk of future harm to defendants.  The Court directed the parties to meet-and-confer on the technical scope of confidential information produced in discovery and jointly propose a covenant not to sue.  After filing nine motions for extensions of time, only Idemia reached a full agreement in principle with plaintiffs; the government and Gemalto did not.  All defendants jointly filed a motion for reconsideration arguing the Court should have imposed terminating sanctions; the government and Gemalto specifically cited plaintiffs' conduct during negotiations as evidence the Court's sanction was inadequate.  The Court ordered briefing on both the remaining covenant disputes and defendants' Motion for Reconsideration and subsequently held telephonic oral argument.  During the argument, the parties agreed to language settling many of the parties' disputes.  Based on these agreements and for the reasons presented below, the Court accordingly enters a modified protective order including the covenant not to sue and denies defendants' Motion for Reconsideration.

## I.     Procedural History

On 5 December 2022, the Court issued an opinion and order granting in part defendants' Motion for Terminating Sanctions, ECF No. 153.  *Mynette Techs., Inc. v. United States*, 163 Fed. Cl. 733 (2022).  The Court imposed sanctions due to plaintiffs' violation of the duty of candor for failing to disclose their attorney's status in Mynette Technologies, Inc. ("Mynette").  *Id.* at 760.  As a remedy, the Court required the parties to negotiate a covenant not to sue (CNS) covering all plaintiffs' patents and adequately addressing the risk of future harm due to attorney-eyes-only (AEO) disclosures made during discovery.  *Id.* at 771.  Due to the technical and fact-intensive nature of the technology, the Court instructed the parties to meet-and-confer and reach an agreement on the appropriate technology scope for the CNS.  *Id.*  After numerous extensions of time, on 18 May 2023, the Court held a telephonic status conference to discuss why the parties had not reached agreement and directed the parties to file a joint status report outlining the parties' disagreements.  15 May 2023 Scheduling Order, ECF No. 169.  The parties filed a joint status report on 17 May 2023.  JSR, ECF No. 170.  Shortly before the status conference started, defendants jointly filed a Motion for Reconsideration of the Court's 5 December 2022 Opinion and Order ("MFR"), ECF No. 171.  The Court issued a scheduling order on 19 October 2023,

which adopted a briefing schedule for both the Motion for Reconsideration and the remaining CNS disputes. 19 Oct. 2023 Scheduling Order, ECF No. 172. On 2 June 2023, defendant-intervenor Idemia Identity and Security USA, LLC ("Idemia") filed its opening brief outlining an agreement in principle with plaintiffs. Idemia's Opening Br. Concerning Covenant Not to Sue ("Idemia's CNS Br."), ECF No. 175. The government and defendant-intervenor Gemalto, Inc. ("Gemalto") filed a joint opening brief the same day. Opening Br. of Defs. the U.S. and Gemalto Concerning Covenant Not to Sue ("Defs.' CNS Br."), ECF No. 176. On 20 June 2023, plaintiffs filed a response to the government's Motion for Reconsideration ("Pls.' MFR Resp."), ECF No. 179, and a response to defendants' opening CNS briefs ("Pls.' CNS Br."), ECF No. 180. Defendants filed a joint reply brief in support of their Motion for Reconsideration on 11 July 2023. Defs.' Reply in Supp. of Their Mot. for Recons ("Defs.' MFR Reply"), ECF No. 181.

## II.   Background

The factual background of plaintiffs' misconduct giving rise to sanctions can be found in full in the Court's previously issued Opinion and Order. *Mynette Techs. v. United States*, 163 Fed. Cl. 733, 740–44 (2022). In summary, the Court imposed sanctions due to plaintiffs' attorney, Mr. Yorio, failing to disclose his relationship with Mynette—including his [XXXX] ownership interest Mynette and his position on the board—while negotiating a protective order to cover, *inter alia*, attorneys-eyes-only documents. *Id.* at 769. This failure to disclose created a risk of future harm to defendants due jointly to his access to AEO documents and Mr. Colby, a Mynette shareholder's, continued patent prosecution:

> [T]he only concern defendants identify with Yorio's access to confidential information is the use of AEO "information to guide Mynette's future lawsuits" and Colby's continued patent prosecution. Defs.' Reply at 16 ("These patents can be used in future lawsuits against [d]efendants—a risk that is heightened because litigation is Mynette's *only* business activity."); *see also* Defs.' Suppl. Resp. at 26–28. The Court finds a similar prosecution bar and CNS to those in *Blackbird Tech*, 2016 WL 2904592, would adequately remedy this risk of harm.

*Id.* The Court's remedy required the parties to meet-and-confer on a CNS to be added to the protective order:

> The Court instead requires the parties to meet-and-confer once more, Tr. at 202:6–203:11, and jointly draft a modification to the protective order to add a covenant not to sue. The scope of the covenant shall exceed the *Blackbird* covenant to properly sanction plaintiffs' actions and deter future misconduct; **it shall include *all* of Mynette's current and future patents (regardless of the date filed or acquired) related to the technology in discovery production at issue in this suit.** At oral argument, counsel for Idemia requested the Court "keep in mind that we're not just dealing with the passport booklets themselves, but also the hardware for reading those booklets[,]" Tr. at 198:21–23, and counsel for Gemalto added Mynette has patents on RFID chips not limited to the passport context, and documents on RFID chips have been produced during discovery, Tr. at 200:1–9, 201:3–10. The Court agrees with this general summary of the technology[;]

however, **as the scope of the discovery production technology in this case and its impact on the covenant not to sue have not been briefed, the Court will leave these issues to the parties to finalize during a future meet-and-confer**, *see* Tr. at 202:6–203:11.

*Id.* at 771 (emphasis added).

At the June 2022 oral argument, Idemia stated, "I think we can probably put our heads together and be rational about coming up with a proposal or at least distill it down into a set of disputes that Your Honor could then address. . . ." 14 June 2022 Oral Arg. Tr. at 203:8–13, ECF No. 151. Between 21 December 2022 and 21 April 2023, however, the parties submitted nine joint motions for extension of time to file a stipulated amended protective order. *See* Order, ECF No. 166. If the parties anticipated filing another motion for extension of time, the Court required them to instead submit a joint motion for status conference. *Id.* at 2. The parties did not file a motion for a joint status conference; they instead filed a tenth motion for extension of time. Joint Mot. for Extension of Time, ECF No. 167; Unopposed Mot. of Extension of Time, ECF No. 168. The Court promptly scheduled a telephonic status conference to discuss why the parties had not reached agreement and directed the parties to file a joint status report noting the parties' positions on any disagreements. 15 May 2023 Scheduling Order. Shortly before the status conference, defendants filed a motion for reconsideration of the Court's Sanctions Order. MFR at 1.

At the 18 May 2023 status conference, defendants indicated the Motion for Reconsideration "was initiated perhaps largely by the government and Gemalto." 18 May 2023 Status Conf. Tr. at 15:8–9, ECF No. 174. Gemalto's role in driving these negotiations became further apparent when, following the status conference, Idemia's opening brief communicated it "ha[d] reached an agreement in principle" with plaintiffs. Idemia's CNS Br. at 3.[1] While Idemia signed on to a Reply in support of the Motion for Reconsideration, it did not join the government and Gemalto in submitting the CNS negotiations themselves as a separate reason for reconsideration. Defs.' MFR Reply at 1 n.1. These actions suggest only Idemia was able to "put . . . heads together and be rational about coming up with a proposal." *See* 14 June Oral Arg. Tr. at 203:8–13.

## III.    Current CNS Language Agreements

### A.    Defendants' Partial Agreement with Plaintiffs

The parties have reached an agreement on some—but not all—provisions of a proposed CNS. These agreed-upon provisions are provided below. Any provisions still in dispute are substituted with brackets:

Mynette Technologies, Inc., and its owners Robert Yorio and Steven M. Colby (collectively, the "Mynette Parties") covenant not to sue Defendants the United

---

[1] Due to Idemia's agreement with plaintiff, the Court's reference to "defendants" in this Opinion and Order typically refers to Gemalto and the government, unless otherwise noted explicitly or by context (i.e., citation to Idemia's brief or portion of a brief joined by Idemia).

States, Thales DIS USA, Inc., Idemia Identity & Security USA, LLC (collectively "Defendants") for infringement of the Restricted Patents; any of the Defendants' respective predecessors, successors (but not as to preexisting products of a successor that are not otherwise covered by this covenant), parents, subsidiaries, divisions, departments, agencies, affiliates (i.e., an entity that has a parent entity in common with any Defendants), and all past and present directors, officers, and employees of Defendants (collectively "Affiliates") for infringement of the Restricted Patents; or any direct or indirect customer of any Defendant for infringement of a Restricted Patent based on a customer's use, manufacture, sale, offer for sale, exportation, importation, or distribution of (i) a Covered Customer Product, or (ii) a downstream product incorporating a Covered Customer Product. For (i) and (ii), the covenant applies only to the extent a Covered Customer Product is relied upon by the party asserting a Restricted Patent to satisfy, in whole or in part, an element or a step of a claim in the Restricted Patent at issue.

"Restricted Patents" are defined as any and all patents, patent applications, and inventions (regardless of the date filed, acquired or conceived) in which

(a) any of the Mynette Parties have a pecuniary or beneficial interest (direct or indirect) or are an inventor, and

(b) that includes one or more claims pertaining, in whole or in part, to:

[OUTSTANDING TECHNOLOGY SCOPE DISPUTE]

For the avoidance of doubt, the Restricted Patents include the Patents-in-Suit and their direct and indirect parents, continuations, continuations-in-part, divisionals, applications, reissues, reexaminations, renewal extensions and foreign equivalents. For purposes of this Agreement, "pecuniary or beneficial interest" in a patent, patent application, or invention includes, but is not limited to, patents, patent applications, and inventions owned or controlled, in whole or in part, by any of the Mynette Parties, or by any business or entity owned or controlled, directly or indirectly, in whole or in part, by any of the Mynette Parties and/or any and all patents, patent applications, and inventions in which any of the Mynette Parties receive, or can claim, benefits or compensation as a result of the licensing of, or litigation regarding, those patents.  Notwithstanding the above, ownership of less than 5% of a publicly-traded company shall not form the basis for a "pecuniary or beneficial interest" in any patent, patent application, or invention, so long as none of the Mynette Parties are executives or board members of that entity or have the right to appoint board members or executives.  Should Dr. Colby be named as a joint inventor in his capacity as prosecuting attorney for a client of his law firm employer, on an otherwise Restricted Patent where he has assigned any interest he has as an inventor to the client in exchange for no additional compensation beyond prosecution fees, then that client's patent will not be included as a Restricted Patent.

"Covered Customer Product" is defined as all past, current, or future products, components, devices, systems, or services that have been or will be made, produced, procured, have made, or developed by or on behalf of a Defendant, and that is then sold or provided commercially to a customer of a Defendant which are covered, or alleged by the party asserting a Restricted Patent to be covered, in whole or in part, by an element or a step of a claim of any Restricted Patent in question. A product that does not meet this condition with respect to a particular Restricted Patent is not a Covered Customer Product with respect to that Patent; and the direct or indirect customer is therefore not granted any rights or covenants with respect to the customer's use, manufacture, sale, offer for sale, exportation, importation, or distribution of a Covered Customer Product for that particular Restricted Patent. Other than "have made" rights, a "Covered Customer Product" does not include a product that Defendants procure and resell (or otherwise provide) without some form of physical or digital modification, or incorporation into a broader product.

The covenants granted herein shall run with the Restricted Patents and shall be binding on any successors-in-interest, licensees, transferees, or assigns thereof.

[OUTSTANDING ASSIGNEE NOTICE OBLIGATION DISPUTE]

For the avoidance of doubt and notwithstanding the above, the covenant granted herein does not apply to or include Mynette and Colby's assertion of the Asserted Claims[1] in the existing litigation *Mynette Technologies, Inc. and Steven Colby v. United States*, No. 16-1647.

---

[1] The Asserted Claims are: (1) claims 1, 5, 51, and 53 of U.S. Patent No. 7,924,156; (2) claims 1, 3, and 6 of U.S. Patent No. 7,719,425; (3) claims 5, 8, 12, 14, 15, 16, and 20 of U.S. Patent No. 9,524,458; and (4) claims 9, 11, 14, and 16 of U.S. Patent No. 9,569,777.

Defs.' CNS Br. Ex. 20; Pls.' CNS Br. at 3–7 (summarizing various agreements). The remaining CNS disputes briefed by plaintiff, Gemalto, and the government comprise the following categories: Technical Scope – (1) Contactless Communications; (2) Embedded Processors; (3) Embedded Operating Systems; and (4) Materials and Structures; and Assignee Notice Obligation – (1) Notification Requirements and (2) Joint and Several Liability.

## B.    Idemia's Agreement with Plaintiffs

On 2 June 2023, the same day the government and Gemalto filed an opening CNS brief, defendant-intervenor Idemia filed an opening brief indicating "Idemia and Plaintiffs have reached agreement in principle regarding the Covenant Not to Sue." Idemia's CNS Br. at 3. The agreement is substantially similar to the undisputed language *supra* Section III.A, but it includes consented language for the remaining technology and assignee notice disputes.[2] Idemia and plaintiffs agreed to the following technology scope:

---

[2] Idemia's proposal identifies Thales DIS USC, Inc. as a party to the covenant. Thales DIS USC, Inc. acquired Gemalto in 2019. Due to Gemalto's pending dispute over the CNS language, the Court presumes Idemia's proposed covenant would not include Gemalto or Thales in its final version.

"Restricted Patents" are defined as any and all patents, patent applications, and inventions (regardless of the date filed, acquired or conceived) in which (a) any of the Mynette Parties have a pecuniary or beneficial interest (direct or indirect) or are an inventor, and (b) that includes one or more claims pertaining, in whole or in part, to: (i) RFID or contactless devices capable of radio frequency communications without an internal power source with a reader (which, for the avoidance of doubt, includes, but is not limited to electronic passports and other identification documents that include such devices, and products incorporating an embedded processor that supports such RFID or contactless communications with a reader), (ii) the use of such devices, (iii) the personalization of such devices, (iv) readers used to read such devices, (v) the embedded Apollo OS Smart Card Operating System, or (vi) electromagnetic shielding when used with such devices.

Idemia's CNS Br. Ex. 1, ECF No. 175-1. Idemia and plaintiffs also agreed to the following assignee notice provision:

In the event of a transfer or assignment of a Restricted Patent to an unaffiliated third party in which no Mynette Party has a "pecuniary or beneficial interest" in that third party or that Restricted Patent, the Mynette Parties shall not be liable to an accused infringer for any damages, harm , costs, expenses, attorneys' fees or any other relief or remedy arising out of or related to the assertion of patent infringement against an accused infringer in contravention to this Covenant Not to Sue as long as this Covenant Not to Sue is disclosed to the transferee or assignee at the time of the transfer or assignment.

*Id.*

## IV. Parties' Arguments

### A. CNS Language Disputes

#### 1. Contact-Based Devices

Defendants argue the AEO documents on "embedded microprocessors are not limited to contactless operation." Defs.' CNS Br. at 4. As an example, defendants [XXXXXXXXXX][3] [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]. *Id.* at 5–6. Plaintiffs argue defendants overexpand the CNS to cover publicly available information which should not have been designated AEO. Pls.' CNS Brief at 7–8. Furthermore, plaintiffs argue including "devices capable of communicating with a reader" in the CNS untenably covers all electronic devices capable of communicating with a reader, including nearly any type of "mobile devices, wearable health monitoring devices, audio speakers, and home security systems." Pls.' CNS Brief at 8. Plaintiffs also dispute portions of Infineon's and

---

[3] [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]

Gemalto's disclosures as being AEO because certain details were disclosed in publicly available data sheets. Pls.' CNS Brief at 8–12.

### 2. Active RFID Devices

Defendants argue "the AEO documents are not limited to RFID or devices without an internal power source" and "plaintiffs have yet to justify" narrowing the CNS in this way. Defs.' CNS Brief at 7. Defendants assert changing "passive" to "without an internal power source," "is not a relevant substantive change." *Id.* at 8. Defendants state both "passive" and "RFID" connote contactless technology, thereby exacerbating the issues of including "contactless" as a term. *Id.* Defendants note "[t]he AEO document's disclosures of the structure, operation, and capabilities of the embedded processors are not limited to 'ID' applications," and limiting the radio frequency to identification devices is unsupported. *Id.* at 8–9. Defendants further assert [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXX] *Id.* Defendants point to [XXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] *Id.* at 10. Defendants interpret plaintiffs' proposal to mean "RFID and/or passive" because, per defendants, "not all RFID products are passive devices, and not all passive devices utilize RFID technology." *Id.* at 8 n.5.

Plaintiffs assert limiting the CNS to RFID and passive devices is commensurate with the scope of properly designated AEO information and "represent[s] the technology at issue in the case." Pls.' CNS Brief at 11. Plaintiffs note *defendants* first included the language "RFID or contactless card technology" on 21 December 2022, and it remained until defendants removed the term RFID on 29 March 2023. *Id.* Plaintiffs address defendants' exclusion of "ID" in RFID and reliance on disclosures of addressable memory for data storage, universal asynchronous receiver/transmitter, trusted platform modules, and alternate uses of integrated circuits, by stating all such information was publicly available, for example, via SLE 66CLX320P and NXP P5Cx Datasheets. *Id.* at 11–12 ("None of the documentation proffered by Defendants in support of its position that RFID should be removed is confidential or AEO."). Addressing defendants' argument "not all RFID products are passive devices, and not all passive devices utilize RFID technology," Defs.' CNS Br. at 8 n.5, plaintiffs contend "the word passive only modifies contactless devices; it does not modify RFID. Hence, the inclusion of passive contactless devices as a separate category in the definition of Restricted Patents." Pls.' CNS Br. at 14. In response to defendants' reliance on disclosures of [XXXXXXXXXXXXXXXXXXXXXXX], plaintiffs assert such disclosures do not qualify as AEO because the information is publicly available via datasheets and ISO 7816 operations. *Id.* at 14–15.

### 3. Embedded Processors

Defendants argue "[p]laintiffs' proposal is too narrow because it: . . . includes embedded processors only to the extent they are incorporated into a broader device otherwise covered by the covenant." Defs.' CNS Brief at 10. Defendants assert "the processor-related information in

the AEO documents includes detailed technical disclosure of processor functionality that could easily be found in embedded processors other than those specifically identified in the AEO documents," and applying the CNS only to the product into which the processors are incorporated allows plaintiffs to circumvent the CNS by "using different embedded processors that also behave the same way." *Id.* at 12–13.

Plaintiffs assert expanding the CNS to embedded processors "capable of use' [in other portable devices] . . . is an impermissible expansion . . . well beyond the AEO technology produced in this case," extending to "most, if not all, embedded processors of recent vintage." Pls.' CNS Brief at 17.  Plaintiffs also note any products incorporating embedded processors supporting RFID or contactless communications with a reader would be covered by plaintiffs' proposed CNS, obviating defendant's hypothetical concerns. *Id.*

### 4.    Embedded Operating Systems

Defendants argue "[p]laintiffs' proposal is too narrow because it:  (i) covers only the Apollo operating system."  Defs.' CNS Brief at 10.  Furthermore, defendants assert Axseal OS "is prior art" referenced in the AEO documents and should also be included.  *Id.* at 11.  Limiting the CNS to any OS, defendants contend, would be "at odds with the AEO documents" because the documents disclose "confidential functionality . . . implemented into operating systems," and limiting the CNS to any specific OS would permit plaintiffs to circumvent the CNS by asserting patents "claim[ing] features found in the AEO OS-related documents [without mentioning] the name of the operating system at all."  *Id.* at 11–12.

Plaintiffs agree to the inclusion of Axseal OS but contend "the subject operating systems should be limited to their use in contactless devices capable of radio frequency communications without an internal power source with a reader" for the same reasons given regarding contactless functionality.  Pls.' CNS Brief at 15–16.  Plaintiffs further argue adding the phrase "and corresponding methods and systems" in relation to operating systems is too vague, allowing for "considerable differences of interpretation," and extends beyond the documented operations systems designated as AEO to include "undefined systems and methods."  *Id.* at 16.

### 5.    Materials and Structures

Defendants note the "parties agree [the] covenant should extend to electromagnetic shielding used with the devices otherwise subject to the covenant."  Defs' CNS Brief at 13. Defendants argue, however, the AEO documents disclose other confidential "materials and structures [usable] to form electronic documents such as e-passports" and coverable by the CNS. *Id.*  Defendants further note structures and materials for forming components, such as "coil on module[s] . . . and RF shielding components," including suppliers, materials and their characteristics, dimensions, processes of forming electronic documents, adhesives, manufacturing methods, lamination techniques, and engineering schematics for document covers, are "amply described in the AEO documents" and should be reflected in the CNS. *Id.* at 13–14.

Plaintiffs find expansion of the CNS to passports or identification documents agreeable but contend "electronic documents in this description . . . is overbroad" because "the only shielding references in this case pertain to the shielding included in passport covers." Pls.' CNS Brief at 18. Plaintiffs assert defendants offer no support for "electronic documents" apart from "the specific shielding for passports described in the Axalto Technical Proposal." *Id.* Specific components and structures in the Axalto Technical Proposal, plaintiffs agree, could be included in the CNS, but plaintiffs contend identities of providers are not confidential. *Id.* at 18–19. Plaintiffs note "electronic document covers" is vague and "[the] category should be limited to eCovers or substantially the same type of component used in identification documents." *Id.*

### 6. Assignee Notice Obligation and Joint and Several Liability

Defendants' contention with the Assignee Notice Obligation stems from a concern assignees will assert patents they otherwise would not have, and defendants would need to prove these patents fall within the CNS. *See* Defs.' CNS Br. at 18–20 ("Defendants risk being forced to devote significant additional time and incur significant additional costs defending an expensive and time-consuming patent litigation, until they can obtain a judgment on the merits that the covenant applies to the pending suit. . . . Plaintiffs deserve to bear some of the risk over future suits . . . ."). Defendants accordingly proposed recovering fees "jointly and severally from the party asserting the Restricted Patent." *Id.* at 20. Plaintiffs, however, object to the joint and several liability language, contending "[a]s long as the covenant was disclosed to the transferee or assignee by the Mynette Parties, why should they be jointly and severally liable for the acts of an unaffiliated third party who breached the covenant?" Pls.' CNS Br. at 19.

### B. Motion for Reconsideration[4]

Defendants assert negotiations have shown "the current sanction is not sufficient to protect defendants or to deter similar misconduct by Colby, Yorio, and others." MFR at 14. The limitation excluding patents "the Mynette parties do not have the power and the right to grant a covenant to sue for" would allegedly allow Mr. Yorio and Mr. Colby "to form new companies structured so neither has the right or required voting power to bind the entity to the covenant." *Id.* at 14–15. As evidence plaintiffs may circumvent the CNS, defendants point to Mr. Colby and Mr. Yorio's "history of using unconventional corporate structures to hold, assert, and monetize their IP." *Id.* at 15. Furthermore, defendants argue, plaintiffs have unreasonably attempted to "narrow[] the technical scope of the covenant" either to only subject matter involved in the current infringement allegations or to only "passive" contactless RF devices, neither of which covers the full scope of AEO materials. *Id.* at 16. Since "plaintiffs have not initiated [a] de-designation process with respect to any AEO document in this case," defendants argue all AEO documents should be reflected in the scope of the CNS, just as the Court ordered. Defs.' MFR Reply at 12–13. Defendants contend in failing to request de-designation, plaintiffs "have no basis to argue that the AEO information . . . must cover [ ] anything narrower than the documents that have been designated AEO." *Id.* at 14.

---

[4] After defendants filed their Motion for Reconsideration, Idemia subsequently "resolved its dispute with [p]laintiffs regarding the scope of [p]lantinffs' [CNS]." Defs.' MFR Reply at 1 n.1. Idemia therefore "[took] no position on the arguments made by [d]efendants" relating to the CNS negotiations. *Id.*

Despite defendants' statement at the June 2022 oral argument they could "put [their] heads together and be rational about coming up with a proposal," 14 June 2022 Oral Arg. Tr. at 203:8–13, defendants now allege "the Court's own findings" of bad faith support harsher sanctions and the Court erred in refusing to impose terminating sanctions.  MFR at 17.  In considering the impact of both Mr. Yorio and Mr. Colby's actions as individual instances of misconduct rather than viewing their "acts as a whole," defendants contend the Court was incorrect.  *Id.* at 19 (citing *Fuery v. City of Chicago*, 900 F.3d 450, 454 (7th Cir. 2018)). Defendants argue viewing Mr. Yorio's and Mr. Colby's actions as a whole would necessarily lead the Court to find plaintiffs acted in bad faith because plaintiffs failed to "negotiate the protective order in good faith" and acted without "honesty of purpose" in withholding documents.  *Id.* at 18 (citing *Stetzer v. Dunkin Donuts, Inc.*, 87 F. Supp. 2d 104, 114 (D. Conn. 2000)).

Defendants request Mr. Yorio's violation of his oath be considered "an independent ground for sanction" because Mr. Yorio allegedly violated his oath to "conduct [himself] in an upright manner as an attorney of this court" by acting dishonestly during negotiations and falsely certifying he had conducted a reasonable search.  *Id.* at 19–20.  As the Court previously imposed no separate punishment for Mr. Yorio's oath violation, defendants request the Court consider the repeated violations along with "other misdeeds" to arrive at termination as an appropriate punishment.  *Id.* at 20–21.  Defendants further argue the Court erred in concluding "it had 'no reason to doubt' the credibility of [Mr.] Yorio's and [Mr.] Colby's declarations" because of Mr. Yorio's history of untruthfulness.  *Id.* at 21–22.  Therefore, defendants contend "the only sufficient sanctions" are exclusion of AEO evidence and termination because the CNS depends on good faith and honesty on the part of the plaintiffs.  *Id.* at 23.  Since "a sanction with loopholes is not a deterrent[,]" defendants argue for termination or exclusion to adequately address the deficiencies of the CNS.  *Id.* at 24.

Plaintiffs argue defendants' motion "is an improper rehash of arguments already presented" and "omits key case law concerning reconsideration standards."  Pls.' MFR Resp. at 13.  The standard for reconsideration under Rule 54(b), plaintiffs contend, requires:  (1) occurrence of an intervening change in controlling law; (2) availability of previously unavailable evidence; or (3) necessity of allowing the motion to prevent manifest injustice, *Id.* at 14  (citing *Haddad v. United States*, 152 Fed. Cl. 1, 15, 19–20 (2021)), and defendants' motion does not come close to meeting the standards for reconsideration.  *Id.*

Plaintiffs further assert defendants "paint a misleading picture about the Court's opinion." *Id.* at 16.  First, plaintiffs contend defendants "latch[] onto a single phrase in a footnote of the Court's opinion."  *Id.* at 16.  As an example, plaintiffs point to defendant's failure to address the Court's finding Mr. Yorio and Mr. Colby work in separate office buildings, reside in separate states, and cannot access each other's files.  *Id.*  Second, plaintiffs contend defendants mischaracterized the test for sanctions as any indication of bad faith rather than "flagrant" bad faith.  *Id.* at 17.  Regardless, if defendants prove the Court *could* impose further or renewed sanctions, plaintiffs argue defendants do not prove the Court *must* impose such sanctions.  *Id.*

Plaintiffs argue the CNS negotiations do not support defendants' allegations. *Id.* at 18–29. Plaintiffs allege the terms of the CNS are critical due to their indefinite effect, and plaintiffs contend negotiations over these terms were reasonable and were not undertaken in bad faith. *Id.* at 18–23. Plaintiffs further respond defendants' suggested terms are far too broad and unclear. *Id.* at 21. Plaintiffs assert Gemalto's unreasonable requirements for language so broad as to cover even cellphones and televisions is the true cause of the current impasse. *Id* at 23. Plaintiffs further argue their agreement in principle with Idemia better aligns with what the Court had envisioned in the Court's Opinion and Order as including *all* possible scope of the AEO is both unreasonable and counter to the Court's intent. *Id.*

## V.   Post-Briefing CNS Agreements

The Court first addresses the remaining CNS disputes before turning to defendants' Motion for Reconsideration. Defendants' Motion for Reconsideration relies in part on the parties' CNS negotiations themselves. As the Court's involvement in resolving these disputes may color the Court's consideration of the motion for reconsideration, the Court addresses each remaining dispute before turning to the Motion.

### A.   Embedded Operating Systems and Personalization

Although the parties' briefs note some disagreement on "embedded operating systems," *see* Defs.' CNS Br. at 11–12; Pls.' CNS Br. at 15–16, at oral argument the parties agreed to the Court's proposed CNS language. 31 Oct. 2023 Oral Arg. Tr. ("Tr.") at 68:20–69:18, ECF No. 184; 19 Oct. 2023 Scheduling Order at 3.

| Gemalto Proposal | Mynette Proposal |
| --- | --- |
| (iii) embedded operating systems for use with devices in category (i) or (ii), and the use of such operating systems | (iv) the embedded Apollo OS Smart Card Operating System |
| (iv) methods for personalization of devices in category (i) or (ii) | (iii) the personalization of such devices |
| (v) readers for communicating with devices in category (i) or (ii); | (iv) readers used to read such devices |

| Court-Proposed & Consented Language |
| --- |
| (iii) embedded operating systems for use with devices in category (i) or (ii), and the use of such operating systems |
| (iv) methods for personalization of devices in category (i) or (ii); |
| (v) readers for communicating with devices in category (i) or (ii); |

### B.   Materials and Structures

The parties' briefs similarly note some disagreement on "materials and structures," *see* Defs.' CNS Br. at 13–14; Pls.' CNS Br. at 17–19, but at oral argument the parties agreed to the Court's proposed CNS language. Tr. at 69:19–70:3; 19 Oct. 2023 Scheduling Order at 3.

| Gemalto Proposal | Mynette Proposal |
|---|---|
| (vi) electromagnetic shielding for use with devices in category (i) | (v) electromagnetic shielding when used with such devices |
| (vii) materials and structures for use in electronic document covers. | N/A |

| Court-Proposed & Consented Language |
|---|
| (vi) electromagnetic components or shielding for use with devices in category (i). |

## VI.    Resolving the Remaining CNS Language Disputes

Although Gemalto, the government, and plaintiffs agree on most provisions of the CNS, the parties maintain a dispute over the scope of technology disclosed AEO, the scope of the obligation to notice assignees, and the liability for failing to notice an assignee.  At oral argument, the Court discussed each dispute in detail, facilitating agreement on many provisions. The Court addresses each of these agreements below and resolves disputes where the parties were at an impasse.  As discussed *infra*, in determining the final CNS language, the Court determines whether the CNS "adequately address[es] the risk of harm" from the disclosure of AEO information, *see Mynette Techs. v. United States*, 163 Fed. Cl. 733, 771 (2022), as determined under its discretion to impose sanctions it finds both just and relevant under the circumstances.  *Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1450 (Fed. Cir. 1988) ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins v. United States*, 816 F.2d 1580, 1581 (Fed. Cir. 1987))); *see also In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1380 (Fed. Cir. 2010) ("The [C]ourt has broad discretion to decide what degree of protection is required." (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984))); *Ala. Pulp Corp. v. United States*, 41 Fed. Cl. 611, 614 (1998).

### A.    Technology Scope Disputes

#### 1.    Whether the CNS Should Include both Contact-Based and Active RFID Devices

The parties dispute whether the CNS should cover both contact-based devices and active RFID technology.  The Court addresses each separate but related dispute *infra*.  The parties each proposed language for these disputes:

| Gemalto Proposal | Mynette Proposal |
|---|---|
| (i) devices adapted to communicate by <u>contact</u> (for example, by wire) or by <u>radio frequency</u> (for example, by load modulation or backscatter) with a reader | (i) RFID or contactless devices capable of <u>radio frequency communications without an internal power source</u> with a reader |
| and the use of such devices | (ii) the use of such devices |

After fully considering the parties' briefs, the Court provided the following draft CNS language prior to oral argument to aid discussion:

| Court's Draft CNS |
|---|
| (i) RFID and/or contactless devices capable of radio frequency communications without an internal power source with a reader . . .<br><br>(ii) the use of such devices; |

### i.    Contact-Based Devices

Defendants contend the AEO documents disclose more than contactless operations and the CNS should therefore cover *contact-based* technology as well.  Defs.' CNS Br. at 4. According to defendants, the AEO documents include "information about various embedded microprocessors used to communicate with readers."  *Id.*  This information, defendants argue, "provide[s] extensive disclosure relating to the contact-based operation of these microprocessors."  *Id.*  Plaintiffs do not dispute these documents were disclosed AEO.  Instead, plaintiffs argue the documents disclose public information and therefore are "not confidential and not AEO."  Pls.' CNS Br. at 10.

The Court provided the following direction on drafting the joint CNS:

> The scope of the covenant shall exceed the *Blackbird* covenant to properly sanction plaintiffs' actions and deter future misconduct; it shall include *all* of Mynette's current and future patents (regardless of the date filed or acquired) related to the technology in discovery production at issue in this suit.  At oral argument, counsel for Idemia requested the Court "keep in mind that we're not just dealing with the passport booklets themselves, but also the hardware for reading those booklets[,]" Tr. at 198:21–23, and counsel for Gemalto added Mynette has patents on RFID chips not limited to the passport context, and documents on RFID chips have been produced during discovery, Tr. at 200:1–9, 201:3–10.  The Court agrees with this general summary of the technology[;] however, as the scope of the discovery production technology in this case and its impact on the covenant not to sue have not been briefed, the Court will leave these issues to the parties to finalize during a future meet-and-confer, *see* Tr. at 202:6–203:11.  The covenant not to sue remedy will adequately address the risk of harm defendants face from Yorio, a Mynette competitive decisionmaker, viewing AEO information as plaintiffs' attorney of record and the risk of that shared information to defendants now and into the future.

*Mynette*, 163 Fed. Cl. at 771.  The Court's instructions indicated the CNS should broadly cover the technology disclosed AEO, not just the technology disclosed in the patents (i.e., passport technology alone).  *Id.*  If the AEO documents included both contactless and contact-based communication, then the CNS may extend to cover both categories of communication.  The Court, however, did not limit the CNS to mere disclosure.  Instead, the Court's sanctions required the CNS to "adequately address the risk of harm" from the disclosure of AEO information.  *Id.*  Even if the AEO documents disclosed contact-based devices, if the disclosure resulted in no risk of harm, then the CNS need not cover this technology.  *See id.*

The government contends the CNS should still cover any public information disclosed AEO.  At oral argument, the government confirmed its position:  "even if [the technology] was widely known public information, if it happened to be labeled AEO . . . [p]laintiffs should have that restricted in the CNS."  Tr. at 20:1–7 ("[GOVERNMENT]:  That would be an appropriate way to approach a sanction, Your Honor.").  Even though it acknowledges if "something [] is out there in the public that is known to everyone, . . . [the CNS] would not need to cover that particular thing to block the future harm of it,"  Tr. at 19:15–17, the government's argument appears to ignore the Court's requirement to address future harm.  The government therefore attempts to acknowledge the Court's requirement to cover risk of future harm but takes a position which is contrary.  In analogy, the government stated the situation was as if "you put your hand in a cookie jar, just because there's no cookies in it doesn't mean you haven't done something wrong."  Tr. at 18:6–8.  Using the government's analogy, however, merely "[doing] something wrong," is not equivalent to creating a *risk of future harm*.  The Court's remedy for violating the duty of candor (i.e., plaintiffs doing "something wrong") was to require a CNS covering the risk of future harm—not one covering the extent of plaintiff's wrong.  *Mynette*, 163 Fed. Cl. at 771.  The Court's Sanctions Order determined the CNS must therefore cover the disclosed technology only to the extent it poses a risk of future harm.  *Id.*

The Court accordingly turns to the government's exhibits to assess the scope of technology disclosed AEO.[5]  The government cites several "Data Books" and other technical documents purportedly disclosing "contact-based operations" and other indications of contact-based technology.  Defs.' CNS Br. at 4–7.  Plaintiffs, however, allege each of the sections cited by defendants are public information and therefore should not be covered by the CNS.  Pls.' CNS Br. at 8–10.  For example, defendants allege an AEO document titled "SLE66 Family Data Book" discloses contact-based features for a family of chips; plaintiffs, however, contend the cited information is publicly available online.  *Id.* at 8–9.  As defendants contend, [XXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXX]  Defs.' CNS Br. Ex. 3 at 423 (INFINEON00000989) ([XXXXXXXXXX XXX]).  Plaintiffs submit a 2004 document, however, labeled "SLE 66CL80P:  16-Bit High Security Dual Interface Controller ISO/IEC 7816 and 14443 Type A & B Compliant Interfaces For Contact and Contactless Operation."  Pls.' CNS Br. Ex. 6 at 2.  Plaintiffs allege this document, which they downloaded from the internet, was publicly available in 2004.  Pls.'s CNS Br. at 8–9.  The government acknowledged at oral argument it "[didn't] know what became publicly available in 2004."  Tr. at 31:9–10.  Assuming plaintiffs' candor as to the document's public nature, *Mynette*, 164 Fed. Cl. at 758–59 (citing MODEL RULES OF PRO. CONDUCT r. 3.3(a) (AM. BAR ASS'N 2023)), the document does indicate SLE66 controllers contain contact-based functionality, *see* Pls.' CNS Br. Ex. 6 at 2.  As the contact-based functionality is public information, the AEO Data Book's disclosure of contact-based operations alone is accordingly insufficient, on its own, to establish a "risk of harm [to] defendants . . . now and into the future."

---

[5] The government did not attach all discovery documents disclosed AEO, as there was "a very large scope of AEO information that was made available."  Tr. at 32:9–10.  At oral argument, the government referenced various other documents purportedly provided during discovery; the government agreed, however, these documents were not in the record for the CNS dispute or Motion for Reconsideration.  Tr. at 32:6–8 ("[THE GOVERNMENT:]  Your Honor, I'm not sure that the Infineon document that I was referencing was submitted as an exhibit in our briefing.").  For purposes of this Opinion and Order, the Court relies solely on documents in the record.

*Mynette*, 163 Fed. Cl. at 771; *see* Tr. at 19:13–17 ("[GOVERNMENT:]  [I]n terms of future harm . . . [with respect to] something that is out there in the public . . . [the CNS] would not need to cover that particular thing to block the future harm from it.").

Even though defendants do not "know what became publicly available in 2004," they nevertheless contend plaintiffs' document fails to disclose the "nitty-gritty details" of the SLE66 Data Book.  Tr. at 31:9–10, 17.  The government stated at oral argument it was "as sure as [it could] be that there are very significant numbers of truly nonpublic AEO information" in the AEO documents.  Tr. at 28:8–11.  At a high level, the controllers' contact-based functions may be public, yet the government contends the problem of disclosure stems more from "the nitty-gritty details of how the chip works, [such as] memory storage, algorithms, [and] how it's operating."  Tr. at 33:10–11.  At oral argument, the government cited page 95 of the Data Book as an example of confidential "nitty-gritty details."  Tr. at 39:17–18.  [XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX].  Defs.' CNS Br. Ex. 3 at 95 (INFINEON00000661).  Plaintiffs did not take a position on the public nature of this particular information but agreed, as a whole, the SLE66 Data Book is not publicly available: "[THE COURT:]  [T]his whole document that Infineon produced [Def.s' CNS Br. Ex. 3] is a document that is not publicly available.  [PLAINTIFF]:  I understand that to be the case.  This particular one."  Tr. at 42:12–16.  This exchange established for defendants a more tenable position:  if the documents disclose sufficient confidential information common to both contactless and contact-based devices such that their disclosure created a risk of future harm, the technology disclosed should be included in the CNS.

The Court must accordingly determine whether the Data Book and other cited references include nonpublic, confidential information common to both contactless and contact-based devices.  Plaintiffs' acknowledgement the Data Book is "not publicly available" is dispositive here.  *See* Tr. at 42:12–16.  Whether or not the document itself includes *some* public information, there are details in the Data Book both (1) absent from plaintiffs' publicly available Data Sheet; and (2) [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX].  *See, e.g.*, Defs.' CNS Br. Ex. 3 at 95 (INFINEON00000661).  Taken together, these two characteristics support the Court's decision to include both contact-based and contactless devices in the CNS.  While the Court acknowledges contact-based and contactless devices are not confidential in general, the underlying technical information disclosed AEO poses a risk of harm to future litigation over both contact-based and contactless devices.  This remedy is the most feasible manner of ensuring the CNS adequately covers the risk of harm stemming from the discovery disclosures.  *Mynette*, 163 Fed. Cl. at 771.  The Court notes, however, even if the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] were public, the Court nevertheless has discretion to impose sanctions it finds both just and relevant under the circumstances. *Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 1581)); *see also In re Deutsche Bank*, 605 F.3d at 1380 ("The [C]ourt has broad discretion to decide what degree of protection is required." (citing *Seattle Times*, 467 U.S. at 36)); *Ala. Pulp*, 41 Fed. Cl. at 614.  The Court previously instructed the parties to negotiate a technology scope for the CNS which adequately covered the risk of future harm due to the scope of discovery disclosure.  Without the parties coming to an agreement, the Court must determine the technology scope commensurate with preventing the risk of future harm to defendants; the Court finds including contact-based devices

within the CNS would adequately addresses the risk of future harm.  *See Ingalls*, 857 F.2d at 1450; *In re Deutsche Bank*, 605 F.3d at 1380; *Ala. Pulp*, 41 Fed. Cl. at 614; *see also* Defs.' CNS Br. Ex. 3 at 95 (INFINEON00000661).

### ii.      Active RFID Devices

In their briefs, the parties dispute whether the CNS should include (1) RFID devices and (2) both active and passive devices.  *See* Pls.' CNS Br. at 11; Defs.' CNS Br. 7.  At oral argument, the parties agreed their first dispute, RFID devices in general, was captured by the broader category of "contactless devices" in the Court's draft CNS.  Tr. at 52:14–15 ("[PLAINTIFF:]  We are agreeable to [the Court's technology definition of RFID and/or contactless devices], and the contactless devices is a broader category than RFID."); Tr. at 53:3– 7 ("[GEMALTO]:  Subject to the other issue's we've discussed, that one issue is okay.  [THE COURT:]  [T]here's no limitation that it has to be identification devices?  Contactless is broader?  [GEMALTO]:  Correct.  That's how we certainly understand it.").  As the parties do not maintain any disagreement related to RFID technology in general, the Court accordingly includes "RFID and/or contactless devices" in its final CNS.

The dispute over active and passive devices is ultimately, as Gemalto noted at oral argument, "quite similar to the exercise . . . [for] contact versus contactless [devices]."  Tr. at 43:2–3.  Plaintiffs wish to limit the CNS to devices only "without an internal power source."  Pls.' CNS Br. at 11.  Defendants do not dispute both active and passive devices are known; instead they contend "[w]hether you use a battery or you don't use a battery, whether it's contact or not contact, that doesn't change that the underlying information in the use of that chip is confidential."  Tr. at 48:10–13.  In other words, similar to contact-based devices, defendants contend the underlying technical information disclosed AEO poses a risk of harm to future litigation over both active and passive devices.  *See id.*; *supra* Section IV.A.1.i.

The Court again reviews the AEO documents attached to defendants' Motion to determine whether the Data Book and other cited documents support an inference the nonpublic information is common to both active and passive devices.  As with contact-based devices *supra*, plaintiffs' acknowledgement the Data Book is "not publicly available" is again dispositive.  *See* Tr. at 42:12–16.  At oral argument, [XXXXXXXXXXXXXXXXXXXXXXXXX], Tr. at 43:21– 44:3, which discloses a [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXX]  Defs.' CNS Br. Ex. 3 at 57 (INFINEON00000623).  Defendants indicate the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXX]  Tr. at 44:13–18.  While defendants do not contend active functionality is itself confidential, they submit "everything that's detailed in [the] Infineon data book . . . is extremely confidential and the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] . . . shouldn't change it."  Tr. at 48:4–9.  Similar to contact-based devices above, the Court acknowledges active technology is not confidential in general, yet the underlying technical information disclosed AEO poses a risk of harm to future litigation over both active and passive devices.  This remedy is the most feasible manner of ensuring the CNS adequately covers the risk of harm stemming from the discovery disclosures.  The Court notes, however, even if the [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] were public, it is still within the

Court's discretion to impose sanctions it finds both just and relevant under the circumstances. *Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 1581)); *see also In re Deutsche Bank*, 605 F.3d at 1380 ("The [C]ourt has broad discretion to decide what degree of protection is required." (citing *Seattle Times*, 467 U.S. at 36)); *Ala. Pulp*, 41 Fed. Cl. at 614. The Court previously instructed the parties to negotiate a technology scope for the CNS which adequately covered the risk of future harm due to the scope of discovery disclosure. Without the parties coming to an agreement, the Court finds permitting the CNS to extend to active devices adequately addresses the risk of future harm. *See Ingalls*, 857 F.2d at 1450; *In re Deutsche Bank*, 605 F.3d at 1380; *Ala. Pulp*, 41 Fed. Cl. at 614; *see also* Defs.' CNS Br. Ex. 3 at 57 (INFINEON00000623).

| Court's Conclusion |
|---|
| (i) devices adapted to communicate by contact, or RFID and/or contactless devices, where the devices are capable of radio frequency communications with a reader . . . |
| (ii) the use of devices in category (i); |

### 2. Embedded Processors

The parties also dispute whether the CNS should cover embedded processors alone, as used in any application. The parties each proposed language for this dispute:

| Gemalto Proposal | Mynette Proposal |
|---|---|
| with a reader (which, for the avoidance of doubt, include, but are not limited to electronic passports and other electronic documents) | with a reader (which, for the avoidance of doubt, includes, but is not limited to electronic passports and other identification documents that include such devices, and products incorporating an embedded processor that supports such RFID or contactless communications with a reader) |
| (ii) embedded processors capable of use in smart cards, electronic documents, or other portable devices that can communicate with a reader by contact (for example, by wire) or by radio frequency (for example, by load modulation or backscatter), and the use of such processors; | N/A |

After fully considering the parties' briefs, the Court provided the following draft CNS language prior to oral argument to aid discussion:

| Court's Draft CNS |
|---|
| with a reader (which, for the avoidance of doubt, includes, but is not limited to electronic passports and other identification documents that include such devices, and products |

incorporating an embedded processor that supports such RFID or contactless communications with a reader);

Defendants contend the CNS should include "a processor sitting alone by itself as a product . . . [even] if [a] claim . . . doesn't talk about a passport or a device that it's sitting in." Tr. at 60:22–61:1. According to plaintiffs, however, defendants' proposed language "is overly broad, vague, and indefinite." Pls.' CNS Br. at 17. They argue defendants' language "captures hardware with no connection with this case whatsoever, and essentially places no limit on the embedded processors that would be included." *Id.* As the Court indicated in its Sanctions Order, the CNS must "adequately address the risk of harm defendants face from [Mr. Yorio] viewing AEO information . . . and the risk of that shared information to defendants now and into the future." *Mynette*, 163 Fed. Cl. at 771. Plaintiffs' argument the technology has "no connection with [the technology at issue in] this case" is therefore irrelevant to the extent the disclosure increases the risk of harm to defendants. *See id.* Nevertheless, at oral argument, both plaintiffs and defendants consented to the Court's suggestion for a new subparagraph governing embedded processors:

> THE COURT: . . . [W]ould it work, in order to broaden this, if there was added language, another subparagraph . . . [saying] "systems, methods, or apparatuses related to [c]ategory (i) or (ii)"?
>
> [GEMALTO]: I think that would work, Your Honor.
> . . . .
> [PLAINTIFFS]: Related is a little bit ambiguous, but if it were apparatuses related to (i) or (ii) . . . I'm trying to think of the right word—that are capable of communications in category (b)(i), I think that would be acceptable.
> . . . .
> Couldn't that be just limited to apparatus? . . . [And] the "related" causes me a little bit of a problem.
>
> THE COURT: So do you have a synonym for related?

Tr. at 62:15–68:15. Plaintiffs were unable to suggest their desired synonym for "related."

Recognizing defendants' concern as resting with processors themselves, the Court accordingly adopts plaintiffs' suggestion to include a new provision limited to only apparatuses. *See* Tr. at 60:22–61:1, 68:5–6. As plaintiffs could not provide a synonym for "related to," the Court determines—in light of the parties' agreement at oral argument—the appropriate scope should include "apparatuses capable of communication as encompassed by categories (i) or (ii)." *See Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 1581)); *see also In re Deutsche Bank*, 605 F.3d at 1380 ("The [C]ourt has broad discretion to decide what degree of protection is required." (citing *Seattle Times*, 467 U.S. at 36)); *Ala. Pulp*, 41 Fed. Cl. at 614.

**Court's Conclusion**

| |
|---|
| with a reader (which, for the avoidance of doubt, includes, but is not limited to electronic passports and other identification documents that include such devices, and products incorporating an embedded processor that supports such RFID or contactless communications with a reader) |
| (vii) apparatuses capable of communication as encompassed by categories (i) or (ii). |

## B.    Assignee Notice Obligation

The parties dispute the manner in which plaintiffs must disclose the covenant not to sue. The parties proposed the following draft language for this dispute:

| Gemalto's Proposal | Plaintiff's Proposal |
|---|---|
| Assignee Notice Obligation:  When assigning any Restricted Patent, the assignor is obligated to provide a copy of this Covenant Not to Sue, and notice that the assigned patent is a Restricted Patent, to the assignees.  Any assertion of infringement of a Restricted Patent against an accused infringer in contravention to this Covenant Not to Sue shall entitle the accused infringer to recover its costs, expenses and reasonable attorneys' fees jointly and severally from the party asserting the Restricted Patent and each party in breach of the Assignee Notice Provision with respect to that patent.    The costs, expenses and reasonable attorneys fees recoverable include, without limitation, amounts paid in the investigation and defense of the action, and amounts expended with respect to any patent office proceedings related to the asserted Restricted Patent, in addition to any other relief to which the accused infringer may be entitled. | In the event of a transfer or assignment of a Restricted Patent to an unaffiliated third party in which no Mynette Party has a "pecuniary or beneficial interest" in that third party or that Restricted Patent, the Mynette Parties shall not be liable to an accused infringer for any damages, harm, costs, expenses, attorneys' fees  or any other relief or remedy arising out of  or related to the   assertion of patent infringement against an accused infringer in contravention to this Covenant Not to Sue as long as this Covenant Not to Sue is disclosed to the transferee or assignee at the time of the transfer or assignment. |

After fully considering the parties' briefs, the Court provided the following draft CNS language prior to oral argument to aid discussion:

| Court's Draft CNS |
|---|
| Assignee Notice Obligation:  When assigning any Restricted Patent, an assignor is obligated to provide a copy of this Covenant Not to Sue, and notice that the assigned patent is a Restricted Patent, to the assignees.  Any assertion of infringement of a Restricted Patent against an accused infringer in contravention to this Covenant Not to Sue shall entitle the accused infringer to recover its costs, expenses and reasonable attorney's fees from any assignee asserting infringement. |

> The costs, expenses and reasonable attorney's fees recoverable include, without limitation, amounts paid in the investigation and defense of the action, and amounts expended with respect to any patent office proceedings related to the asserted Restricted Patent, in addition to any other relief to which the accused infringer may be entitled.

Defendants' concern largely centers on having to prove future asserted patents meet the requirements of the CNS, where such litigation would not otherwise have occurred. *See* Defs.' CNS Br. at 18–20 ("Defendants risk being forced to devote significant additional time and incur significant additional costs defending an expensive and time-consuming patent litigation, until they can obtain a judgment on the merits that the covenant applies to the pending suit. . . . Plaintiffs deserve to bear some of the risk over future suits . . . ."). Defendants accordingly proposed recovering fees "jointly and severally from the party asserting the Restricted Patent." *Id.* at 20. Plaintiffs, however, object to the joint and several liability language, contending "[a]s long as the covenant was disclosed to the transferee or assignee by the Mynette Parties, why should they be jointly and severally liable for the acts of an unaffiliated third party who breached the covenant?" Pls.' CNS Br. at 19.

Before oral argument, the Court's proposed language removed the requirement for joint and several liability, instead permitting an accused infringer to "recover its costs, expenses and reasonable attorney's fees from any assignee asserting infringement." 19 Oct. 2023 Scheduling Order at 4. At oral argument, defendants proposed including language requiring plaintiffs "prove in writing that they complied with the notice and assignment to the full scope required under the covenant." Tr. at 71:20–22. Plaintiffs consented to this language.

> [THE COURT:] [Plaintiffs], are you comfortable with that language then? . . .
>
> . . . .
>
> [PLAINTIFFS]: It does sound reasonable . . . .
>
> . . . .
>
> And "prove" means just provide written evidence of the disclosure?
>
> THE COURT: . . . [W]ritten evidence of compliance, yes. . . .
>
> [PLAINTIFFS]: That seems agreeable.
>
> [GEMALTO]: Yes, that's how I understand [it], Your Honor.

Tr. at 72:4–73:6. The Court accordingly adopts the parties' consented language, including the Court's initially proposed language, modified with the written disclosure requirement agreed to at oral argument. *See Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 1581)); *see also In re Deutsche Bank*, 605 F.3d at 1380 ("The [C]ourt has broad discretion to decide what degree of protection is required." (citing *Seattle Times*, 467 U.S. at 36)); *Ala. Pulp*, 41 Fed. Cl. at 614.

**Court's Conclusion**

Assignee Notice Obligation:  When assigning any Restricted Patent, an assignor is obligated to provide a copy of this Covenant Not to Sue, and notice that the assigned patent is a Restricted Patent, to the assignees.  Any assertion of infringement of a Restricted Patent against an accused infringer in contravention of this Covenant Not to Sue—without written proof of compliance with this Assignee Notice Obligation to the full scope required under the covenant—shall entitle the accused infringer to recover its costs, expenses and reasonable attorney's fees from any assignee asserting infringement.

The costs, expenses and reasonable attorney's fees recoverable include, without limitation, amounts paid in the investigation and defense of the action, and amounts expended with respect to any patent office proceedings related to the asserted Restricted Patent, in addition to any other relief to which the accused infringer may be entitled.

### C.    Final Protective Order

The Court will enter an amended protective order including the undisputed language between Gemalto, the government, and plaintiffs, as well as any resolution from the sections *supra*.  At oral argument, Idemia indicated it was "happy with either the language that the parties have agreed to or the different language that [the Court] proposed."  Tr. at 9:11–13.  The Court finds the most appropriate resolution to prevent the risk of future harm includes entering the same covenant not to sue for all parties.  The Court will accordingly enter an addendum to the protective order including the final language from resolving the parties' disputes *supra*.[6]  In accordance with this Opinion and Order, *supra*, the addendum will include the following language defining the technology scope:

> (b) that includes one or more claims pertaining, in whole or in part, to:
>
>> (i) devices adapted to communicate by contact, or RFID and/or contactless devices, where the devices are capable of radio frequency communications with a reader (which, for the avoidance of doubt, includes, but is not limited to electronic passports and other identification documents that include such devices, and products incorporating an embedded processor that supports such RFID or contactless communications with a reader);
>>
>> (ii) the use of devices in category (i);
>>
>> (iii) embedded operating systems for use with devices in category (i) or (ii), and the use of such operating systems;

---

[6] In their Motion for Reconsideration Response, plaintiffs ask the Court "if [it] decides to enter [a CNS] that Mynette does not agree to, Mynette first be granted the opportunity to consider and request appropriate relief before the covenant goes into effect—as if the covenant goes into effect immediately, it could potentially irreparably harm Mynette."  Pls.' MFR Resp. at 4 n.5.  Plaintiffs provide no further rationale for why the Court's entry of a CNS would cause them undue irreparable harm.  The Court reiterates the CNS is intended to prevent the risk of future harm to defendants caused by *plaintiffs' breach of the duty of candor*. *Mynette Techs., Inc. v. United States*, 163 Fed. Cl. 733, 760 (2022).  To the extent this remedy disadvantages plaintiffs, it does so only to the extent necessary to prevent plaintiffs from benefiting from their breach of duty.  The Court accordingly finds no reason to delay entry of the protective order nor postpone its effective date.

(iv) methods for personalization of devices in category (i) or (ii);

(v) readers for communicating with devices in category (i) or (ii);

(vi) electromagnetic components or shielding for use with devices in category (i);

(vii) apparatuses capable of communication as encompassed by categories (i) or (ii).

The addendum will also include the following language defining the assignee notice obligation:

Assignee Notice Obligation:  When assigning any Restricted Patent, an assignor is obligated to provide a copy of this Covenant Not to Sue, and notice that the assigned patent is a Restricted Patent, to the assignees.  Any assertion of infringement of a Restricted Patent against an accused infringer in contravention of this Covenant Not to Sue—without written proof of compliance with this Assignee Notice Obligation to the full scope required under the covenant—shall entitle the accused infringer to recover its costs, expenses and reasonable attorney's fees from any assignee asserting infringement.

The costs, expenses and reasonable attorney's fees recoverable include, without limitation, amounts paid in the investigation and defense of the action, and amounts expended with respect to any patent office proceedings related to the asserted Restricted Patent, in addition to any other relief to which the accused infringer may be entitled.

## VII.    Motion for Reconsideration

Despite the Court granting defendants' Motion for Sanctions and requiring plaintiffs to covenant not to sue, defendants nevertheless ask the Court to reconsider its decision.  The Court notes at the outset its broad discretion to impose discovery sanctions.  *Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1450 (Fed. Cir. 1988) ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins v. United States*, 816 F.2d 1580, 1581 (Fed. Cir. 1987))); *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed. Cir. 1986)).  Although the parties disagree which standard applies in a motion for reconsideration, *infra*, even if the Court did revisit the substance of its decision, the ultimate conclusion on when and how to impose sanctions is broadly within the Court's discretion.  *See Ingalls*, 857 F.2d at 1450; *Hester*, 785 F.2d at 1022.  The Court nevertheless considers the parties' arguments to determine whether reconsideration is warranted.

### A.    Whether the Court Should Decide Defendants' Motion Under RCFC 54(b) or RCFC 59

Defendant's Motion is styled as a motion for reconsideration pursuant to RCFC 54(b). *See* Defs.' MFR at 1.  Plaintiffs, however, contend a motion for reconsideration must be governed by RCFC 59.  Pls.' MFR Resp. at 13.  Plaintiffs note "disagreement within this [c]ourt about whether RCFC 54(b) or RCFC 59 governs motions for reconsideration of interlocutory orders."  *Id.* (first citing *E&I Glob. Energy v. United States*, 152 Fed. Cl. 524, 530–31 (2021); and then citing *BHB Ltd. P'ship v. United States*, 152 Fed. Cl. 215, 217–18 (2021)).  Despite plaintiffs arguing RCFC 59 applies, they contend "[d]efendants' motion does not come close to meeting the standards for reconsideration under RCFC 54(b) either."  *Id.*  Plaintiffs brief no additional arguments on the applicability of RCFC 59.  Nevertheless, at oral argument, plaintiffs continued to argue RCFC 59 applies here.  Tr. at 75:10–76:3.  While defendants protested plaintiffs' argument, contending the argument had been waived, Tr. at 76:13–14, "there can be no waiver . . . of the Judge's duty to apply the correct legal standard."  *Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 11 n.4 (Fed. Cir. 2020) (quoting *United States v. Ali*, 508 F.3d 136, 144 n.9 (3rd Cir. 2007)).  The Court accordingly determines whether RCFC 54(b) or RCFC 59 applies in this scenario.

RCFC 54(b) provides:

*[A]ny order or other decision*, however designated, *that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action* as to any of the claims or parties *and may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

RCFC 54(b) (emphases added).  In contrast, RCFC 59(a)(1) states:

The court may, on motion, grant a *new trial or a motion for reconsideration* on all or some of the issues—and to any party—as follows:

(A)  *for any reason for which a new trial has heretofore been granted . . .* ;
(B)  *for any reason for which a rehearing has heretofore been granted . . .* ; or
(C)  upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States.

RCFC 59(a)(1) (emphases added).  RCFC 59(b)(1) then specifies "[a] *motion for new trial or for reconsideration under RCFC 59(a)(1)(A) or (B) must be filed no later than 28 days after entry of judgment*."  RCFC 59(b)(1) (emphasis added).  The text of RCFC 54(b) lacks this post-judgment language and permits the Court to "revise[] at any time *before the entry of judgment*" any *"order or other decision . . . [that] does not end the action.*"  RCFC 54(b) (emphases added).

In another recent case, the Court likewise considered whether pre-judgment motions for reconsideration are governed by RCFC 54(b) or RCFC 59.  *See Alta Wind I Owner Lessor C v. United States*, 169 Fed. Cl. 1 (2023).  Notably, the government adopted the opposite position there, instead arguing RCFC 59 was the correct standard.  *See id.* at 6.  In *Alta Wind*, the Court explained:

> RCFC 54(b) "does not expressly authorize *motions* for reconsideration," . . . [but] RCFC 54(b) expressly permits the Court to reconsider all orders and decisions "[that] do[] not end the action" (i.e., interlocutory orders), RCFC 54(b). RCFC 59, on the other hand, specifically discusses motions for new trial and reconsideration filed "after the entry of judgment." RCFC 59(b)(1). The text of RCFC 59(b), which generally "imposes a 28-day limit '*after the entry of judgment*' to seek reconsideration under RCFC 59(a)(1)(A)," suggests RCFC 59 governs reconsideration of orders entering judgment. *E&I Glob.*, 152 Fed. Cl. at 530 . . . .

*Id.* at 7. The Court accordingly held RCFC 59 was more appropriate for post-judgment motions, rather than motions for reconsideration in general:

> By inviting "motion[s] . . . [for] a new trial or . . . reconsideration on all or some of the issues," RCFC 59(a)(1), the text and timing of RCFC 59 thus appear better suited to post-judgment motions not, as the government contends, "motions for reconsideration [in general]," *see* Gov't's Resp. at 33. RCFC 54(b), in contrast, explicitly provides for reconsideration of non-final orders before entry of judgment. *See* RCFC 54(b). The Court accordingly finds, as between RCFC 54(b) and 59, the plain language of these rules indicates the former applies to motions for reconsideration of interlocutory orders, including plaintiffs' Motion for Reconsideration of the Court's 20 June Order denying plaintiffs' Motion for Partial Summary Judgment. 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.1 (3d ed. 2017) ("[Rule] 54(b) confirms the trial court's necessary authority to correct itself. It provides that until the court expressly directs entry of final judgment, an order that resolves fewer than all of the claims among all of the parties 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.' *And so the Supreme Court has said[, citing Rule 54(b),] that 'every order short of a final decree is subject to reopening at the discretion of the . . . judge.'*" (emphasis added) (footnote omitted) (first quoting FED. R. CIV. P. 54(b); and then quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983))).

*Id.* at 7–8. Considering the Court's previous decision in *Alta Wind* and the split of authority within the Court of Federal Claims, the Court finds Rule 54(b) is more appropriate for reconsideration of the interlocutory order in this case. *See id.*; *Myco*, 955 at 11 n.4 ("[T]here can be no waiver . . . of the Judge's duty to apply the correct legal standard." (quoting *Ali*, 508 F.3d at 144 n.9)).

As the Court finds RCFC 54(b) is applicable in this case,[7] the Court need not address defendants' argument regarding waiver. *See* Tr. at 76:13–14. Both parties briefed the motion for

---

[7] In *Alta Wind*, the Court explained further:

> This court's caselaw and guidance from the Supreme Court confirm the Court's interpretation of these Rules. In *E&I Global*, after briefly surveying the recent decisions of the

reconsideration based on an RCFC 54(b) standard.  *See* Defs.' MFR at 1; Pls.' MFR Resp. at 13. The Court accordingly turns to the standard under RCFC 54(b).

### B.     Applicable Standard Under RCFC 54(b)

The Court, as in *Alta Wind*, applies the "'as justice requires' standard set forth by this court for reconsideration of interlocutory orders under RCFC 54(b) to [defendants'] Motion for Reconsideration."  *Alta Wind*, 169 Fed. Cl. at 9 (quoting *Sacramento Grazing Ass'n, Inc. v. United States*, 154 Fed. Cl. 769, 778 (2021) ("After careful review of case precedent and the parties' arguments, the Court . . . finds that the applicable standard of review under RCFC 54(b) is simply 'as justice requires.'")).  In *Alta Wind*, the Court described the "as justice required" standard:

> The "broad[] flexibility to revise interlocutory orders" under the "as justice requires" standard reflects the Court's "inherent power . . . to afford . . . relief from interlocutory" decisions.  *E&I Glob.*, 152 Fed. Cl. at 532 (first quoting *Carlson v. Bos. Sci. Corp.*, 856 F3d 320, 325 (4th Cir. 2017); and then quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22 (1st Cir. 1985)); *see also Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1583 ("[Even under Rule 59,] [t]he decision whether to grant reconsideration lies largely within the discretion of the [trial] court.").  This flexibility is not, however, "an invitation for litigants to treat interlocutory decisions 'as mere first drafts' . . . [because] RCFC 54(b) afford[s] judges of the Court of Federal Claims with great[] discretion to deny motions for reconsideration that offer no good reasons to alter interlocutory decisions."  *E&I Glob.*, 152 Fed. Cl. at 533 (quoting *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988)).

*Id.*  The Court accordingly applies the "as justice requires" standard to the facts of this case.

### C.     Whether Justice Requires Reconsideration of the Court's Sanctions Order

---

Court of Federal Claims, this court determined "the language of the Rules," including the post-judgment timing language in RCFC 59, indicates "RCFC 54(b) applies to reconsideration of interlocutory decisions, while the more rigorous RCFC 59(a) & (e) apply to reconsideration of matters for which [j]udgment has been entered."  *E&I Glob., Inc.*, 152 Fed. Cl. at 530; *accord Capstone Assoc. Servs., Ltd. v. United States*, 2023 WL 5624480, at *3 (Fed Cl. Aug. 31, 2023) ("RCFC 54(b) [applies], . . . since the sanctions order at issue does not adjudicate the pending claim and the merits of the action remain to be addressed.").  The *E&I Global* court therefore reviewed the plaintiff's motion for reconsideration under RCFC 54(b).  *E&I Glob.*, 152 Fed. Cl. at 533.  A decade earlier, in *L-3 Communications*, this court similarly held in a bid protest, "because [d]efendant and [i]ntervenor seek reconsideration . . . of an interlocutory decision [granting plaintiff's motion to supplement the administrative record,] Rule 54(b) . . . governs instead of Rule 59(e) or 60, which address reconsideration of final judgments."  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 48 (2011). . . . The decisions of this court therefore support the Court's conclusion plaintiffs' Motion for Reconsideration should be analyzed under RCFC 54(b). *See E&I Glob.*, 152 Fed. Cl. at 530; *see also Moses*, 460 U.S. at 12 (acknowledging "every order short of a final decree is subject to reopening at the discretion of the . . . judge" pursuant to Rule 54(b) of the Federal Rules of Civil Procedure).

*Alta Wind I Owner Lessor C v. United States*, 169 Fed. Cl. 1, 8 (2023).

Defendants present four main reasons the Court should reconsider its Sanctions Order: (1) plaintiffs' CNS negotiations "call into question the covenant's ability to protect [d]efendants from future lawsuits and harm," Defs.' MFR at 14; (2) the Sanctions Order included "conflicting conclusions to the question of [p]laintiffs['] bad faith," *id.* at 17; (3) the Sanctions Order "did not consider whether Yorio's repeated violation of his oath to the Court . . . satisfied the standard for terminating sanctions," *id.* at 20–21; and (4) the Court's "crediting of Yorio's and Colby's declarations in light of their histories of dishonesty was incorrect," *id.* at 22. Defendants contend the "as justice requires" standard means "the Court has the power to do the right thing," Tr. at 78:18, and—as in their original Motion for Sanctions—ask the Court to find terminating sanctions appropriate. Defs.' MFR at 23. The Court addresses each of these contentions below, considering again the Court's broad discretion to impose discovery sanctions. *See Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 158)); *Hester*, 785 F.2d at 1022.

### 1.   Plaintiffs' CNS Negotiations[8]

Despite defendants originally proposing, in part, a perpetual covenant not to sue, Defs.' Suppl. Br. at 16, ECF No. 142, defendants now contend the remedy is "not a workable sanction," Defs.' MFR Reply at 15. Defendants cite various discussions with plaintiffs during CNS negotiations as evidence of plaintiffs' "apparent goal to obtain a covenant that would allow them to sue [d]efendants again on the subject matter of AEO documents that Yorio obtained." Defs.' MFR at 14. Most of defendants' arguments, however, focus on negotiations for provisions that were either (1) eventually resolved in agreement prior to oral argument or (2) submitted to this court and subsequently resolved by agreement or in defendants' favor. For example, defendants take issue with plaintiffs' attempt to narrow the parties covered by the CNS and their failure to reach "agreement on the technical scope of covenant." *Id.* at 14–16. Even though the parties agreed to many provisions during and after briefing, defendants nevertheless contend: "While [p]laintiffs have since modified their proposal, their overall negotiating strategy has remained the same—insisting on a covenant that would provide an avenue for them to sue [d]efendants on patents related to that very AEO matter." Defs.' MFR Reply at 10; *see also id.* at 10–11 ("[E]ven though [p]laintiffs eventually agreed to narrower language, their continued arguments with respect to Colby's inclusion in the covenant also demonstrate their unwillingness to accept a meaningful sanction. . . . And the covenant that [p]laintiffs specifically request that Your Honor enter includes Colby."). Defendants also contend the dispute over contact-based devices itself, *see supra* Section VI.A.1.i, evidences plaintiffs' sanctionable approach to the CNS negotiations. *See* Defs.' MFR Reply at 13–14. According to defendants, "[t]he failure of the parties to negotiate a mutually acceptable covenant not to sue along with [p]laintiffs' breaches in this case show that a covenant not to sue is not a workable sanction against [p]laintiffs in this case." *Id.* at 15. These disputes, however, were eventually resolved, either by agreement or by the Court generally in favor of defendants' proposed language. *See supra* Sections IV–VI. Defendants cannot rely on the absence of agreement as evidence of bad faith necessitating the Court grant reconsideration when they agreed to many provisions and had most other provisions resolved in their favor. *See Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640–43 (1976) (citing *Societe Internationale v. Rogers*, 357 U.S. 197, 212 (1958)) (indicating dismissal

---

[8] Idemia took no position on this portion of defendant's Motion for Reconsideration. *See supra* note 4.

is appropriate for "willfulness, bad faith, . . . or fault"); *Mancon Liquidating Corp. v. United States*, 210 Ct. Cl. 695, 696 (1976) (holding sanctions were not warranted where there was no evidence of willfulness).

In contrast to defendant's argument, the CNS is a "workable sanction" if the Court determines the CNS appropriately addresses the risk of future harm to defendants, particularly where defendants reached an agreement with plaintiffs, the Court largely adopted defendants' proposed language, and defendants' own actions evidence a shifting stance against a covenant not to sue. *See supra* Sections V–VI. Even before oral argument, the parties had reached agreement on most provisions besides the technology scope and specific language for the Assignee Notice provision. *See supra* Section V. At oral argument, however, defendants argued: "[T]he fact that . . . we couldn't get any real movement out of them until Your Honor got involved, I don't believe that shows good faith." Tr. at 80:13–18. Defendants allege plaintiffs demonstrated *bad faith* in their insistence on including language which defendants contend would permit future litigation from a "'Schmynette' that's basically . . . the Mynette parties wearing Groucho glasses, . . . but they will have structured the company in a way where . . . the covenant disappears." Tr. at 81:23–82:2. Defendants have not presented sufficient evidence plaintiffs were acting in bad faith, however. Taking opposing positions—and even reaching an impasse during negotiations—does not itself amount to bad faith. In fact, the government admitted its own position changed during negotiations and suggested it would not have consented to its own initial proposal to plaintiffs. *See* Tr. at 22:7–21 ("THE COURT: So would the government agree to [its initial proposal] now? [THE GOVERNMENT]: . . . I do recall an instance in which when the scope started to narrow, pursuant to the negotiations . . . . And so we said . . . that's where we should have been from the beginning. . . . [A]nd to the extent that we weren't . . . we take responsibility for that."). Based on the parties' 10 joint requests for extensions of time to negotiate the CNS, as well as Gemalto's shifting position from in favor of a CNS to contending now it is "not a workable sanction," Defs.' MFR Reply at 15, there is ample evidence Gemalto and the government's initiation of the Motion for Reconsideration exacerbated this dispute. *Compare* Defs.' Suppl. Br. at 16, *with* Defs.' MFR Reply at 15. This shift contradicts defendants' arguments the failure to negotiate a CNS resulted from plaintiffs' lack of good faith. The negotiations themselves therefore do not evidence bad faith, particularly where the parties have reached an agreement on large portions of the CNS language and the Court has adopted much of defendants' proposed language.

In the Sanctions Order, the Court determined a CNS would "adequately address the risk of harm" from the disclosure of AEO information. *Mynette Techs.*, 163 Fed. Cl. at 771. The Court has broad discretion to impose discovery sanctions and could have imposed a CNS directly. *See Ingalls*, 857 F.2d at 1450. Instead, the Court left the specifics of "the scope of the discovery production technology" to the parties. *Mynette Techs.*, 163 Fed. Cl. at 771. Considering the parties' agreement on CNS language, the Court finds the parties' negotiations—even those reaching impasse—do not meet the "as justice requires" standard for the Court to change the remedy directed by the Sanctions Order. *Alta Wind*, 169 Fed. Cl. at 8 (citing *Sacramento Grazing*, 154 Fed. Cl. at 778); 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.1 (3d ed. 2017) ("[Rule] 54(b) confirms the trial court's necessary authority to correct itself. It provides that until the court expressly directs entry of final judgment, an order that resolves fewer than all of the claims

among all of the parties 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.' *And so the Supreme Court has said[, citing Rule 54(b),] that 'every order short of a final decree is subject to reopening at the discretion of the . . . judge.'"* (emphasis added) (footnote omitted) (first quoting FED. R. CIV. P. 54(b); and then quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 12)).

## 2.    Conflicting Conclusions on Bad Faith

Defendants further contend the Court's Sanctions Order found "conflicting conclusions" on bad faith. Defs.' MFR at 17. According to defendants, the Court correctly characterized plaintiffs' actions but "contradicted th[o]se findings when deciding the appropriate sanction." *Id.* at 18. Defendants contend "[t]he Opinion expressly held that [p]laintiffs did not negotiate the protective order in good faith . . . [and] [t]he bad faith found in the Opinion should have been treated as material to the sanction selected." *Id.* at 18–19. Defendants take issue with one sentence in particular: "[D]efendants provide the Court with a set of facts sufficient for the Court to infer, but not confirm, impropriety on the part of the plaintiffs." *Mynette Techs.*, 163 Fed. Cl. at 769, *quoted in* Defs.' MFR at 19. "If the Court had instead relied upon its own correct determination that [p]laintiffs had acted in bad faith," defendants argue, "it would not have found that [p]laintiffs' conduct was explainable by mere 'negligence,' and would then have found the impropriety necessary for terminating or AEO sanctions." Defs.' MFR at 19.

The Court's Sanctions Order, however, was precise in its findings on bad faith and how those findings relate to the legal standard.  In contrast to defendants' characterization of the Sanctions Order, the Court did not find bad faith.  The Court instead determined "defendants provide[d] the Court with a set of facts sufficient for the Court to *infer, but not confirm,* impropriety on the part of plaintiffs." *Mynette Techs.*, 163 Fed. Cl. at 769 (emphasis added).  By indicating the Court could "infer, but not confirm impropriety," the Court stated impropriety was *implied*, though not confirmed.  *See Infer*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020) ("4:  suggest, hint").  The Court justifiably imposed sanctions based on an *implied improper purpose*, even though the improper purpose was not a *confirmed improper purpose*; the Court accordingly determined plaintiffs' "failure to disclose the Yorio-Mynette relationship [was] a serious matter, but absent more, . . . attribute[d] it to 'simple negligence.'" *Mynette Techs.* 163 Fed. Cl. at 769 (quoting *Ingalls*, 857 F.2d at 1451).  Although defendants may disagree with the Court's findings on plaintiffs' improper purpose, defendants fail to identify any contradiction in the Court's Sanctions Order.

Defendants nevertheless contend because the Court did not find good faith, finding an inferred improper purpose is equivalent to finding "bad faith."  Tr. at 89:12–23.  Defendants cite to various district court cases to contend "an absence of good faith constitutes bad faith." Defs.' MFR at 18–19 (first quoting *Houston Specialty Ins. Co. v. Fontecilla*, No. 20-CV-20725, 2020 WL 13627577, at *2 (S.D. Fla. Dec. 14, 2020); then quoting *Grand St. Realty, LLC v. McCord*, 04-CV-4738, 2005 WL 2436214, at *9 (E.D.N.Y. Sept. 30, 2005); and then quoting *In re Scaccia*, No. 19-13024, 2022 WL 1216284, at *7 (Bankr. E.D. La. Apr. 25 2022), *aff'd*, No. BR 19-13024, 2023 WL 2632794 (E.D. La. Mar. 24, 2023)).  At oral argument, however, defendants admitted they cited no binding Federal Circuit precedent establishing such a principle.  Tr. 90:15–17; *see also* Tr. at 90:23–91:3 ("[GEMALTO:]  I don't believe bad faith necessary 100

percent of the time.  THE COURT:  And what Federal Circuit case would conclude that?
[GEMALTO]:  I can't point to one right now, Your Honor.").  To the contrary, the Supreme
Court has suggested even "*flagrant* bad faith" can—but need not—warrant terminating
sanctions.  *Nat'l Hockey League*, 427 U.S. at 640–43 (emphasis added).  The Court therefore
need not conclude a finding of implied "simple negligence" is sufficient for terminating
sanctions.  *Id.*; *Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions
rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 1581)).

The Court's imposed sanctions are likewise not in conflict with its factual findings.  The
Court found terminating sanctions were not appropriate because "infer[red], but not confirm[ed]"
impropriety did not rise to the level of "'flagrant bad faith' or 'callous disregard' for [plaintiffs']
responsibilities during protective order negotiations."  *See Mynette Techs.*, 163 Fed. Cl. at 769–
70 (quoting *Nat'l Hockey League*, 427 U.S. at 640–43).  Similarly, the finding of "infer[red], but
not confirm[ed], impropriety" did not warrant evidentiary exclusions, as "[t]he issue here is not
plaintiffs' or Yorio's use of AEO information in *this case* . . . .  Rather, the issue is plaintiffs'
failure to disclose, the need to prevent future misuse of AEO information, and the need to deter
others from similar conduct." *Id.* at 769, 771.  Despite defendants' desire for *inferred* (i.e.,
implied) impropriety to equal flagrant bad faith, "infer[red], but not confirm[ed], impropriety"
does not necessarily require non-terminating sanctions.  *See Nat'l Hockey League*, 427 U.S. at
640–43.  Defendants ultimately ask the Court to "look[] collectively at all of the wrongdoings
that occurred" and confirm plaintiffs' bad faith.  Tr. at 85:15–16; Defs.' MFR at 19 ("[T]he
Court [sh]ould have then considered the impact of both Yorio's and Colby's acts *as a whole*
rather than focusing individually on the specifics of each instance of misconduct.").  Justice does
not warrant reconsideration of the Sanctions Order, however, when defendants merely ask the
court to "add up the facts and reach a different conclusion," Tr. at 85:26–86:1 (the Court).  *See
Alta Wind*, 169 Fed. Cl. at 8 (citing *Sacramento Grazing*, 154 Fed. Cl. at 778); 18B CHARLES
ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE
§ 4478.1 (3d ed. 2017) ("[Rule] 54(b) confirms the trial court's necessary authority to correct
itself. . . .  *[T]he Supreme Court has said[, citing Rule 54(b),] that 'every order short of a final
decree is subject to reopening at the discretion of the . . . judge.'*" (emphasis added) (footnote
omitted) (first quoting FED. R. CIV. P. 54(b); and then quoting *Moses H. Cone Mem'l Hosp.*, 460
U.S. at 12)).

The Court finally notes the context supporting its decision to impose non-terminating
sanctions.  First, even if there was bad faith, the Court is not required to impose terminating
sanctions.  As indicated in the Sanctions Order:

> "The decision whether to impose discovery sanctions rests within the sound
> discretion of the trial court." *Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d
> 1448, 1450 (Fed. Cir. 1988) (citing *Adkins v. United States*, 816 F.2d 1580, 1581
> (Fed. Cir. 1987); *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022
> (Fed. Cir. 1986)). . . .

> A sanction of dismissal "is a harsh remedy, which should be reserved for only the
> most severe abuses of the discovery process." *Genentech, Inc. v. U.S. Int'l Trade
> Comm'n*, 122 F.3d 1409, 1423 (Fed. Cir. 1997) (quoting *Hendler v. United States*,

952 F.2d 1364, 1382 (Fed. Cir. 1991)) (citing *Dahl v. City of Huntington Beach*, 84 F.3d 363, 366 (9th Cir. 1996) (holding dismissal "is so harsh a penalty it should be imposed as a sanction only in extreme circumstances")) (collecting cases); *see also Mancon Liquidating Corp. v. United States*, 210 Ct. Cl. 695, 696 (1976) (holding the sanction of "dismissal is a drastic action to be used only when clearly authorized"). "Because dismissal is universally recognized as a sanction of last resort, courts are required, before imposing that sanction, to consider fully all the surrounding circumstances, such as the degree of culpability, the amount of prejudice, and the availability of less drastic sanctions." *Genentech, Inc.*, 122 F.3d at 1423 (collecting more cases).

*Mynette Techs.*, 163 Fed. Cl. at 767. The Court accordingly has broad discretion to determine the appropriate remedy. Even in cases where a court imposed terminating sanctions, the presiding judges maintained and exercised broad discretion on the sanctions they determined were appropriate. *See Societe Internationale*, 357 U.S. at 212; *Nat'l Hockey League*, 427 U.S. at 643; *Field Turf USA, Inc. v. Sports Constr. Grp. LLC*, No. 6-2623, 2007 WL 4412855 (N.D. Ohio Dec. 12, 2007). In the case of Mynette, the Court found "plaintiffs' conduct . . . [was] far less culpable than counsel's in [other cases]." *Mynette Techs.*, 163 Fed. Cl. at 768. This determination and the sanctions imposed were accordingly within the Court's discretion. *Ingalls*, 857 F.2d at 1450. Second, the risk of harm here is only for *future* litigation, not present. As described in the Sanctions Order:

> [T]he main concern identified [by defendants] is Yorio's use of AEO "information to guide Mynette's future lawsuits" and Colby's continued patent prosecution. . . .
> . . . .
> . . . The issue here is not plaintiffs' or Yorio's use of AEO information in *this case*; as the Court discusses *supra* Section V.A.3.iii, such conduct is normal and expected of litigants. Rather, the issue is plaintiffs' failure to disclose, the need to prevent future misuse of AEO information, and the need to deter others from similar conduct.

*Id.* at 756, 771 (citation omitted). The Court is accordingly concerned with harm in the *future*, rather than in *the immediate case*. This focus on future harm, rather than present, further justifies the Court's CNS requirement and further counsels against reconsideration and terminating sanctions. *See Ingalls*, 857 F.2d at 1450. Third, the Court determined it could not conclude plaintiffs' actions were *not* the result of general negligence. *See Mynette Techs.*, 163 Fed. Cl. at 769 ("[D]efendants provide the Court with a set of facts sufficient for the Court to infer, but not confirm, impropriety on the part of plaintiffs."). Without concluding impropriety assuredly occurred, the Court is further justified in imposing less-than-terminating sanctions as dismissal "is a harsh remedy, which should be reserved for only the most severe abuses of the discovery process." *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1423 (Fed. Cir. 1997) (quoting *Hendler v. United States*, 952 F.2d 1364, 1382 (Fed. Cir. 1991)). The Court accordingly finds justice does not require reconsidering the Court's Sanctions Order. *See Alta Wind*, 169 Fed. Cl. at 8 (citing *Sacramento Grazing*, 154 Fed. Cl. at 778); *E&I Glob.*, 152 Fed. Cl. at 530 ("This interpretation, utilizing RCFC 54(b) for interlocutory matters and Rule 59 exclusively for decision that trigger final judgments, would align this Court with the rest of the

federal judiciary."); *see also Moses H. Cone Mem'l Hosp.*, 460 U.S. at 12 (acknowledging "every order short of a final decree is subject to reopening at the discretion of the . . . judge" pursuant to Rule 54(b) of the Federal Rules of Civil Procedure).

> ### 3. Mr. Yorio's Violation of His Oath to the Court and "History of Dishonesty"

In their Motion for Reconsideration, defendants raise an argument previously proposed only at oral argument on the Motion for Sanctions, where they contended Mr. Yorio violated his admission oath for the Court, which they allege warrants harsher sanctions. Defs.' MFR at 19–21. In its Sanctions Order, the Court noted, despite defendants raising this argument for the first time at oral argument, "[d]efendants did not cite any case, and the Court could not find one, where a party was sanctioned for violating the Court's attorney admission oath." *Mynette Techs.*, 163 Fed. Cl. at 758 n.9. In their Motion, defendants attempt to remedy this lack of support by providing cases from a variety of other jurisdictions. Defs.' MFR at 19–21. These cases, however, also fail to support defendants' contention. While the cases might support imposing sanctions for various breaches of professional responsibility, none directly discuss a breach of a court's admission oath. *See Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 590 (9th Cir. 1983) (affirming dismissal sanctions where plaintiff's "law firm deliberately deceived the court"); *Jabary v. McCullough*, 325 F.R.D. 175, 198–99 (E.D. Tex. 2018) (imposing sanctions on attorney for violating local rule requiring attorneys to act "with the utmost personal integrity, professional integrity, civility, and professionalism"); *In re Hermesmeyer*, 688 Fed. App'x 300, 304–05 (5th Cir. 2017) (affirming monetary sanction for violation of a local criminal rule prohibiting "conduct unbecoming of a member of the bar"); *King v. Whitmer*, 556 F. Supp. 3d 680, 689 (E.D. Mich. 2021), *aff'd in part and rev'd in part after defendants' citation*, 71 F.4th 511 (6th Cir. 2023) (reversing the district court's finding of sanctions on all grounds but making frivolous arguments). Defendants admitted at oral argument the cases do not relate to a court's admission oath directly. Tr. at 96:13–17 ("[GEMALTO]: I think all of these cases effectively stand for the proposition of you don't need a specific case or oath, you just have to . . . conduct yourself a certain way in front of the Court and that's what you do when you take the oath to be there."). To the extent defendants contend Mr. Yorio violated his professional responsibilities as an attorney, the Court considered these responsibilities in imposing an appropriate sanction. *See Mynette Techs.*, 163 Fed. Cl. at 758, 766–67.

Similarly, defendants contest the Court's crediting the declarations of Mr. Yorio and Mr. Colby despite their alleged "histories of dishonesty and misconduct." Defs.'s MFR at 21. Defendants recite various "pattern[s] of dishonesty" exhibited by plaintiffs' attorneys, including a disciplinary action against Mr. Yorio and Mr. Colby's corrected deposition testimony in this case. *See id.* at 21–22. Although the Court agrees a "history of untruthfulness is probative when assessing credibility," Defs.' MFR at 22, neither of these arguments present any new facts or law not already addressed in the Court's Sanctions Order. *See Mynette Techs.*, 163 Fed. Cl. at 756 n.7. Defendant's contention "[Mr.] Yorio's and [Mr.] Colby's histories of dishonesty provide ample reasons to discredit their declarations" is merely a disagreement with the Court's conclusion on crediting testimony. Defs.' MFR at 22. Without any new law or facts, defendants cannot claim justice requires the Court to reconsider its previous Order. Justice therefore does not require the Court's reconsideration of plaintiffs' "history of dishonesty" or Mr. Yorio and

Mr. Colby's declarations.  *See Mynette Techs.*, 163 Fed. Cl. at 756 n.7; *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1423 (Fed. Cir. 1997) ("[C]ourts are required, before imposing [terminating] sanction[s], to consider fully all the surrounding circumstances, such as the degree of culpability, the amount of prejudice, and the availability of less drastic sanctions."); *Ingalls*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." (citing *Adkins*, 816 F.2d at 1581)); RCFC 54(b).

## VIII.   Conclusion

The Court has considered all arguments in defendants' Motion for Reconsideration.  For the foregoing reasons, the government's Motion for Reconsideration, ECF No. 171, is **DENIED**. The Court will enter the final covenant not to sue as a separate Protective Order.  On or before **22 March 2024**, the parties **SHALL FILE** a joint status report proposing a schedule for lifting the stay and next steps in discovery and future proceedings.  The proposed schedule should resume discovery from the last scheduled event completed before this dispute arose.  *See* 18 Oct. 2021 Order, ECF No. 124.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge